# ORIGINAL

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

In re ANONYMOUS ONLINE SPEAKERS, )
                       Petitioner,    )
vs.                            )

U.S. DISTRICT COURT, DISTRICT OF )
NEVADA; QUIXTAR, INC.; SIGNATURE )
MANAGEMENT TEAM, LLC, d/b/a TEAM;)
APOLLO WORKS HOLDINGS, INC.;)
GREEN GEMINI ENTERPRISES, INC.,)
NORTH STAR SOLUTIONS, INC.;)
NORTHERN LIGHTS SERVICES, INC.;)
SUNSET RESOURCES, INC.; and SKY )
SCOPE TEAM, INC.,              )

              Respondents.   )

Case No. **09-71265**

Petition for Writ of Mandamus to
District Court Case No.
3:07-cv-00505-ECR-(RAM)

R E C E I V E D
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

APR 27 2009

FILED_____
DOCKETED_____
               DATE      INITIAL

## APPENDIX TO

## PETITION FOR WRIT OF MANDAMUS

John P. Desmond, Nevada Bar No. 5618
Wayne O. Klomp, Nevada Bar No. 10109
JONES VARGAS
100 West Liberty Street
Twelfth Floor
Reno, Nevada 89504
Telephone: (775) 786-2283
Facsimile: (775) 786-1177

Attorneys for Petitioner
ANONYMOUS ONLINE SPEAKERS

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000  Fax: (775) 786-1177

# UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

In re ANONYMOUS ONLINE SPEAKERS,   )   Case No.
                                   )
              Petitioner,          )   Petition for Writ of Mandamus to
                                   )   District Court Case No.
vs.                                )   3:07-cv-00505-ECR-(RAM)
                                   )
U.S. DISTRICT COURT, DISTRICT OF)
NEVADA; QUIXTAR, INC.; SIGNATURE)
MANAGEMENT TEAM, LLC, d/b/a TEAM;)
APOLLO   WORKS   HOLDINGS,   INC.;)
GREEN  GEMINI  ENTERPRISES,  INC.,)
NORTH   STAR   SOLUTIONS,   INC.;)
NORTHERN  LIGHTS  SERVICES,  INC.;)
SUNSET  RESOURCES,  INC.;  and  SKY)
SCOPE TEAM, INC.,                  )
                                   )
              Respondents.         )
_____)

## APPENDIX TO

## PETITION FOR WRIT OF MANDAMUS

John P. Desmond, Nevada Bar No. 5618
Wayne O. Klomp, Nevada Bar No. 10109
JONES VARGAS
100 West Liberty Street
Twelfth Floor
Reno, Nevada 89504
Telephone:  (775) 786-2283
Facsimile:   (775) 786-1177

Attorneys for Petitioner
ANONYMOUS ONLINE SPEAKERS

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000    Fax: (775) 786-1177

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LIST OF EXHIBITS

| | | |
|---|---|---|
| 1. | Minutes of the Court dated February 21, 2008 | 2 pages |
| 2 | Order dated April 7, 2008 | 2 pages |
| 3. | Order dated July 7, 2008 | 22 pages |
| 4. | Minutes of the court dated November 12, 2008 | 3 copies |
| 5 | Order dated April 8, 2009 | 35 pages |
| 6. | Complaint dated October 23, 2007 | 19 pages |
| 7. | Article dated August 10, 2007 | 1 page |
| 8. | Order Denying Plaintiff's Motion for Clarification of Order and Expedited Discovery | 2 pages |
| 9. | Quixtar's List of Allegedly Tortious Online Statements | 4 pages |
| 10 | Hooded Angry Man Phones Alticor's Mike Mohn Video | |
| 11. | "Save Us Dick DeVos' blog | 3 pages |
| 12. | Declaration of Gary D. | 7 pages |
| 13. | Printout from YouTube | 1 page |
| 14. | "Q'Reilly - The No Spin Zone" | 3 pages |
| 15. | Plaintiff Quixtar Inc.'s Motion to Compel Deponent Benjamin Dickie to Testify About Additional Anonymous Online Speakers | 24 pages |

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b) the **APPENDIX TO PETITION FOR WRIT OF MANDAMUS** was served via United States Mail on April 24, 2009 to the addresses shown below:

John J. Frankovich
Miranda du
MCDONALD CARANO WILSON LLP
100 West Liberty Street, 10th Floor
Reno, Nevada 89501
Telephone: (775) 788-2000
Facsimile: (775) 788-2020
E-Mail: **jfrankovich@mcdonaldcarano.com**
And **mdu@mcdonaldcarano.com**

Cedric C. Chao
William L. Stern
James M. Schurz
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522
E-Mail: **cchao@mofo.com**
and **western@mofo.com**
and **JSchurz@mofo.com**

James Sobieraj
Dominic P. Zanfardino
Brinks Hofer Gilson & Lione NBC Tower, Suite 3600 North Cityfront Plaza Drive Chicago, IL 60611-5599Telephone: (312) 321-4226
E-Mail: **jsobieraj@usebrinks.com**
and **dzanfardino@usebrinks.com**

Bradley Smith
Jim Cleland
Brinks Hofer Gilson & Lione
524 South Main Street, Suite 200 Ann Arbor, MI 48104-2921 Telephone: (734) 302-6032
E-Mail: **bsmith@usebrinks.com**
and **jcleland@usebrinks.com**

Edward J. Bardelli
Brian J. Masternak
Warner Norcross & Judd LLP
900 Fifth Third Center, 111 Lyon Street, NW
Grand Rapids, MI 49503
E-Mail: **EBardelli@wnj.com**
and **BMasternak@wnj.com**

Evan Beavers
EVAN BEAVERS AND ASSOC., P.C.
1625 Highway 88, Suite 304
Minden, NV 89423
Telephone: (775) 852-5110
E-Mail: **beaverslaw@charterinternet.com**

Sharon M. Woods
Morley Witus
Daniel J. LaCombe
BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
211 W. Fort Street, 15th Floor
Detroit, Michigan 48226-3281
Telephone: (313) 965-9725
Facsimile: (313) 965-2493
E-Mail: **swoods@bsdd.com,**
**mwitus@bsdd.com and dlacombe@bsdd.com**

Wm. Charles Bundren, Esq. WM. CHARLES BUNDREN & ASSOCIATES
2591 Dallas Parkway, Suite 300
Frisco, Texas 75034
Telephone: (972) 624-5338
Facsimile: (972) 624-5340
E-Mail: **cbundren@aol.com**

JONES VARGAS
100 West Liberty Street, Twelfth Floor
P.O. Box 281
Reno, NV 89504-0281
Tel: (775) 786-5000   Fax: (775) 786-1177

1

2    Ricardo J. Lara                              Michael Y. McCormick
     William A. Sankbeil                         McCormick Hancock & Newton
3    Joanne Geha Swanson                         1900 West Loop South
     KERR, RUSSELL and WEBER, PLC                Suite 700
4    500 Woodward Ave. Ste. 2500                 Houston, TX 77027
     Detroit, MI 48226                           **E-mail: mmccormick@mhn-law.com**
5    **E-mail:rjl@krwlaw.com,    was@krwlaw.com**
     **and jgs@krwlaw.com**
6
     Daniel J.M. Schouman
7    1060 E. West Maple Road
     Walled Lake, MI 48390
8    E-Mail: dschouman@gmail.com

9

10                        *Cindy S. Grinstead*
                        An employee of JONES VARGAS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ExhiBit I

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA

| | | |
|---|---|---|
| QUIXTAR, INC., | ) | CASE NO.    3:07-CV-0505-ECR-RAM |
| Plaintiff, | ) | MINUTES OF THE COURT |
| vs. | ) | DATED: February 21, 2008 |
| SIGNATURE MANAGEMENT TEAM, d/b/a TEAM, | ) | |
| Defendant(s). | ) | |

PRESENT: <u>HONORABLE ROBERT A. McQUAID, JR.</u>, U.S. MAGISTRATE JUDGE

Deputy Clerk: <u>Jennifer S. Cotter</u>    Reporter: <u>FTR 10:06:48 a.m. - 12:08:06 p.m.</u>

Counsel for Plaintiff(s):    <u>Miranda Du, John Frankovich, Cedric Chao, and James Sobieraj</u>

Counsel for Defendant(s):    <u>Charles Bundren, Molly Rezac, Sharon Woods (telephonically), and Erica Fitzgerald (telephonically)</u>

Counsel for Respondent(s):    <u>Mike McCormick and Daniel O'Brien</u>

PROCEEDINGS: MOTION HEARING RE: SUBPOENA RESPONDENTS' MOTION FOR PROTECTIVE ORDER (#52), MOTION TO COMPEL RESPONSES FROM DEPONENT BENJAMIN DICKIE (#54), AND DEFENDANT/COUNTER-PLAINTIFF'S MOTION FOR PROTECTIVE ORDER (#56).

10:00 a.m.  Court convenes.

The parties present oral argument as to Subpoena Respondents' Motion for Protective Order (Docket #52), Motion to Compel Responses from Deponent Benjamin Dickie (Docket #54), and Defendant/Counter-Plaintiff's Motion for Protective Order (Docket #56).

In reference to Subpoena Respondents' Motion for Protective Order (Docket #52), IT IS ORDERED that the discovery request contained within Category 12 of the subpoenas is overly broad and no response shall be required to said category. IT IS ORDERED that [52] Motion for Protective Order is DENIED. IT IS FURTHER ORDERED that Quixtar shall pay the costs associated with producing responsive documents, including the cost of the computer experts. Mr. McCormick and counsel for Quixtar shall meet and agree as to which expert(s) to use and which search terms will be employed. IT IS FURTHER ORDERED that Quixtar shall pay for Mr. McCormick's time to go through documents to determine privilege issues. Mr. McCormick shall, upon receiving the documents in hard copy form, advise the Court of the estimated time it will take to review said documents.

IT IS ORDERED that the Motion to Compel Responses from Deponent Benjamin Dickie (Docket #54) is GRANTED to the extent that Mr. Dickie shall respond to Quixtar's questions about his knowledge regarding the Internet sites, blogs, and videos that contain statements about Quixtar; both in his individual capacity and as an employee of TEAM.

In reference to the Defendant/Counter-Plaintiff's Motion for Protective Order (#56), the Court notes the motion may be premature.  IT IS ORDERED that Mr. Bundren review the responsive documents he has received from Ashton Partners, prepare a privilege log, and meet and confer with Plaintiff's counsel within thirty (30) days.  If there are disagreements regarding the privilege log, the matter may be brought back to this Court at that time.  Ashton Partners shall not be required to produce documents in response to the subpoena at this point.

12:04 p.m. Court adjourns.

LANCE S. WILSON, CLERK

By: /s/_____

Deputy Clerk

exhibit 2

Case 3:07-cv-00505-ECR-RAM    Document 111    Filed 04/07/2008    Page 1 of 2

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | | |
|---|---|---|
| QUIXTAR, INC., | ) | 3:07-CV-0505-ECR (RAM) |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| SIGNATURE MANAGEMENT TEAM, | ) | |
| LLC, dba TEAM, | ) | |
| Defendant. | ) | |

Respondent Benjamin Dickie has filed a Motion to Clarify February 21, 2008, Minute Order or, In the Alternative, His Objection to Order (Doc. #84). Team has concurred in Respondent Dickie's Motion (Doc. #85). Plaintiff Quixtar, Inc. has opposed the Motion (Doc. #95) and Respondent Dickie has replied (Doc. #101).

The court having the considered the papers submitted in connection with the Motion, and good cause appearing therefor, Respondent Dickie's Motion to Clarify (Doc. #84) is GRANTED. Mr. Dickie is to answer questions on the following:

1.    Websites, blogs and videos which Mr. Dickie created or on which he posted content, as an individual or as a TEAM employee;

2.    Websites, blogs and videos which other TEAM employees created or on which they posted content;

3.    Websites, blogs and videos which TEAMS management and leaders (founders of TEAM, policy council members and other TEAM-identified "leadership") created or on which they posted content.

/ / /

1    If following entry of this Order Quixtar learns of websites, blogs and videos containing

2  potentially tortuous content, the parties will submit letter briefs of no more than two (2) pages,

3  exclusive of the excerpt of the potentially tortuous content, for resolution by the court. If the court

4  concludes that such additional content is potentially tortuous then Mr. Dickie will be directed to

5  answer questions regarding such websites, blogs and videos.

6    IT IS SO ORDERED.

7    DATED:   April 7, 2008.

8

9    _____

10   UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

exhibit  3

1

2

3

4

5

6

7    **UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
8    **RENO, NEVADA**

9
QUIXTAR INC.,                    )        3:07-CV-505-ECR-RAM
10                                   )
             Plaintiff,          )
11                                   )
v.                               )        **ORDER**
12                                   )
SIGNATURE MANAGEMENT TEAM,       )
13  LLC d/b/a TEAM,                  )
                                     )
14           Defendant.          )
     _____)

15

16

17    Plaintiff Quixtar is a company that was formerly known as

18  Amway.  Defendant Signature Management TEAM ("TEAM") is a company

19  that was started by former "Independent Business Operators" ("IBOs")

20  with Quixtar.  Plaintiff's Complaint (#1), filed on October 23,

21  2007, states causes of action against Defendant for (1) violation of

22  the Lanham Act, (2) trade secret misappropriation, (3) tortious

23  interference with existing contracts, 4) tortious interference with

24  advantageous business relations, and (5) a declaratory judgment

25  regarding the viability of claims brought against Quixtar in Collin

26  County Texas.  Defendant's Counter-Claim (#15), filed on November

27  14, 2007, states causes of action for (1) tortious interference with

28  existing and advantageous business relations, (2) defamation, and

1 (3) a declaratory judgment both that TEAM is not in violation of the
2 Quixtar rules of conduct and that Quixtar's "IBO" contracts are
3 unenforceable.

4    Currently pending before the Court is Defendant's Motion to
5 Transfer the Case to the Eastern District of Texas, Sherman
6 Division, Based on 28 U.S.C. § 1404(a) (#22).  Also pending is
7 Benjamin Dickie's Objection to [the] Magistrate Judge's April 7,
8 2008 Order (#124).  Defendant TEAM has concurred (#125) in that
9 objection.  For the reasons stated below, the motion (#22) to
10 transfer is **DENIED** and Dickie's objection (#124) is **SUSTAINED** in
11 part.

12

13    **I.   Defendant TEAM's Motion to Transfer**

14    Defendant TEAM moves the Court to transfer this case to the
15 Eastern District of Texas.  "For the convenience of parties and
16 witnesses, in the interest of justice, a district court may transfer
17 any civil action to any other district or division where it might
18 have been brought."  28 U.S.C. § 1404(a).  The burden of
19 demonstrating that transfer is appropriate under section 1404(a)
20 falls on the movant. Commodity Futures Trading Comm'n v. Savage, 611
21 F.2d 270, 279 (9th Cir. 1979).

22    The basic framework for deciding whether to transfer a case
23 pursuant to section 1404(a) requires weighing (1) the convenience of
24 the parties, (2) the convenience of the witnesses, and (3) the
25 interests of justice.  Miracle Blade, LLC. v. Ebrands Commerce
26 Group, LLC, 207 F. Supp. 2d 1136, 1155-56 (D.Nev. 2002).  A non-
27 exclusive list of related considerations includes (1) the

28                                  2

1 plaintiff's choice of forum; (2) the parties' contacts with the
2 forum, and the extent to which the contacts are related to the
3 pending action; (3) access to proof; (4) the cost of litigating in
4 the two forums; (5) the availability of compulsory process, (6)
5 judicial economy; (7) the court's familiarity with the governing
6 law; and (8) the public policy of the forum state.  See Jones v. GNC
7 Franchising, Inc., 211 F.3d 495, 498-99 (9th Cir. 2000); Decker Coal
8 Co. v. Commonwealth Edison Co., 805 F.2d 834, 843 (9th Cir. 1986).

9     Transfer under section 1404(a) "should not be freely granted."
10 In re Nine Mile Ltd., 692 F.2d 56, 61 (8th Cir. 1982), overruled on
11 other grounds by Mo. Hous. Dev. Comm'n v. Brice, 919 F.2d 1306, 1311
12 (8th Cir. 1990).  "The defendant must make a strong showing of
13 inconvenience to warrant upsetting the plaintiff's choice of forum."
14 Decker Coal, 805 F.2d at 843.  Indeed, normally the plaintiff's
15 choice of forum is given paramount consideration.  Galli v.
16 Travelhost, Inc., 603 F. Supp. 1260, 1262 (D.Nev. 1985).  Some
17 courts have afforded less deference to a plaintiff's choice of forum
18 where the plaintiff has not chosen its home forum.  See, e.g.,
19 Bryant v. ITT Corp., 48 F. Supp. 2d 829, 832 (N.D.Ill. 1999) ("where
20 the plaintiff's chosen forum is not the plaintiff's home forum or
21 lacks significant contact with the litigation, the plaintiff's
22 chosen forum is entitled to less deference").  Cf. Iragorri v.
23 United Technologies Corp., 274 F.3d 65, 72 (2d Cir. 2001) (adopting
24 a sliding scale approach towards forum non conveniens).

25     Here, Defendant TEAM is organized under the laws of the State
26 of Nevada and TEAM is also apparently owned by several Nevada
27 corporations.  TEAM's principal place of business is in Michigan.

28

1  Plaintiff Quixtar is a Virginia corporation, headquartered in
2  Michigan.  Although Plaintiff has not brought this actions in its
3  home forum, Plaintiff's decision to litigate this case in Nevada was
4  not arbitrary.  Further, it is readily apparent that this is not a
5  dispute that is local in scope; no forum will be without its
6  inconveniences.  The Court finds that Plaintiff's choice of forum in
7  this case is entitled to substantial, but certainly not dispositive
8  weight.

9      Defendant's principal argument is that this case should be
10  transferred due to ongoing litigation in state and federal courts in
11  Texas, either on the grounds of judicial economy or for the
12  convenience of the witnesses who may be called to testify in those
13  cases.  Defendant, however, has not made a substantial showing that
14  judicial economy will be facilitated by transferring this action.
15  With respect to litigation in federal court, one related federal
16  action in Texas (Simmons v. Quixtar, 4:07-CV-389-MHS-DDB) has been
17  referred to arbitration and a second (Simmons v. Quixtar, 4:07-CV-
18  487-MHS-DDB) has been stayed on the basis of the Colorado River
19  doctrine.  Consolidation is thus unavailing.  Neither has Defendant
20  made any substantial showing that the litigation in Texas state
21  court renders transfer appropriate.  Indeed, beyond the obvious fact
22  that state and federal cases cannot be consolidated, one related
23  case in Texas state court was dismissed on the basis of forum non
24  conveniens.  The assertion that discovery could be coordinated
25  between state and federal cases is too speculative to be given
26  significant weight.  Finally, while Defendant contends that some of
27  its important witnesses reside in Texas, Plaintiff has identified
28

4

1 other witnesses it intends to call who reside in Nevada.[1]  See <u>Graff</u>
2 <u>v. Qwest Commc'ns Corp.</u>, 33 F. Supp. 2d 1117, 1121 (D.Minn. 1999)
3 ("[T]ransfer should not be granted if the effect is simply to shift
4 the inconvenience to the party resisting the transfer.") (citing <u>Van</u>
5 <u>Dusen v. Barrack</u>, 376 U.S. 612, 646 (1964)), <u>Gherebi v. Bush</u>, 352
6 F.3d 1278, 1303 (9th Cir. 2003) (same), <u>vacated on other grounds</u>,
7 542 U.S. 952 (2004).

8      The Court gives significant weight to the fact that Plaintiff
9 seeks a declaratory judgment related to TEAM's dismissed state law
10 claims in Collin County Texas.  Texas courts obviously have more
11 expertise with issue of Texas law than Nevada courts, and this issue
12 on its own makes the matter of whether to transfer this case quite
13 close.  By contrast, because no issue of corporate law is pleaded or
14 otherwise apparent in this case, the Court does not give any weight
15 at all to Plaintiff's contention that Defendant has abused Nevada
16 corporate law.

17      All in all, the balance is close to equipoise.  Accordingly,
18 the motion (#22) to transfer this case to the Eastern District of
19 Texas, Sherman Division, is **DENIED**.

20
21
22
23

24      [1]In general, the convenience that a transfer would have for
   counsel is not a relevant consideration under section 1404(a).  <u>See</u>
25 <u>Grubs v. Consol. Freightways, Inc.</u>, 189 F. Supp. 404, 410 (D.Mont.
   1960).  Even if it were relevant, it would not be given significant
26 weight here.  Defendant has retained competent counsel in Nevada and
   has not demonstrated any significant prejudice in defending this case
27 in Nevada on this basis.

28                                        5

## II.   Dickie and TEAM's Objection

Benjamin Dickie and Defendant TEAM object (##124, 125) to the Magistrate Judge's second Order (#111) granting Plaintiff Quixtar's motion (#54) to compel.  The objection presents novel questions of law and will be sustained to the extent outlined below.[2]

### A.    Background

Plaintiff contends that TEAM has waged a wrongful, illegal internet campaign to induce Quixtar's "IBOs" to defect from Quixtar. In connection with Plaintiff's causes of action for tortious interference with business relations and tortious interference with an existing contract, Plaintiff took Benjamin Dickie's deposition on January 18, 2008.  (Ex. P to P. Quixtar's Opp. (#141).)  According to Dickie, a part of his duties as a TEAM employee has been to work as a content manager for TEAM's web sites and blogs.[3]  Dickie testified that these sites include "www.the-team.biz," "www.chrisbrady.com," "orrinwoodward.com," "www.launching-a-leadership-revolution.com," "orrinwoodward.mindsay.com," "orrinwoodward.tripod.com," and possibly others.  When Plaintiff's counsel inquired whether there were other blogs that Dickie had set

---

[2]The Magistrate Judge gave quite careful attention to these novel issues, but did not have the opportunity to address the issue of standing because it was not raised.  The Court is obliged to review the parties' legal contentions de novo, and does so in this Order.

[3]"Blog" is short for "web log," which may be defined as follows: "A frequently updated web site consisting of personal observations, excerpts from other sources, etc., typically run by a single person, and usually with hyperlinks to other sites; an online journal or diary."  Oxford English Dictionary, http://dictionary.oed.com (last visited June 24, 2008).

1 up, he responded in the affirmative and his counsel objected.
2 Dickie's counsel then instructed Dickie not to answer questions
3 regarding a pending lawsuit in Ottawa County (Michigan) on the basis
4 of First Amendment privilege.  The limited record indicates that
5 this lawsuit was filed by Quixtar against unnamed Doe defendants.
6 Dickie refused to answer any questions regarding whether he had any
7 role in establishing or maintaining "freetheibo.com," "drinkxs.biz,"
8 "theiborebellion," "qreilly," "freetheibo blog,"
9 "quixtarlostmycents," "saveusdickdevos," "teamfoundingfathers,"
10 "quixtartoday," "integrityisteam," or "quixtatic."  He also refused
11 to answer whether he knew who posted videos on the internet under
12 the titles "Hooded Angry Man," "Hooded Angry Man 2," "The New Amway
13 Highlights," "Stevie goes to China," "Shameus McSteeley Quixtar
14 versus Meijer," "Rich DeVos, Who's Running Your Company?," "Amway
15 Yesterday," "Quixtar Tell Me Sweet Little Lies," and "Boston
16 Teaberry Party."[4]  Dickie also refused to answer if there were other
17 sites that he believed were covered by the privilege, and he refused
18 to answer if he had ever posted under a pseudonym.  Dickie's counsel
19 explained that the privilege extended to his involvement or non-
20 involvement with all of these web sites.  At the time, the Michigan
21 court had not addressed the issue of the discoverability of the
22 identities of the Does, and there is no indication in the record
23
24

25    [4]As is true with any evidence, the Court will not independently
26 research any of these web sites and will only consider evidence that
   is in the custody of the Clerk of the Court.  A citation to a web site
27 is insufficient to put the contents of that site into the Court's
   record.
28
                                    7

1  that it has done so since.  There is no information in this record

2  regarding any subsequent rulings of the Michigan court.

3       Plaintiff filed a motion to compel (#54) responses from

4  Benjamin Dickie.  The Magistrate Judge held a hearing on February 2,

5  2008, to address these and other pending motions.  At the hearing,

6  the Magistrate Judge stated that Plaintiff must be afforded the

7  ability to ask about whether Dickie established various web sites to

8  support its cause of action for tortious interference with a

9  contract.  (Hearing Tr., p. 46, Ex. B to P. Quixtar's Opp. (#141).)

10 Shortly thereafter, however, Quixtar's counsel posed the following

11 question:

12       Mr. Chao: Let me ask you a question.  We've already
         established, I think, through the questioning of the Court and
13       Mr. O'Brien's answer, that if there's tortious conduct there's
         no First Amendment protection; so if there's a website out
14       there, and let's say it's not affiliated with TEAM but he knows
         who it is, there's no First Amendment protection, and we should
15       be allowed, should we not, to inquire into that?

16 The Magistrate Judge responded:

17       The Court: Well, no, not right now, because right now you have
         not shown me what's on every one of those websites that you
18       believe is tortious.  The answer to that is no.

19 (Hearing Tr., p. 46, Ex. B to P. Quixtar's Opp. (#141).)  Quixtar's

20 counsel then distinguished between Dickie's role as a potential

21 independent author and his role as an employee of TEAM, and further

22 asserted that under the most demanding precedents, Quixtar had made

23 the showing necessary to compel Dickie to answer.  (Id. at 76.)

24      The Magistrate Judge focused primarily on whether Plaintiff's

25 questions could be addressed to Dickie as an individual or merely in

26 his capacity as an employee; the ultimate minute order granted

27 Quixtar's motion, as follows:

28
                                   8

1       IT IS ORDERED that the Motion to Compel Responses from Deponent
Benjamin Dickie (Docket #54) is GRANTED to the extent that Mr.
2       Dickie shall respond to Quixtar's questions about his knowledge
regarding the Internet sites, blogs, and videos that contain
3       statements about Quixtar; both in his individual capacity and
as an employee of TEAM.

4

  (Order of February 21, 2008 (#72).)  Dickie then filed a motion for
5

  clarification (#84), in which TEAM joined (#85).  The Magistrate
6

  Judge granted the motion for clarification, issuing the following
7

  revised ruling:
8

9       Mr. Dickie is to answer questions on the following:
       1. Websites, blogs and videos which Mr. Dickie created or on
       which he posted content, as an individual or as a TEAM
10      employee;

11      2. Websites, blogs and videos which other TEAM employees
       created or on which they posted content;
12

13      3. Websites, blogs and videos which TEAMS management and
       leaders (founders of TEAM, policy council members and other
       TEAM-identified "leadership") created or on which they posted
14      content.

15      If following entry of this Order Quixtar learns of websites,
       blogs and videos containing potentially [tortious] content, the
16      parties will submit letter briefs of no more than two (2)
       pages, exclusive of the excerpt of the potentially [tortious]
17      content, for resolution by the court.  If the court concludes
       that such additional content is potentially [tortious] then Mr.
18      Dickie will be directed to answer questions regarding such
       websites, blogs and videos.
19

  (Order of April 7, 2008 (#111).)  Dickie filed his objection (#124)
20

  on April 24, 2008, which TEAM joined (#125).  Quixtar filed its
21

  opposition (#141) to the objection on May 19, 2008.
22

23           **B.**   **Standard of Review**
24

25    "A district judge may reconsider any pretrial matter referred
26  to a magistrate judge in a civil or criminal case pursuant to LR IB

1-3 where it has been shown that the magistrate judge's ruling is
27

28                          9

1  clearly erroneous or contrary to law." Local Rule IB 3-1; see 28

2  U.S.C. § 636(b)(1)(A). The "contrary to law" standard only applies

3  to the Magistrate Judge's legal conclusions, which are reviewed de

4  novo.

5

6       **C.   Relevant Authority in Analogous Circumstances**

7       Dickie and Defendant TEAM argue that this Court should apply

8  the standard articulated in Doe v. Cahill, 884 A.2d 451 (Del. 2005)

9  and Dendrite International, Inc. v. Doe No. 3, 775 A.2d 756 (N.J.

10 Super. Ct. App. Div. 2001), and vacate the Magistrate Judge's order.

11 Plaintiff Quixtar, on the other hand, argues that (1) the First

12 Amendment is not implicated because tortious speech is not protected

13 by the First Amendment; (2) the First Amendment affords no

14 protections to anonymity in the context of "commercial speech"; (3)

15 Quixtar has met any of the standards various courts have announced

16 for requiring the disclosure of anonymous internet authors,[5] which

17 Plaintiff also asserts are inapplicable here because this case does

18 not involve a subpoena to an internet service provider ("ISP"); and

19 finally, (4) Dickie lacks standing to object to discovery based on

20 the purported rights of anonymous third parties.

21      Typically, analogous situations to the one presented here arise

22 when a plaintiff seeks to compel an ISP to disclose the identity of

23 a "Doe defendant" who wishes to remain anonymous. See generally

24 Krinsky v. Doe 6, 159 Cal. App. 4th 1154 (6th Dist. 2008)

25 (collecting and reviewing cases); Michele McCarthy, Right of

26

27      [5]We consider authors writing under a pseudonym to be anonymous
    for the purposes of the issues raised in this Order.

28                                    10

1  Corporation, Absent Specific Statutory Subpoena Power, to Disclosure
2  of Identity of Anonymous or Pseudonymous Internet User, 120 A.L.R.
3  5th 195 (2004) (same); Michael Vogel, Unmasking "John Doe"
4  Defendants: The Case Against Excessive Hand-Wringing Over Legal
5  Standards, 83 Or. L. Rev. 795 (2004); Lyrissa Barnett Lidsky,
6  Silencing John Doe: Defamation & Discourse in Cyberspace, 49 Duke L.
7  J. 855 (2000).  This is, apparently, the posture of the related case
8  in Michigan.  Several approaches have arisen in these circumstances.
9  Despite differences, the weight of authority holds that courts must
10  adopt procedures that strike a balance between the plaintiff's need
11  to destroy the Doe's anonymity and the anonymous speaker's First
12  Amendment rights.  Moreover, no decision this Court has encountered
13  has simply rejected procedural precautions on the basis that the
14  anonymous speech was commercial in nature.

15      In the approach taken by the court in In re Subpoena Duces
16  Tecum to America Online, Inc., 52 Va. Cir. 26, 2000 WL 1210372
17  (2000), rev'd on other grounds by Am. Online v. Anonymous Publically
18  Traded Co., 542 S.E.2d 377 (Va. 2001), disclosure will only be
19  compelled if the evidence is required for the case and "the party
20  requesting the subpoena has a legitimate, good faith basis to
21  contend that it may be the victim of conduct actionable in the
22  jurisdiction where suit was filed . . . ."  Id. at *8.  This
23  approach has been faulted for "offer[ing] no practical, reliable way
24  to determine the plaintiff's good faith and leav[ing] the speaker
25  with little protection."  Krinsky, 159 Cal. App. 4th at 1167
26  (modification supplied).

27

28                                 11

1       A second approach requires the court to evaluate the
2  plaintiff's need to identify the speaker, and requires that the
3  plaintiff's allegations of illegality be able to withstand a motion
4  to dismiss.  See Columbia Ins. Co. v. Seescandy.com, 185 F.R.D. 573,
5  578-80 (N.D.Cal. 1999) (requiring plaintiff to (1) "identify the
6  missing party with sufficient specificity such that the Court can
7  determine that the defendant is a real person or entity who could be
8  sued in federal court"; (2) "identify all previous steps taken to
9  locate the elusive defendant"; (3) "establish to the Court's
10 satisfaction that the plaintiff's suit against the defendant could
11 withstand a motion to dismiss"; and (4) "file a request for
12 discovery with the Court, along with a statement of reasons
13 justifying the specific discovery requested as well as
14 identification of a limited number of persons or entities on whom
15 discovery process might be served and for which there is a
16 reasonable likelihood that the discovery process will lead to
17 identifying information about defendant that would make service of
18 process possible").  The motion to dismiss approach has also been
19 criticized by some courts for offering insufficient protections to
20 anonymous speakers.  See Highfields Capital Mgmt., L.P., v. Doe, 385
21 F. Supp. 2d 969, 975 & 975 n.8 (N.D.Cal. 2005) ("It is not enough
22 for a plaintiff simply to plead and pray.  Allegation and
23 speculation are insufficient.  The standards that inform Rule 8 and
24 Rule 12(b)(6) offer too little protection to the defendant's
25 competing interests.").

26      A third, more demanding approach requires a plaintiff to submit
27 evidence sufficient to overcome a limited motion for summary

28                                    12

1  judgment attacking the actionability of the allegedly defamatory

2  statements.  See Cahill, 884 A.2d 451 (embracing and clarifying the

3  standard applied in Dendrite Int'l, 775 A.2d 756).  The "prima

4  facie" or "summary judgment" procedure is limited to evidence that

5  is or should be in the possession of the plaintiff.  Thus, whether

6  or not the plaintiff is a public figure, he or she need not present

7  evidence of "actual malice" as this would require evidence that the

8  plaintiff does not have.[6]  Cahill, 884 A.2d at 464.  The Dendrite

9  standard, as summarized by Cahill, requires a plaintiff:

> 1) to undertake efforts to notify the anonymous poster that he
> is the subject of a subpoena or application for an order of
> disclosure, and to withhold action to afford the anonymous
> defendant a reasonable opportunity to file and serve opposition
> to the application.  In the internet context, the plaintiff's
> efforts should include posting a message of notification of the
> discovery request to the anonymous defendant on the same
> message board as the original allegedly defamatory posting;
> (2) to set forth the exact statements purportedly made by the
> anonymous poster that the plaintiff alleges constitute
> defamatory speech; . . . .
> (3) to satisfy the prima facie or "summary judgment standard";
> [and]
> (4) [to] balance the defendant's First Amendment right of
> anonymous free speech against the strength of the prima facie
> case presented and the necessity for the disclosure of the
> anonymous defendant's identity in determining whether to allow
> the plaintiff to properly proceed.

Cahill, 884 A.2d at 460 (modifications supplied); see also

Highfields, 385 F. Supp. 2d at 974 n.6, 975 n.8 (relying on

Dendrite); Best Western Int'l., Inc. v. Doe, CV-06-1537-PHX-DGC,

2006 WL 2091695 (D.Ariz. 2006) (unreported) (following Cahill);

Krinsky, 159 Cal. App. 4th at 1170-72 & 1172 n.14 (reviewing

authority and adopting a "prima facie" test equivalent to that in

---

[6]Dickie and Quixtar ask the Court to adopt Cahill, but ignore
this component of the Cahill opinion.

13

1 <u>Cahill</u>).   The <u>Cahill</u> court shortened the test, retaining the notice
2 requirement but opining that the second requirement and the fourth
3 requirement should both be considered implicit in the third
4 requirement.  884 A.2d at 461.  Thus, <u>Cahill</u> requires that the
5 plaintiff give notice, or attempt to do so,[7] and that the plaintiff
6 satisfy a "prima facie or 'summary judgment standard'."  884 A.2d at
7 460-61.

8      Finally, <u>Matrixx Initiatives, Inc. v. Doe</u>, 138 Cal. App. 4th
9 872 (6th Dist. 2006), allowed discovery to proceed without inquiring
10 into the protections required by the First Amendment on the basis
11 that the party who opposed discovery was not, or at least did not
12 admit to being, the anonymous author.  There, the plaintiff traced
13 postings made under two pseudonyms on an internet financial bulletin
14 board to a hedge fund, and the hedge fund's manager refused to
15 answer any questions regarding the identities of the anonymous
16 authors at his deposition on the grounds that their anonymity was
17 protected by the First Amendment.  <u>Id.</u> at 876.  The California Court
18 of Appeal held that under these circumstances the non-party lacked
19 standing to raise the issue of the anonymous speaker's First
20 Amendment rights.  <u>Id.</u> at 879-81.  Although the California Court of
21 Appeal is not an Article III court, the Court relied on Article III
22 jurisprudence, <u>id.</u> at 878 n.4 , and found that the party seeking to
23 quash discovery did not have the "close relationship" with the

24

25

26      [7]<u>Cahill</u> appears to insist that the plaintiff post a message on
the web site at issue.  This poses numerous problems, including the
27 fact that the internet site may no longer exist.  <u>See</u> <u>Krinsky</u>, 159
Cal. App. 4th at 1170 & n.11.

28                                    14

1 anonymous author required to raise the third party's rights.[8]  Id.

2 at 880-81 (citing NAACP v. Ala., 357 U.S. 449, 458-460 (1958)).

3

4 **D.    Analysis of Dickie and TEAM's Objection**

5    While a pseudonym can certainly be expressive, more important

6 than the expression of the pseudonym, at least in general, is the

7 condition of expression that anonymity affords.[9]  Anonymity can

8 focus the audience on the speech rather than the speaker, and more

9 pragmatically, it is a useful antidote to reprisal and the other

10 potential inconveniences and adversities of publicity.  "Anonymity,"

11 the Supreme Court has noted, "is a shield from the tyranny of the

12 majority," McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 357

13 (1995), and "[t]he decision in favor of anonymity may be motivated

14 by fear of economic or official retaliation, by concern about social

15 ostracism, or merely by a desire to preserve as much of one's

16 privacy as possible."  Id. at 341-42.[10]  Where speakers may remain

17

18    [8]The Matrixx court's factual reasoning is not entirely clear.
The court noted that the postings could be traced to a hedge fund, but
19 nevertheless considered the anonymous authors to be "presumably
unrelated third parties."  138 Cal. App. 4th at 881.

20    [9]The distinction is significant:  As a condition of speech,
21 rather than pure speech, anonymity is unique in that it can be
subsequently destroyed through negligence, or for that matter, an
22 intentional act of the speaker.

23    [10]On numerous occasions the Supreme Court has held that anonymity
must be afforded some amount of First Amendment protection, albeit in
24 cases primarily involving prior restraints.  See Buckley v. American
Constitutional Law Found., 525 U.S. 182, 200 (1999) (invalidating a
25 statute that required circulators of an initiative petition to wear
identification badges); McIntyre, 514 U.S. at 357 (overturning law
26 that prohibited distribution of campaign literature that did not
contain the name and address of the distributor); Talley v.
27 California, 362 U.S. 60, 65 (1960) (invalidating law prohibiting the
distribution of "any handbill in any place under any circumstances"

28

1 anonymous, ideas are communicated that would not otherwise come

2 forward. See Doe v. 2TheMart.Com, Inc., 140 F. Supp. 2d 1088, 1092

3 (W.D.Wash 2001) ("The right to speak anonymously extends to speech

4 via the Internet. Internet anonymity facilitates the rich, diverse,

5 and far ranging exchange of ideas."). To fail to protect anonymity

6 is, therefore, to chill speech. Yet where speakers remain anonymous

7 there is also a great potential for irresponsible, malicious, and

8 harmful communication, and the lack of accountability that anonymity

9 affords is anything but an unqualified good. This is particularly

10 true where the speed and power of internet technology makes it

11 difficult for the truth to "catch up" to the lie. See Lidsky,

12 Silencing John Doe, 49 Duke L. J. at 864. Anonymity thus presents

13 benefits, risks, and problems. To the extent that Courts take on

14 the task of protecting it, balancing is inevitable.

15     With this in mind, caution is warranted with respect to

16 purported per se rules. In particular, a per se assertion that the

17 First Amendment does not protect tortious speech is not terribly

18 helpful for the purposes of legal analysis.[11] First, the scope of

19

20 that did not contain the name and address of the person who prepared
it, on the grounds that the law would chill "perfectly peaceful
21 discussions of public matters of importance"); NAACP v. Ala., 357 U.S.
449, 462 (1958) (holding that discovery order requiring NAACP to
22 disclose its membership interfered with freedom of association). But
cf. Branzburg v. Hayes, 408 U.S. 665, 695-708 (1972) (White, J.,
23 writing for a plurality) (concluding that a reporter does not have a
First Amendment right not to reveal unnamed sources to a grand jury).
24

25 [11]Compare Beauharnais v. People of State of Ill., 343 U.S. 250,
254-255 (1952) (libelous utterances are unprotected speech);
26 Chaplinsky v. State of N.H., 315 U.S. 568, 572 (1942) (same), with New
York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) (holding that
27 prohibitions against libel "can claim no talismanic immunity from
constitutional limitations").

28                                          16

1  First Amendment protections of speech is not, and should not be

2  defined by state law torts.[12]  Second, states, including the State

3  of Nevada, have long recognized the importance of the First

4  Amendment in crafting and delimiting the scope of actionable

5  defamation.  Third, the tort of interference with a contract need

6  not, at least in theory, be founded in speech at all, but this

7  cannot mean that the First Amendment is not implicated by the cause

8  of action where speech is alleged to be harmful.  See Blatty v. New

9  York Times Co., 728 P.2d 1177, 1183 (Cal. 1986) ("The fundamental

10 reason that the various limitations rooted in the First Amendment

11 are applicable to all injurious falsehood claims and not solely to

12 those labeled 'defamation' is plain: although such limitations

13 happen to have arisen in defamation actions, they do not concern

14 matters peculiar to such actions but broadly protect free-expression

15 and free-press values.").  Fourth, and relatedly, there is every

16 reason to predict that the Nevada Supreme Court would apply state

17 law privileges designed to protect speech in the context of tortious

18 interference with a contract, just as it has with defamation.  Cf.

19 Blatty, 728 P.2d at 1183.[13]  Thus, in sum, the Court must look

20

21

_____

22      [12]New York Times Co., 376 U.S. at 269.

23      [13]Notably, there is no First Amendment "opinion privilege,"
   Milkovich v. Lorain Journal Co., 497 U.S. 1, 3 (1990), but the Nevada
24 Supreme Court recognizes such a privilege.  See Pegasus v. Reno
   Newspapers, Inc., 57 P.3d 82, 87 (Nev. 2002) ("Statements of opinion
25 cannot be defamatory because 'there is no such thing as a false idea.
   However pernicious an opinion may seem, we depend for its correction
26 not on the conscience of judges and juries but on the competition of
   other ideas.'") (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323,
27 339-40 (1974)).

28                              17

1  beyond a simple recitation of the elements of the torts at issue in

2  this case to determine whether the statements are actionable.

3      Of course, the inquiry is also complicated by the fact that it

4  is impossible on this record to establish whether Dickie or TEAM

5  have standing to raise their objection.  See Matrixx, 138 Cal. App.

6  4th 872.  The well established rule, subject to pragmatic and

7  important exceptions,[14] is that, "[i]n the ordinary case, a party is

8  denied standing to assert the rights of third persons."  Arlington

9  Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 263 (1977); see,

10  e.g., Secretary of State of Md. v. Joseph H. Munson Co., 467 U.S.

11  947, 955 (1984); Warth, 422 U.S. at 501.  "Jus tertii" standing

12  generally requires (1) that the litigant has suffered an injury in

13  fact, (2) that the litigant has a "close relationship" to the third

14  party, and (3) that there is some hindrance to the third party's

15  ability to protect his or her own interests.  Powers, 499 U.S. at

16  411.  It should be noted that the inquiry into whether there is a

17  "close relationship" is functional in nature, and it is not

18  necessarily required that the parties know, work, or associate with

19  one another.  See id. at 413 (juror and criminal defendant have

20  required relationship where "the relationship between [them is] such

21

22  [14]E.g. Powers v. Ohio, 499 U.S. 400, 415 (1991) (defendant in a
    criminal case has standing to raise the third-party equal protection
23  claims of jurors excluded by the prosecution because of their race);
    Craig v. Boren, 429 U.S. 190, 192-94 (1976) (permitting beer vendors
24  to assert rights of prospective male customers who were barred, unlike
    females of the same ages, from purchasing beer).  Notably, third party
25  standing is a jurisprudential, not a constitutional or jurisdictional
    problem.  Craig, 429 U.S. at 193-94; see also Warth v. Seldin, 422
26  U.S. 490, 500-01 (1975) ("In some circumstances, countervailing
    considerations may outweigh the concerns underlying the usual
27  reluctance to exert judicial power when the plaintiff's claim to
    relief rests on the legal rights of third parties.").

28                                    18

1 that the former is fully, or very nearly, as effective a proponent
2 of the right as the latter") (modification supplied; quoting
3 Singleton v. Wulff, 428 U.S. 106, 115 (1976)). Even with this
4 observation, however, it is impossible to determine on this record
5 if either of the first two requirements for third party standing are
6 met.

7    Among the many reasons for requiring parties to rely on their
8 own rights in Article III courts is the need to avoid simple
9 obstruction based on speculation regarding the positions of persons
10 not before the court. Dickie has no standing to object to answering
11 questions about what he does not know with respect to internet sites
12 with which he has no involvement. Dickie may or may not have
13 standing to otherwise object, depending upon the facts which he
14 refuses to divulge. Moreover, to the extent that he does have
15 standing, he clearly cannot refuse to answer if he had any
16 involvement with the mere administration of a website without
17 articulating why this administration implicates his First Amendment
18 rights.

19    Plaintiff is correct that the authors of the internet postings
20 at issue could have contested the discovery of their identities
21 using pseudonyms in this Court. See Doe v. Bolton, 410 U.S. 179,
22 187 (1973) (use of a pseudonym in litigation is permissible and does
23 not destroy standing). Again, this is the typical posture of
24 similar cases. Nevertheless, the fact that the third parties may
25 not have been put on notice that their identities may be divulged
26 via discovery is certainly a potential "hindrance to the third

27

28

1 party[ies'] ability to protect [their] interests." <u>Powers</u>, 499 U.S.
2 at 411 (modification supplied).

3    In this Court's view, the fact that there has been an
4 insufficient showing of standing, third party or otherwise, should
5 not simply end the inquiry.  First, it is possible that such a
6 showing could be made in this case without creating a situation
7 where there is "nullification of the right at the very moment of its
8 assertion."  <u>NAACP</u>, 357 U.S. at 459.  Second, the fact that
9 permitting discovery amounts to prospective court action is not
10 insignificant here, and the Court is not without independent
11 authority to adopt procedures to protect against potential
12 violations of third party constitutional rights.  To fail to inquire
13 into the merits of this issue, <u>e.g.</u>, <u>Matrixx</u>, 138 Cal. App. 4th 872,
14 may well be to decide them in practice, and this is problematic
15 where there is at least good reason to believe that the anonymous
16 authors of the internet postings would object to their identities
17 being revealed without notice.

18    The order of the Magistrate Judge will be vacated in order to
19 allow Dickie and TEAM a reasonable opportunity to notify third party
20 authors that Dickie may be obliged to reveal their identities.  Any
21 party, including Dickie, who wishes to oppose the divulgence of his
22 or her identity may do so under a pseudonym,[15] and the Court should

23

24    [15]The Court notes that this likely would have been the procedure
    if the facilitator of the third party internet communication had been
25 a cable ISP.  <u>See</u> 47 U.S.C. § 551(c)(2)(B); <u>Cahill</u>, 884 A.2d at 455
    & n.4.  E.g. <u>Warner Bros. Record Inc. v. Does 1-14</u>, No. 07-CV-706
26 (RJL), __ F. Supp. 2d __, 2008 WL 60297 (D.D.C. Jan. 4, 2008)
    (allowing subpoena of ISP, but also allowing subscriber time to file
27 motion to quash).  The Court sees no reason why this is not analogous
    and persuasive authority regarding the principles that should apply

28                                    20

1 refrain from acting for a reasonable amount of time to allow for
2 this possibility.  That said, the Court will not consider any
3 further objections based on anonymity unless there is a factual
4 basis for finding that the objecting party has standing to raise the
5 objection.

6    For the guidance of the Magistrate Judge, the Court finds that
7 so long as an objection is raised by a party with standing to raise
8 it, Cahill articulates the correct standard.  See Highfields, 385 F.
9 Supp. 2d at 975.  Cf. Leatherman v. Tarrant County Narcotics
10 Intelligence and Coordination Unit, 507 U.S. 163, 168-69 (1993)
11 ("federal courts and litigants must rely on summary judgment and
12 control of discovery to weed out unmeritorious claims sooner rather
13 than later").  It appears that the Magistrate Judge tailored the
14 discovery he allowed to the elements of the torts at issue.  On the
15 one hand, no tailoring beyond the general restraints of relevance is
16 necessary unless a party with standing makes a proper objection.  On
17 the other hand, more particularized tailoring may be necessary if a
18 proper objection is raised.  In particular, to the extent that a
19 party with standing raises a meritorious objection, Plaintiff should
20 not be afforded discovery regarding the identity of any anonymous
21 author where the exact statement at issue has not been put into
22 evidence.[16]  Nor is discovery warranted into the identity of an
23 anonymous author where it is beyond reasonable dispute that the

24

25

26 here.

27    [16]For example, at present, neither the videos nor any detailed
   description of their contents is in the Court's record.

28                                    21

1 | particular internet postings at issue are subject to a privilege or
2 | defense.

3

4 | **III. Conclusion**

5 | **IT IS, THEREFORE, HEREBY ORDERED THAT** the motion (#22) to
6 | transfer this case to the Eastern District of Texas is **DENIED**.

7 | **IT IS FURTHER ORDERED THAT** Dickie's objection (#124) is
8 | **SUSTAINED** to the extent stated in this Order.  The Order of April 7,
9 | 2008 (#111) is **VACATED** and the matter is **REMANDED** to the Magistrate
10 | Judge for further proceedings.  Dickie's motion (#159) to file a
11 | reply brief is **DENIED** as moot.

12 | The Magistrate Judge should withhold action for a reasonable
13 | period of time (1) to allow Dickie and TEAM to notify interested
14 | parties that, if they wish to do so, they may contest the discovery
15 | of their identities under pseudonyms, and (2) to allow any such
16 | party to file an opposition.  Any party that raises an objection
17 | must demonstrate that he or she has standing to raise the objection.
18 | At present, no such showing has been made.  The nature of any
19 | further proceedings that may be required is left to the Magistrate
20 | Judge's wise discretion.

21

22

23 | DATED: This  7th   day of July, 2008.

24

25 | _Edward C. Reed._

UNITED STATES DISTRICT JUDGE

26

27

28

22

# ExhiBit 4

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
RENO, NEVADA

| | | |
|---|---|---|
| QUIXTAR, INC., | ) | CASE NO. 3:07-CV-0505-ECR-RAM |
| | ) | |
| Plaintiff(s), | ) | MINUTES OF THE COURT |
| | ) | |
| vs. | ) | DATED: NOVEMBER 12, 2008 |
| | ) | |
| SIGNATURE MANAGEMENT | ) | |
| TEAM, LLC d/b/a TEAM, | ) | |
| | ) | |
| Defendant(s). | ) | |

PRESENT: <u>HONORABLE ROBERT A. MCQUAID, JR.</u>, U.S. MAGISTRATE JUDGE

Deputy Clerk: <u>Jennifer S. Cotter</u>    Reporter: <u>Margaret Griener</u>

Counsel for Plaintiff(s): <u>Cedric Chao, James Cleland (telephonically), Miranda Du, and John Frankovich</u>

Counsel for Defendant(s): <u>Daniel LaCombe, and Erica Fitzgerald (telephonically)</u>

Counsel for Subpoena Respondents: <u>Daniel O'Brien, Michael McCormick, and Anthony Spaeth (telephonically)</u>

PROCEEDINGS: HEARING RE: ANONYMOUS ONLINE SPEAKERS' OBJECTION (Docket #194), MOTION TO COMPEL FURTHER RESPONSES (Docket #201), and MOTION TO STRIKE (Docket #223)

9:00 a.m. Court convenes.

The Court addresses each matter in order and parties present oral argument as to their respective positions regarding said matters:

**Anonymous Online Speakers' Objection (Docket #194)**

The Court advises the parties that it does not believe there is a waiver in this case. The individuals who have objected do have standing. If their anonymity is taken away, they lose first amendment protection. The Court notes that Ben Dickie has stated he does not know the identity of the online speakers related to "TheChosenOnes", "IBO Minute Man", "Quixtar Is A Cult Intervention", and Free The IBO website. The Court addresses the remaining speakers applying the *Cahill* standard. *Doe v. Cahill*, 884 A.2d 451 (Del. 2005).

IT IS ORDERED that Mr. Dickie shall testify as to his knowledge of the identity of the speakers in

Page 2
3:07-cv-0505-ECR-RAM
Quixtar Inc. v. TEAM
November 12, 2008

the "Hooded Angry Man" video and the "Save Us Dick DeVos" blog, as the statements are presented as facts and can be considered defamatory.

IT IS FURTHER ORDERED that Mr. Dickie shall **not** be required to testify as to the identity of the speakers in the "IBO Rebellion" blog, the "Q'Reilly" blog, the "Integrity is Team" blog, and the "QSSR" blog, as the statements by these speakers are presented as opinions.

The Court and parties discuss the proposed order submitted by Plaintiff prior to the hearing. IT IS ORDERED that Mr. Chao shall prepare a new proposed order reflecting the occurrences of this proceeding and submit it to Mr. O'Brien for review. If there are disputes, the parties may bring said disputes back to the Court. Mr. McCormick suggests that, if there is not agreement as to the proposed order, Mr. Chao and Mr. O'Brien each prepare a proposed order and submit them both for the Court's decision. The Court agrees to this suggestion.

**Quixtar's Motion to Compel Further Responses to Its Second Set of Interrogatories and Second Set of Requests for Production of Documents (Docket #201)**

Ms. Du advises the Court that this motion has been resolved with respect to Interrogatory 20 and Requests for Production of Documents 116, 120, and 143-146.

With respect to Interrogatories 22-25, IT IS ORDERED that Quixtar shall be allowed to assert these as additional interrogatories with the condition that the time be limited from September, 2004 to the present. TEAM shall have thirty (30) days to respond to said interrogatories.

Regarding Requests for Production of Documents 114, 115, 122, 150, 151, and 158, IT IS ORDERED that the parties shall confer and narrow these requests to a point where TEAM will respond.

IT IS ORDERED that the Motion to Compel, as it relates to Interrogatory 18 and Requests for Production of Documents 117, 118, 129-133, 136-138, 141, 148, 153, 154-160, 161, and 162, is DENIED.

IT IS ORDERED that the Motion to Compel, as it relates to Interrogatory 19 and Requests for Production of Documents 119, 121, 123, 124, 125, 128, 139, 147, 149, 165, 168, and 169, is GRANTED to the extent as indicated on the record.

IT IS ORDERED that the Motion to Compel, as it relates to Requests for Production of Documents 135 and 152, is GRANTED IN PART AND DENIED IN PART pursuant to the terms placed on the record.

Page 3
3:07-cv-0505-ECR-RAM
Quixtar Inc. v. TEAM
November 12, 2008

**<u>Quixtar's Motion to Strike Reply Brief in Support of Anonymous Online Speakers' Objection</u>**
**<u>and Opposition to Motion to Compel Responses from Benjamin Dickie (Docket #223)</u>**

IT IS ORDERED that the Motion to Strike (Docket #223) is DENIED.

3:08 p.m.  Court adjourns.

LANCE S. WILSON, CLERK

By: /s/_____

Deputy Clerk

ExhiBit 5

1

2

3

4             **UNITED STATES DISTRICT COURT**
                       **DISTRICT OF NEVADA**
5                           **RENO, NEVADA**

6

7
QUIXTAR, INC.,                          )        3:07-CV-505-ECR-RAM
8                                        )
         Plaintiff,                      )
9                                        )
vs.                                      )        **Order**
10                                       )
SIGNATURE MANAGEMENT TEAM, LLC           )
11  d/b/a/ TEAM, APOLLO WORKS HOLDINGS,  )
INC., GREEN GEMINI ENTERPRISES,          )
12  INC., NORTH STAR SOLUTIONS, INC.,    )
NORTHERN LIGHTS SERVICES, INC.,          )
13  SUNSET RESOURCES, INC., and SKY      )
SCOPE TEAM, INC.,                        )
14                                       )
         Defendants.                     )
15                                       )
                                         )
16

17        Plaintiff Quixtar, Inc. ("Quixtar") is a company that was

18  formerly known as Amway.  Defendant Signature Management TEAM

19  ("TEAM") is a company that was started by former "Independent

20  Business Operators" ("IBOs") of Quixtar.  TEAM is a Nevada limited

21  liability company that initially had six members, all of which were

22  Nevada corporations, and which constitute the remaining six named

23  defendants in this action.

24        Currently pending before the Court is "Five Constituent

25  Defendants' Motion to Dismiss and for Summary Judgment" ("MTD")

26  (#231), filed by Defendants Apollo Works Holdings, Inc., Green

27  Gemini Enterprises, Inc., North Star Solutions, Inc., Northern

28  Lights Services, Inc., and Sunset Resources, Inc. (collectively,

1   "the constituent defendants"). Quixtar opposed (#239) the motion to
2   dismiss, and the constituent defendants replied (#245). For the
3   reasons stated below, the motion to dismiss (#231) will be granted.

4        Also pending before the Court are two sets of objections (##
5   267, 269) to the Magistrate Judge's November 12, 2008 Minute Order
6   (#261). The Minute Order (#261) addresses a discovery dispute
7   between the parties regarding whether Mr. Benjamin Dickie must
8   testify as to his knowledge of the identity of certain non-party
9   anonymous online speakers who posted allegedly defamatory material
10  on various websites and blogs. This dispute was previously the
11  subject of a published Order (#167) by the Court, which vacated the
12  Magistrate Judge's earlier Order (#111) on the issue and remanded
13  for further proceedings. Quixtar Inc. v. Signature Mgmt. TEAM, 566
14  F. Supp. 2d 1205 (D. Nev. 2008). For the reasons stated below, the
15  objections filed by non-party anonymous online speakers (#267) will
16  be overruled, while Quixtar's objections (#269) will be sustained in
17  part and overruled in part.

18       Further, Defendants have objected (#306) to the Magistrate
19  Judge's December 12, 2008 Minute Order (#295). Among other things,
20  this Minute Order addressed Defendants' Motion to Compel (#242).
21  Defendants object to the Magistrate Judge's ruling regarding two
22  particular requests for production raised in the motion to compel,
23  Request 29 and Request 42. (D.s' Objection 2 (#306).) For the
24  reasons stated below, this objection will be overruled.

25       Finally, pending before the Court are two sets of objections
26  (## 342, 343) to the Magistrate Judge's January 15, 2009 Order
27  (#330). Like the November 12, 2008 Minute Order (#261), this Order

28                                    2

1  (#330) deals with the deposition of Mr. Dickie.  Paragraphs 2(D), 3
2  and 4 of the Order (#330) incorporate the provisions of the November
3  12, 2008 Minute Order (#261) at issue in the objections (## 267,
4  269) described above.  Our ruling in this Order on the objections
5  (##267, 269) to the Magistrate Judge's November 12, 2008 Minute
6  Order (#261) will apply equally to the analogous provisions of the
7  Magistrate Judge's later Order (#330).  Other provisions of the
8  Magistrate Judge's Order (#330), however, have been separately
9  disputed: objections have been filed by both Mr. Dickie (#342) and
10 Defendants (#343).  For the reasons stated below, these objections
11 will be sustained in part and overruled in part.

12

13                            **I. Background**

14      Quixtar contends that TEAM has waged a wrongful, illegal
15 internet campaign to induce Quixtar's IBOs to defect from Quixtar.
16 Quixtar's initial complaint (#1) was filed on October 23, 2007,
17 naming TEAM as the sole defendant.  Quixtar filed its first amended
18 complaint (#203) on August 20, 2008, bringing the remaining six
19 named defendants into the case and asserting an additional cause of
20 action.  The first amended complaint (#203) states causes of action
21 for (1) violation of the Lanham Act, (2) trade secret
22 misappropriation, (3) tortious interference with existing contracts,
23 (4) tortious interference with advantageous business relations, (5)
24 civil conspiracy, and (6) a declaratory judgment regarding the
25 viability of claims brought by TEAM against Quixtar in Collin County
26 Texas.  The parties have stipulated (#347) to dismissal with
27 prejudice of TEAM's counterclaims (#15) against Quixtar.

28                                  3

1

## II.  Motion to Dismiss

2        The constituent defendants filed their motion to dismiss (#231)
3 on September 18, 2008.  The basis for this motion is a change in the
4 corporate status of the constituent defendants.  On February 13,
5 2008, the constituent defendants were merged into Sky Scope Team,
6 Inc. ("Sky Scope") pursuant to Nev. Rev. Stat. § 92A.200.
7 ("Articles of Merger," MTD (#231) Ex. A.)  The merger left Sky Scope
8 the sole remaining member of TEAM.

9        The constituent defendants argue that as a result of the merger
10 they lack the capacity to be sued.  Thus, the moving parties argue,
11 Quixtar's First Amended Complaint fails to state a claim against
12 them, and they are entitled to dismissal pursuant to Fed. R. Civ. P.
13 12(b)(6).  Further, the constituent defendants assert that because
14 they no longer exist, the Court lacks personal jurisdiction over
15 them and, moreover, they could not be served with process.  On that
16 basis, the constituent defendants seek dismissal pursuant to Fed. R.
17 Civ. P. 12(b)(2) and Fed. R. Civ. P. 12(b)(5).  Finally, the
18 constituent defendants seek summary judgment on the claims asserted
19 against them, arguing that Quixtar has no evidence in support of its
20 allegations.

21        Quixtar filed its opposition (#239) to the motion to dismiss
22 (#231) on October 6, 2008.  Quixtar argues that the constituent
23 defendants are subject to suit under Nevada law despite the merger
24 with Sky Scope and that the first amended complaint asserts viable
25 claims against them.  Quixtar further argues that the Court does not
26 lack personal jurisdiction, nor was service of process insufficient.

27

28                                    4

1 Finally, Quixtar argues that summary judgment is premature because
2 discovery against the constituent defendants has "barely commenced."
3     We will address only the issue of whether Quixtar has failed to
4 state a claim against the constituent defendants because our ruling
5 on that issue is dispositive.  For the reasons discussed below, we
6 find that the constituent defendants lack the capacity to be sued
7 under Nevada law, and the claims against them therefore must be
8 dismissed.
9     A. Motion to Dismiss Standard
10     A motion to dismiss under Fed. R. Civ. P. 12(b)(6) will only be
11 granted if the complaint fails to "state a claim to relief that is
12 plausible on its face."  Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955,
13 1974 (2007).  On a motion to dismiss, "we presum[e] that general
14 allegations embrace those specific facts that are necessary to
15 support the claim."  Lujan v. Defenders of Wildlife, 504 U.S. 555,
16 561 (1992) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889
17 (1990)) (alteration in original).  Moreover, "[a]ll allegations of
18 material fact in the complaint are taken as true and construed in
19 the light most favorable to the non-moving party."  In re Stac
20 Elecs. Sec. Litig., 89 F.3d 1399, 1403 (9th Cir. 1996) (citation
21 omitted).
22     Although courts generally assume the facts alleged are true,
23 courts do not "assume the truth of legal conclusions merely because
24 they are cast in the form of factual allegations."  W. Mining
25 Council v. Watt, 643 F.2d 618, 624 (9th Cir. 1981).  Accordingly,
26 "[c]onclusory allegations and unwarranted inferences are
27
28                                     5

1 insufficient to defeat a motion to dismiss." In re Stac Elecs., 89
2 F.3d at 1403 (citation omitted).

3      Review on a motion pursuant to Fed. R. Civ. P. 12(b)(6) is
4 normally limited to the complaint itself. See Lee v. City of L.A.,
5 250 F.3d 668, 688 (9th Cir. 2001). If the district court relies on
6 materials outside the pleadings in making its ruling, it must treat
7 the motion to dismiss as one for summary judgment and give the non-
8 moving party an opportunity to respond. FED. R. CIV. P. 12(d);
9 see United States v. Ritchie, 342 F.3d 903, 907 (9th Cir. 2003). "A
10 court may, however, consider certain materials — documents attached
11 to the complaint, documents incorporated by reference in the
12 complaint, or matters of judicial notice — without converting the
13 motion to dismiss into a motion for summary judgment." Ritchie, 342
14 F.3d at 908.

15      If documents are physically attached to the complaint, then a
16 court may consider them if their "authenticity is not contested" and
17 "the plaintiff's complaint necessarily relies on them." Lee, 250
18 F.3d at 688 (citation, internal quotations, and ellipsis omitted).
19 A court may also treat certain documents as incorporated by
20 reference into the plaintiff's complaint if the complaint "refers
21 extensively to the document or the document forms the basis of the
22 plaintiff's claim." Ritchie, 342 F.3d at 908. Finally, if
23 adjudicative facts or matters of public record meet the requirements
24 of Fed. R. Evid. 201, a court may judicially notice them in deciding
25 a motion to dismiss. Id. at 909; see FED. R. EVID. 201(b) ("A
26 judicially noticed fact must be one not subject to reasonable
27 dispute in that it is either (1) generally known within the

28                                    6

1  territorial jurisdiction of the trial court or (2) capable of
2  accurate and ready determination by resort to sources whose accuracy
3  cannot reasonably be questioned.").

4      B.  Discussion

5      A corporation's capacity to sue or be sued is determined by the
6  law under which it was organized. FED. R. CIV. P. 17(b); see, e.q.,
7  Sierra Ass'n for Env't v. Fed. Energy Regulatory Comm'n, 744 F.2d
8  661, 662 (9th Cir. 1984).  All the constituent defendants were
9  Nevada corporations, thus, Nevada law applies here.

10     Under Nevada law, "[e]very corporation, by virtue of its
11 existence as such, is entitled . . . [t]o sue and be sued in any
12 court of law or equity." NEV. REV. STAT. § 78.060(2)(b).  After a
13 merger, however, "[e]very other entity that is a constituent entity
14 merges into the surviving entity and the separate existence of every
15 entity except the surviving entity ceases." NEV. REV. STAT. §
16 92A.250(1)(a).  The logical conclusion that follows from these two
17 premises is that after a merger, the constituent entities lack the
18 capacity to later sue or be sued because they no longer exist.[1]

19     In February 2008, the constituent defendants were merged with
20 Sky Scope by means of Articles of Merger filed with the Nevada
21 Secretary of State pursuant to Nevada Revised Statutes Chapter 92A.
22 (MTD Ex. A (#231).)  Quixtar's first amended complaint was filed in
23 August 2008.  Under Nevada law, in August 2008 the constituent

24

25  [1] An action that is already "pending against any constituent
    entity may be continued as if the merger had not occurred or the
26  surviving entity may be substituted in the proceeding for the entity
    whose existence has ceased." NEV. REV. STAT. § 92A.250(d).  This
27  provision does not apply, however, to actions brought against the
    constituent entity only after the merger.

28                                  7

1  defendants no longer existed as separate corporate entities.  We
2  conclude that they therefore lacked the capacity to sue or be sued.
3       Quixtar argues that Nev. Rev. Stat. § 78.585 applies here, and
4  provides that the constituent corporation "continues as a body
5  corporate for the purpose of prosecuting and defending suits . . .
6  ."  This statute, however, deals with the dissolution and winding up
7  of a corporation, not merger.  It is therefore inapplicable to the
8  facts of the present case.[2]
9       Quixtar expresses concern that if the pending motion to dismiss
10 is granted, the constituent corporations "might be permitted to
11 insulate themselves (and their co-conspirators) from liability and
12 deny Quixtar rights to satisfy a judgment."  (P.'s Opp. 1 (#239).)
13 This concern is not warranted.  By law, all liabilities of a
14 constituent corporation pass to the surviving corporation.  NEV. REV.
15 STAT. § 92A.250(1)(c); see Lamb v. Leroy Corp., 454 P.2d 24, 26
16 (Nev. 1969) ("A consummated agreement of merger or consolidation
17 imposes upon the surviving corporations all liabilities of the
18

19       [2] Quixtar also cites to authority supporting the notion that "in
20  some cases there may be special equitable considerations for not
    barring [a post-merger] derivative claim."  (P.'s Opp. 12 (#239)
21  (quoting Evmar Oil Corp. v. Getty Oil Co., No. 76-4039, 1978 U.S.
    Dist. LEXIS 18957, at *31-32 (C.D. Cal. Mar. 17, 1978), and citing
22  Miller v. Steinbach, 268 F. Supp. 255, 267 (S.D.N.Y. 1967)); see also
    P.'s Opp. 10 (#239) (citing Smallwood v. Pearl Brewing Co., 489 F.2d
23  579, 592 (5th Cir. 1974) (assuming without deciding that a merged
    corporation had capacity to be sued in a derivative action).)  The
24  present case, however, is not a derivative suit.  Moreover, the Nevada
    Supreme Court has rejected the approach taken in Evmar Oil Corp.,
25  Miller, and Smallwood.  See Cohen v. Mirage Resorts, Inc., 62 P.3d
    720, 732 (Nev. 2003) (noting that a former shareholder does not have
26  standing to assert a derivative claim, though the former shareholder
    does have standing to seek relief for direct injuries that are
27  independent of any injury suffered by the corporation).  Thus,
    Quixtar's arguments in this regard also fail.
28

1  constituent corporations so merged or consolidated."). Any rights
2  that Quixtar could have asserted against the constituent defendants
3  absent the merger can instead be asserted against Sky Scope as the
4  surviving entity after the merger. There is no basis for concluding
5  that this transfer of liability to the surviving entity would not
6  include liability for conspiracy or for fraudulent conveyance,
7  Quixtar's suggestion to the contrary notwithstanding.

8      In short, under Nevada law, after a business entity merges into
9  another, the constituent entity cannot later sue or be sued because
10 the separate existence of every entity except the surviving entity
11 ceases. All liabilities of the constituent entity, however, survive
12 the merger, and are the responsibility of the surviving entity. The
13 discovery with regard to Quixtar's claims against the constituent
14 defendants that has, according to Quixtar, "barely commenced,"
15 should therefore proceed. Those claims are still a part of this
16 case. The sole, nominal difference is that the corporate entity
17 that is liable for the alleged wrongful acts by the constituent
18 defendants is Sky Scope.

19

20     **III.  Objections to November 12, 2008, Minute Order (#261)**

21     In connection with Quixtar's causes of action for tortious
22 interference with business relations and tortious interference with
23 an existing contract, Quixtar took TEAM employee Benjamin Dickie's
24 deposition on January 18, 2008. Mr. Dickie testified that as part
25 of his employment responsibilities, he had a role in maintaining
26 certain TEAM websites and blogs. He refused, however, to answer any
27 questions regarding whether he had any role in establishing or

28                                    9

1 maintaining certain other websites and blogs.  He further refused to
2 answer whether he knew the identity of certain anonymous online
3 speakers who posted text and videos on these sites.  Quixtar brought
4 a motion to compel (#54) responses from Mr. Dickie, which was
5 granted by a February 21, 2008 Order (#71) by the Magistrate Judge,
6 and subsequently clarified by an April 7, 2008 Order (#111).

7      After our Order (#167) vacated the Magistrate Judge's Order
8 (#111), the Magistrate Judge held a hearing on November 12, 2008,
9 and then issued the Minute Order (#261) that is the subject of the
10 pending objections.  The Magistrate Judge found that Mr. Dickie did
11 not know the identity of four anonymous online speakers about whom
12 Plaintiff had sought discovery.  (Hearing Tr., p. 9, Ex. A to
13 Objections (#267).)  The Magistrate Judge then addressed whether Mr.
14 Dickie had to testify as to his knowledge of six other anonymous
15 online speakers.

16      In the Minute Order (#261), the Magistrate Judge ruled that Mr.
17 Dickie shall testify as to his knowledge of two of the anonymous
18 online speakers; the anonymous online speakers have objected (#267).
19 The Magistrate Judge further ordered that Mr. Dickie shall not be
20 required to testify regarding the identity of four other anonymous
21 online speakers; Quixtar has objected (#269) with regard to three of
22 those four speakers.

23      A.  Standard of Review

24      "A district judge may reconsider any pretrial matter referred
25 to a magistrate judge in a civil or criminal case pursuant to LR IB
26 1-3 where it has been shown that the magistrate judge's ruling is
27 clearly erroneous or contrary to law."  Local Rule IB 3-1; see 28

28                                10

1  U.S.C. § 636(b)(1)(A). The "contrary to law" standard only applies
2  to the Magistrate Judge's legal conclusions, which are reviewed <u>de</u>
3  <u>novo</u>. See <u>Osband v. Woodford</u>, 290 F.3d 1036, 1041 (9th Cir. 2002).

4       B.  Discussion

5       The two anonymous online speakers whose identity would be
6  revealed under the Magistrate Judge's Minute Order (#261) object
7  (#267) that their speech, and in particular the anonymity of their
8  speech, is protected by the First Amendment.  Quixtar objects to the
9  Magistrate Judge's determination that Mr. Dickie shall not be
10 required to testify as to the identities of three other anonymous
11 online speakers.

12      We noted in our published Order (#167) that courts "must adopt
13 procedures that strike a balance between the plaintiff's need to
14 destroy [an anonymous speaker's] anonymity and the anonymous
15 speaker's First Amendment rights." <u>Quixtar</u>, 566 F. Supp. 2d at
16 1211.  We found that <u>Doe v. Cahill</u>, 884 A.2d 451 (Del. 2005),
17 "articulates the correct standard" for performing this balancing.
18 <u>Quixtar</u>, 566 F. Supp. at 1216.[3]

19      The <u>Cahill</u> standard requires that a plaintiff seeking discovery
20 of the identity of a non-party anonymous online speaker first give
21 notice to the speaker, or at least attempt to do so. <u>Id.</u> at 1212-13
22 (citing <u>Cahill</u>, 884 A.2d at 460-61).  Then the plaintiff must
23 satisfy a "prima facie or 'summary judgment'" standard, analyzing

24 _____

25 [3] <u>Cahill</u> involved defamation claims, whereas here Quixtar asserts
   claims for tortious interference with existing contracts and tortious
26 interference with advantageous business relations.  The particular
   tortious acts giving rise to Quixtar's claims, however, are allegedly
27 defamatory statements.  The First Amendment, therefore, is similarly
   implicated.  See <u>Quixtar</u>, 566 F. Supp. 2d at 1205.

28                                    11

1 the actionability of the statements at issue on the basis of
2 evidence that is or should be in the plaintiff's control.[4] Id.
3 Here, notice was given, so only the second of these requirements is
4 at issue. To satisfy this second step of the Cahill analysis, a
5 plaintiff must prove that the "statement is factually based and thus
6 capable of a defamatory meaning." 884 A.2d at 467 n.78; see Pegasus
7 v. Reno Newspapers, Inc., 57 P.3d 82, 87 (Nev. 2002) (defining
8 defamation as "a publication of a false statement of fact").

9       In making the determination of whether a statement can
10 reasonably be interpreted as a factual assertion, and thus
11 potentially defamatory, the court must examine the "totality of the
12 circumstances in which it was made." Underwager v. Channel 9
13 Australia, 69 F.3d 361, 366 (9th Cir. 1995); see also Pegasus, 118
14 P.3d at 88 (noting that under Nevada defamation law "comments must
15 be considered in context"). In performing this analysis, we first
16 "look at the statement in its broad context, which includes the
17 general tenor of the entire work, the subject of the statements, the
18 setting, and the format of the work." Knievel v. ESPN, 393 F.3d
19 1068, 1075 (9th Cir. 2005).

20       Second, "we turn to the specific context and content of the
21 statements, analyzing the extent of figurative or hyperbolic
22 language used and the reasonable expectations of the audience in

23

24      [4] We agree with the sentiment expressed in Krinsky v. Doe 6, 72
   Cal. Rptr. 3d 231, 244 (Cal. Ct. App. 2008), that "it is unnecessary
25 and potentially confusing to attach a procedural label . . . to the
   showing required of a plaintiff seeking the identity of an anonymous
26 speaker on the Internet." We will therefore use the term "prima
   facie," rather than "summary judgment," though Cahill used the terms
27 interchangeably.

28                                    12

1 that particular situation."  Id.  Even where the broad context tends
2 to weigh in favor of the conclusion that a statement is protected
3 opinion, the specific context or phrasing of a particular statement
4 may imply an actionable assertion of objective fact.  Partington v.
5 Bugliosi, 56 F.3d 1147, 1153 (9th Cir. 1995).  Nonetheless, where
6 the language used is "loose, figurative [and] hyperbolic," this
7 tends to negate the impression that a statement contains an
8 assertion of verifiable fact, and is instead non-actionable opinion
9 or mere rhetoric.  See Milkovich v. Lorain Journal Co., 497 U.S. 1,
10 21 (1990).

11      Finally, "we inquire whether the statement itself is
12 sufficiently factual to be susceptible of being proved true or
13 false."  Id.  Whether a particular product works or doesn't, for
14 example, is provably true or false.  See Unelko Corp. v. Rooney, 912
15 F.2d 1049, 1055 (9th Cir. 1990).  A statement that implies a
16 verifiable assertion of perjury is similarly subject to being proven
17 true or false.  See Underwager, 69 F.3d at 367 ("While we agree that
18 [defendant's] statement may be an exaggeration, [plaintiff] has
19 failed to show that the statement implies a verifiable assertion of
20 perjury.").

21      The parties identified the specific statements at issue in an
22 exhibit to a joint proposed scheduling order.  (Scheduling Order,
23 Ex. A ("Ex. A") (#183).)  We will analyze each of the statements in
24 turn.  Whether a particular statement is potentially defamatory or
25 not is a question of law.  Rodriquez v. Panayiotou, 314 F.3d 979,
26 985 (9th Cir. 2002).  We therefore review de novo the Magistrate
27 Judge's determinations.

28                                      13

1    **1.   "Save Us Dick DeVos" Blog**

2        Quixtar has complained of the following statements from the

3    "Save Us Dick DeVos" blog:

4        Quixtar has regularly, but secretly, acknowledged that its
         products are overpriced and not sellable. . . .  Quixtar is
5        aware of, approves, promotes, and facilitates the systematic
         noncompliance with the FTC's Amway rules . . . .  Quixtar knows
6        that it violates the Amway rules and has disregarded this fact
         for years.
7
     (Ex. A, No. 5.)  The Magistrate Judge determined that these
8
     statements are "presented as facts and can be considered
9
     defamatory."  (Minute Order 2 (#261).)  On this basis, the
10
     Magistrate Judge ordered that Mr. Dickie shall testify as to his
11
     knowledge of the identity of the speaker.  Id.  The anonymous online
12
     speaker has objected that the blog post at issue here cannot
13
     "reasonably be interpreted as stating actual facts."  (Objection 6
14
     (#267).)
15
         The basis for the anonymous speaker's objection here is that
16
     the post in question only "refers to quotes [the blogger] read on
17
     another website," and expresses "no claim of accuracy beyond his own
18
     belief and experience."  (Objection 6 (#267).)  It is well
19
     established, however, that a person who repeats a defamatory
20
     statement "is generally as liable as the one who first utters it."
21
     Flowers v. Carville, 310 F.3d 1118, 1128 (9th Cir. 2002).
22
         Moreover, the statements at issue here can reasonably be
23
     interpreted as declaring or at least implying provable assertions of
24
     fact, either of which is actionable.  See Milkovich, 497 U.S. at 19
25
     (noting that expressions of opinion may imply an assertion of
26
     objective fact, and that in such a circumstance they may give rise
27

28                                   14

1  to liability for defamation).  It may be the case that the broad
2  context of the statement — on a blog that makes no pretense of
3  objectivity regarding the Quixtar/TEAM dispute — weighs in the
4  blogger's favor.  This factor is outweighed, however, by other
5  considerations, once the totality of circumstances are taken into
6  account.  The specific context of the statement is a quotation from
7  another website, accompanied by the commentary of the blogger that
8  the statements "sound truthful."  A reasonable reader could conclude
9  on this basis that the statements are intended as, or at least
10  imply, assertions of fact, rather than opinion or mere rhetoric.
11  Further, the statements of which Quixtar complains are susceptible
12  to being proven true or false.  Thus, the <u>Cahill</u> prima facie
13  standard is satisfied, and the Magistrate Judge was correct to order
14  Mr. Dickie to testify as to the identity of the anonymous speaker.[5]

15       In short, the Magistrate Judge's ruling that a <u>Cahill</u> prima
16  facie showing has been made with regard to these statements was
17  neither clearly erroneous nor contrary to law.  Thus, the objection
18  will be overruled.

19

20

21

22

23       [5]    The anonymous online speaker also objects that there is
24  insufficient evidence of causation to make a prima facie case for
    defamation.  For purposes of the limited analysis to be performed at
25  this stage, however, the declaration of Mr. VanderVen (P.'s Opp., Ex.
    A ¶ 5 (#212)), asserting that Quixtar has been injured by the various
26  statements at issue, is sufficient: It constitutes at least some
    evidence of causation, which is all that is needed to make the
27  necessary prima facie showing.  The anonymous online speaker's
    objections on this basis too, therefore, will be overruled.

28                                        15

1       2.  "Hooded Angry Man" Video

2       Quixtar has complained of the following three statements from
3   the video titled "Hooded Angry Man," which was posted on the
4   internet:

5       Quixtar's "high prices crippled IBO's ability to sell at retail
        prices,"
6
        Quixtar "terminated IBOs without due process,"
7
        Quixtar "refused to pay year end bonuses to IBOs in good
8       standing."

9   (Ex. A, No. 2.)  The Magistrate Judge determined that these
10  statements, too, were presented as facts and could be considered
11  defamatory, and therefore ordered Mr. Dickie to testify as to his
12  knowledge of the speaker's identity.  (Minute Order 2 (#261).)

13      The anonymous online speaker argues that these statements,
14  "viewed as a whole and in context," given the "amateurish and
15  comical" nature of the video, could not be viewed by a reasonable
16  person as stating "actual facts about Quixtar."  We disagree.

17      The Magistrate Judge correctly noted that though the video as a
18  whole may have a humorous tone, there is an core of (alleged) fact
19  at the center of the jokes: "all the laughter and jokes were gone
20  from [the portion in which these statements were made], they played
21  that as a fact . . . the context shows that the reader is encouraged
22  to believe that those ten items which were all negative about
23  Quixtar were all fact."  (Hearing Tr., p. 35, Ex. A to Objections
24  (#267).)  In other words, the broad context of the statements in a
25  humorous video factors into the analysis in favor of the anonymous
26  speaker.  The specific context of the statements, however, shows
27  that they may reasonably be interpreted as set apart from the rest

28                                      16

1  of the video and best understood as assertions of fact, rather than
2  opinion, hyperbole or mere rhetoric. Moreover, the statements are
3  capable of being proven true or false. The totality of the
4  circumstances, therefore, supports a finding that the statements
5  could be considered defamatory. Because the Magistrate Judge's
6  ruling with regard to these statements was neither clearly erroneous
7  nor contrary to law, the objection will be overruled.

8           3.  "Integrity is Team" Blog

9       Quixtar has complained of the following statement from the
10  "Integrity is Team" blog: "Quixtar currently suffers from systemic
11  dishonesty. There is a pattern of deceit that emanates from its
12  core."  (Ex. A, No. 7.)  The Magistrate Judge found that this
13  statement was not actionable and therefore ordered that Mr. Dickie
14  shall not be required to testify as to the identity of the speaker.
15  (Minute Order 2 (#261).)

16       The Magistrate Judge agreed with Quixtar that "taken out of
17  context, just the statement itself, it probably is defamatory."
18  (Hearing Tr., p. 49, Ex. A to Objections (#267).)  Nevertheless, the
19  Magistrate Judge determined that "taken in context with everything
20  else that's in that paragraph that it can be considered as fact, I
21  think it's opinion, and it's the order that Mr. Dickie not testify
22  about that."  (Id.)  Quixtar has objected, arguing that the
23  statements are not protected opinion because they imply assertions
24  of objective fact.  (P.'s Objections 4-7 (#269).)

25       As noted above, Quixtar is correct that after Milkovich it is
26  well established that a statement may be defamatory, even though it
27  is couched as opinion, if it implies an assertion of objective fact.

28                                  17

1   497 U.S. at 19.  Nevertheless, though the Magistrate Judge did not
2   fully articulate the standard underlying his analysis, it appears
3   that he did look appropriately to the totality of the circumstances
4   in which the statement was made.  See Knievel, 393 F.3d at 1075;
5   Underwager, 69 F.3d at 366.

6        The broad context of the statement on the "Integrity is TEAM"
7   blog weighs in favor of the conclusion that the statements are the
8   author's opinion, rather than an assertion of objective fact.  (See
9   P.'s Objections (#269) Ex. A.)  The blogger makes no bones about
10  being a partisan in an ongoing dispute with Quixtar; there is no
11  pretension of objectivity.  Id.  Thus, the broad context for the
12  statement is much more like the opinion page of a newspaper than the
13  front page.  See Cochran v. NYP Holdings, Inc., 58 F. Supp. 2d 1113,
14  1123 (C.D. Cal. 1998) (noting that alleged defamatory statement is
15  "formatted as opinion rather than as a standard news article").

16       The anonymous online speaker's speech is quite loose,
17  figurative and hyperbolic: the post is titled "Behind the Walls of
18  Quixtar Part 4," and imagery of war continues throughout the text,
19  albeit sporadically and mixed in with other unrelated metaphors and
20  analogies.  (P.'s Objections (#269) Ex. A.)  Though the speaker
21  purports to present "information" gleaned from reconnaissance
22  conducted behind the lines of the "battle" between TEAM and Quixtar,
23  the overall tone of the post leads the reasonable reader of the post
24  to understand that they are being presented with the anonymous
25  speaker's opinions, rather than objective facts.  (Id.)

26       Further, it is doubtful that the statement itself is
27  susceptible to being proven true or false.  Whether or not Quixtar

28                                    18

1  "suffers from systemic dishonesty" or has demonstrated "a pattern of
2  deceit that emanates from its core" is very much in the eye of the
3  beholder.  The statement is not one of objective, provable fact, but
4  rather is better considered "nonactionable 'rhetorical hyperbole, a
5  vigorous epithet'" used by a speaker who considers Quixtar to be
6  "'extremely unreasonable'"  Underwager, 69 F.3d at 367 (quoting
7  Milkovich, 497 U.S. at 17).

8      In short, the Magistrate Judge's determination that the
9  statement, in its original context and taking into account the
10 totality of the circumstances, is not actionable was neither clearly
11 erroneous nor contrary to law.  Thus, Quixtar's objection in regard
12 to the Magistrate Judge's ruling regarding this statement will be
13 overruled.

14          4.  "Q'Reilly" Blog

15     Quixtar has complained that the "Q'Reilly" blog contains the
16 following statement: "[Quixtar has] [r]efuse[d] to pay bonuses to
17 IBOs in good standing and claim[ed] the bonuses are
18 'discretionary[.]'"  (Ex. A, No. 6.)  The Magistrate Judge found
19 that, in context and without the bracketed alterations, the
20 statements by the anonymous speaker were not actionable and
21 therefore denied discovery with regard to the speaker's identity.
22 (Minute Order 2 (#261).)

23     The broad context of this statement is the "Q'Reilly" blog.
24 (P.'s Objections (#269) Ex. B.)  Like the other blogs discussed
25 above, the "Q'Reilly" blog makes little if any attempt to appear
26 objective regarding the ongoing dispute between Quixtar and TEAM.
27 For similar reasons, therefore, we conclude that the broad context

28                                  19

1 of the statement weighs in favor of the conclusion that the
2 statement is non-actionable opinion.

3     The specific context of this statement is a blog post in which
4 the anonymous online speaker ponders the following question: "What
5 are the top three things you would do (in the U.S. market) if you
6 were [Amway/Quixtar] and wanted to get rid of your IBO sales force
7 and start selling directly to the public from the store shelves?"
8 (Id.)  The blog writer then goes on to suggest some ideas to "get
9 you started," the fifth of which is "Refuse to pay bonuses to IBO's
10 [sic] in good standing (and claim the bonuses are discretionary)."
11 (Id.)  Just before asking and answering the above-described
12 question, the anonymous speaker remarks that certain things have
13 occurred that make one "wonder what these [Amway/Quixtar] folks are
14 up to.  My guess? . . . Getting rid of all those pesky IBO's [sic]."
15 (Id.) (ellipses in original.)

16     The "suggestions" of the anonymous online speaker are not
17 phrased in language that is particularly loose, figurative or
18 hyperbolic, though some of the phrasing may fall into the last
19 category.  Nevertheless, the language is not obviously purely
20 rhetorical.  In context, a fair implication of the "suggestions"
21 proposed by the anonymous speaker is that Quixtar is indeed engaging
22 in such behavior, though the blogger frames his list of "moronic
23 moves" as a hypothetical.

24     If the blogger's "suggestion" is treated as an implied
25 assertion that Quixtar is indeed engaging in such behavior, the next
26 question is whether the implied statement is susceptible to being
27 proven true or false.  The implied statement would be that Quixtar

28                                    20

1 refused to pay bonuses to IBOs in good standing and then claimed
2 that the bonuses were discretionary. This statement is susceptible
3 to being proven true or false — though the concept of an "IBO in
4 good standing" might be somewhat fuzzy, it would be generally
5 capable of definition. The rest of the statement is easily
6 demonstrated true or false: Quixtar either paid bonuses or it did
7 not; it either claimed bonuses are "discretionary" or it did not.

8     In sum, two of the three factors to be considered weigh in
9 favor of finding this statement potentially actionable. The test is
10 not a mathematical one, but in our view, those two factors weigh
11 more heavily than the other here. Looking at the totality of the
12 circumstances, though the statement is framed as an opinion, it
13 fairly may be read to imply an assertion of objective fact. We
14 conclude that the Magistrate Judge erred in ruling otherwise, and
15 Quixtar's objection with regard to this statement will therefore be
16 sustained. Quixtar should be permitted to discover the identity of
17 the anonymous online speaker who posted this statement to the
18 "Q'Reilly" blog.

19          5.    "IBO Rebellion" Blog

20     Quixtar has complained of the following statements from the
21 "IBO Rebellion" blog:

22     It sounds as though the roof is caving in on Quixtar. I am
       sure these resignations will pave the way for a mass exodus.
23     All of the above [TEAM] leaders are very well respected and
       their departure is sure to influence others to follow suit."
24
       [Alticor, Quixtar's parent company,] will milk you for all your
25     worth, methodically destroy your business, and then without
       warning pull the plug.
26

27

28                              21

1  (Ex. A, No. 4.)   The Magistrate Judge found that these statements
2  were non-actionable opinions, rather than potentially defamatory
3  assertions of fact.

4      Again, the broad context of these statements is a blog that
5  makes no pretense to objectivity in the dispute between Quixtar and
6  the IBOs.  The blog's title sets this tone, which is continued in
7  the mission statement, albeit with the disclaimer that comedic
8  effect, rather than advocacy per se, is intended: "This blog is an
9  attempt to add some comedic relief to the serious battle between
10 IBOs and the Alticor/Quixtar/Amway group of companies.  The opinions
11 expressed here are my own and of other guest bloggers.  There is a
12 strong emphasis on satire and tongue in cheek comedy."  (P.'s
13 Objections (#269) Ex. C).)  As noted above, however, such framing of
14 a blog does not necessarily mean that a statement contained therein
15 is incapable of being defamatory.

16     The two statements about which Quixtar complains are from two
17 separate posts to the "IBO Rebellion" blog.  The first comes from a
18 short September 9, 2007 post titled "Team Resignations Add Up."  The
19 blogger lists a number of recent resignations from Quixtar,
20 apparently of IBOs, and then adds the comment cited above that
21 begins "It sounds as though the roof is caving in on Quixtar."

22     Quixtar urges that this statement should be interpreted as an
23 act of tortious interference, encouraging other IBOs to leave
24 Quixtar.  It is not an entirely unreasonable supposition that a blog
25 titled "IBO Rebellion" would support IBOs leaving Quixtar.  The
26 particular statement at issue, however, does not on its face urge
27 IBOs to leave.  Rather, the post presents the blogger's

28                              22

1 interpretation of events: though he or she is "sure" that the
2 resignations are the first wave of a "mass exodus" and will
3 "influence others to follow suit," there is no explicit exhortation
4 for other IBOs to do so.  Moreover, the loose, metaphorical language
5 of the post ("roof is caving in on Quixtar") supports the
6 interpretation that the assertions here are protected opinion, not
7 potentially defamatory assertions of fact.

8    Even if the statement is an implied assertion of fact in some
9 sense, it is not of the sort that is provably true or false: the
10 boundary between a few resignations and a "mass exodus" is too
11 subjective to be susceptible to such a determination; the meaning of
12 "the roof caving in" is similarly indistinct.  Whether or not the
13 resignations in fact lead to further resignations is perhaps
14 susceptible to analysis, but only in hindsight: the blogger's
15 certainty that they will lead to future resignations is not provably
16 true or false, but rather constitutes a subjective opinion in the
17 form of speculation about future events.

18    The second statement of which Quixtar complains is from a
19 longer, November 25, 2007 blog post titled "Traitorous Actions
20 Accumulate @ Alticor."  The paragraph in which the statement is
21 contained begins: "Alticor's actions toward IBOs is undermining and
22 traitorous."  The paragraph goes on to detail various things the
23 blogger believes Alticor is doing to "undermine" the IBOs, and ends
24 with the warning that rather than just buy "you" (the IBO) out,
25 "they will milk you for all your [sic] worth, methodically destroy
26 your businesses, and then without warning pull the plug."

27

28                              23

1      The language of this post is loose, figurative, and hyperbolic.
2 The particular statement of which Quixtar complains is not only
3 metaphorical, it mixes several metaphors. We conclude that this
4 string of colorful language is not reasonably understood as an
5 assertion of fact, direct or implied. Any reasonable reader would
6 conclude that the blogger is simply weighing in on the dispute
7 between Quixtar and the IBOs and that the statements are rhetorical
8 expressions of the blogger's opinion regarding that conflict, rather
9 than assertions of fact to be taken literally.

10     Moreover, the statement at issue is not susceptible to being
11 proven true or false. There is no core of objective truth the Court
12 could look to in order to determine whether the IBOs are being,
13 were, or will be "milked for all [they're] worth." The distinction
14 between methodically destroying someone's business and then without
15 warning "pull[ing] the plug," on the one hand, and engaging in
16 proper, albeit somewhat aggressive, business practices, on the
17 other, is at least partially, if not entirely, subjective. In
18 short, we agree with the Magistrate Judge that these statements are
19 protected opinion, rather than potentially actionable assertions of
20 fact.

21     Quixtar argues that even if the statements in the "IBO
22 Rebellion" blog are not themselves actionable, discovery of the
23 anonymous author's identity should be allowed because of that
24 information's relevance to the causation element of Quixtar's
25 tortious interference claims against other speakers. (P.'s
26 Objections 10 (#269).) We disagree. First, we fail to see any such
27 relevance. Even if the statement itself may be relevant evidence of

28                                    24

1  causation, there would be little, if any, additional probative value
2  garnered by revealing the anonymous speaker's identity.  Second,
3  under the Cahill standard, as adopted by our Order (#167), discovery
4  of an anonymous online speaker's identity is only justified when the
5  statement that speaker made is potentially actionable.  See Quixtar,
6  566 F. Supp. at 1216 (noting that discovery into the identity of an
7  anonymous author is not warranted where the particular internet
8  posting at issue is subject to a privilege or defense).  The
9  anonymous online speaker's First Amendment rights should not be
10 impinged in order to provide a small piece of marginally relevant
11 evidence in support a plaintiff's case regarding some other
12 speaker's allegedly tortious speech.

13      Thus, discovery regarding the identity of the anonymous online
14 speaker who posted the comments to the "IBO Rebellion" blog was
15 properly denied.  Quixtar's objection in this regard will be
16 overruled.

17

18      **IV.  Objections to December 12, 2008, Minute Order (#295)**
19      Defendants have objected (#306) to the Magistrate Judge's
20 December 12, 2008 Minute Order (#295).  Among other things, this
21 Minute Order addressed Defendants' Motion to Compel (#242).
22 Defendants state that "at issue for purposes of the present
23 objection" are two particular requests for production raised in the
24 motion to compel, Request 29 and Request 42.  (D.s' Objections 2
25 (#306).)

26      In Defendants' reply brief (#256) in support of the Motion to
27 Compel (#242), Defendants explicitly withdrew the motion to compel

28                                   25

1 (#242) with respect to Requests 29 and 42.  (D's Reply 2 (#256).)
2 We would not normally consider objections to issues that were
3 explicitly withdrawn from the Magistrate Judge's consideration.

4        Nevertheless, though the motion to compel was seemingly
5 withdrawn with regard to both Request 29 and Request 42, the
6 Magistrate Judge heard argument in connection with Request 42
7 regarding the production of documents from companies related to
8 Quixtar.  The Magistrate Judge ruled that "documents related to
9 Alticor, Amway, or Access need not be provided."  (Minute Order
10 (#295).)  The transcript of the hearing reveals that this ruling was
11 made on relevance grounds.  (Hearing Transcript, 7 (#292).)  The
12 Magistrate Judge stated "I don't think there's been any kind of
13 showing made that any of their records have anything to do with this
14 case or would lead to any discoverable information about this case.
15 Quixtar's the party.  These other companies are not the parties."
16 (Id.)

17        We are satisfied that the Magistrate Judge's ruling was neither
18 clearly erroneous nor contrary to law.  See Local Rule IB 3-1; 28
19 U.S.C. § 636(b)(1)(A).  We see no abuse of discretion in the
20 Magistrate Judge's decision to limit the required production of
21 financial records to companies that are parties to this case.  Thus,
22 to the extent that Defendants' objections were not waived, they are
23 overruled.

24

25        **V.   Objections to Magistrate Judge's Order (#330)**

26        Like the November 12, 2008 Minute Order (#261) discussed above,
27 the Magistrate Judge's Order (#330) addresses the issue of Mr.

28                                   26

1  Dickie's deposition. As noted above, the Order (#330) covers some
2  of the same ground as that Minute Order (#261), simply incorporating
3  the provisions into a more complete and final form — the Order
4  (#330) was issued while the objections (## 267, 269) to the Minute
5  Order (#261) resolved here were still pending. The Order (#330) has
6  also, however, provoked new objections, to which we now turn.

7      Mr. Dickie objects (#342) to Paragraph 2(A) of the Magistrate
8  Judge's Order (#330), which requires Mr. Dickie to answer questions
9  regarding "[w]ebsites, blogs, forums and videos which, in his
10 capacity as a TEAM employee, Mr. Dickie created, administered, or
11 sponsored." Mr. Dickie also objects to Paragraph 2(E), which
12 requires him to testify regarding "[w]ebsites, blogs, forums and
13 videos, which as an individual, Mr. Dickie created, administered,
14 sponsored or on which he posted or provided content which suggested
15 or encouraged Quixtar IBOs to leave Quixtar, to not renew as IBOs,
16 to join a competitor of Quixtar, or otherwise disregard the Quixtar
17 Rules of Conduct." Paragraph 2(E) specifies that "Mr. Dickie's
18 answers shall include the content of such statements."

19     Defendants object (#343) to Paragraph 2(B) of the Magistrate
20 Judge's Order (#330), which requires Mr. Dickie to answer questions
21 regarding "[w]ebsites, blogs, forums and videos which, in their
22 capacities as TEAM employees, other TEAM employees created,
23 administered or sponsored." Defendants further object to Paragraph
24 2(C), which requires Mr. Dickie to answer questions regarding
25 "[w]ebsites, blogs, forums and videos which TEAM's management and
26 leaders (founders of TEAM, Policy Council members, Round Table

27

28                                  27

1 members, and other TEAM-identified 'leadership'), in their capacity
2 as such, created, administered, sponsored or authorized."

3    Mr. Dickie and Defendants argue that these provisions of the
4 Magistrate Judge's Order (#330) conflict with our previous Order
5 (#167), advising the Magistrate Judge that Cahill, 884 A.2d at 451,
6 "articulates the correct standard" for determining whether the
7 identities of anonymous online speakers should be revealed.
8 Quixtar, 566 F. Supp. at 1216.  Mr. Dickie and Defendants both
9 object that the Magistrate Judge's Order (#330) requires Mr. Dickie
10 to testify on the matters described without first requiring that
11 Quixtar make the primia facie showing described in Cahill.

12    Quixtar, on the other hand, argues that the Cahill standard is
13 inapplicable with regard to these portions of the Magistrate Judge's
14 Order (#330).  According to Quixtar, Paragraphs 2(A)-(C) of the
15 Magistrate Judge's Order (#330) do not trigger the Cahill inquiry
16 because no testimony regarding the identity of anonymous online
17 speakers is required.  Further, Quixtar argues that these provisions
18 of the Magistrate Judge's Order (#330) do not compel testimony
19 regarding statements: thus, the Cahill inquiry into the
20 actionability of statements identified by a plaintiff does not
21 apply.  Quixtar makes the same arguments regarding Paragraph 2(E),
22 to the extent that provision addresses testimony about creating,
23 administering, or sponsoring websites, blogs, forums, or videos.
24 With regard to the portion of Paragraph 2(E) requiring Mr. Dickie to
25 testify with regard to statements he posted "as an individual,"
26 Quixtar claims that the Order only requires him to testify about
27

28                                    28

1 actionable statements. Thus, on Quxitar's view, <u>Doe v. Cahill</u> is
2 satisfied.[6]

3     A. Standard of Review

4     As noted above, "[a] district judge may reconsider any pretrial
5 matter referred to a magistrate judge in a civil or criminal case
6 pursuant to LR IB 1-3 where it has been shown that the magistrate
7 judge's ruling is clearly erroneous or contrary to law." Local Rule
8 IB 3-1; <u>see</u> 28 U.S.C. § 636(b)(1)(A). The "contrary to law"
9 standard only applies to the Magistrate Judge's legal conclusions,
10 which are reviewed <u>de novo</u>. See <u>Osband</u>, 290 F.3d at 1041.

11     B. Discussion

12     In our published Order (#167), we remarked that Mr. Dickie
13 "clearly cannot refuse to answer if he had any involvement with the
14 mere administration of a website without articulating why this
15 administration implicates his First Amendment rights." <u>Quixtar</u>, 566
16 F. Supp. 2d at 1215. Mr. Dickie has attempted to make such a
17 showing: "creating or administering a website or blog is akin to
18 publishing or distributing a statement, since the acts allow the
19 message to reach an audience, and they deserve the same protection."
20 (Objection 7 (#342).)

21     There is likely some minimal degree of association with a
22 website that would not constitute speech. Quixtar's suggestion that
23 the First Amendment does not apply to acts "such as contacting the
24 Internet Service Provider that hosts the website or paying the ISP's

25

26 [6] Quixtar's arguments invoking the causation element of their
   tortious interference claims as a basis for ignoring the <u>Cahill</u>
27 standard have been previously rejected (<u>see</u> <u>supra</u> at 24-25), and need
   not be further addressed here.

28                                      29

1  monthly bill" could be correct.  (P.'s Opp. 10 (#368).)  The

2  creation, administration, sponsorship, or authorization of a

3  website, blog, forum or video would seem likely, however, to

4  encompass rather more significant activity than the "mere

5  administration" to which we previously referred.  These activities

6  very well might constitute speech, giving rise to First Amendment

7  rights, as well as potential liability for defamation.  See, e.g.,

8  Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122, 1130-31 (9th Cir.

9  2006) (discussing analogy between internet publication and

10  publication in traditional print media).

11      The Magistrate Judge has specified that nothing in the Order

12  (#330) requires Mr. Dickie to testify as to the identity of any

13  particular anonymous online speaker.  (Hearing Tr., p. 26 (#307).)

14  We are concerned, nonetheless, that the Magistrate Judge's written

15  Order (#330) could in practice require such identification.  For

16  example, merely identifying a website as one which Mr. Dickie

17  "created, administered or sponsored" could reveal Mr. Dickie's

18  identity as an anonymous speaker, even if Mr. Dickie were not

19  required to testify as to the authorship of any particular statement

20  on that website.  Similarly, identification of a website as one

21  which was "created, administered, or sponsored" by a TEAM employee

22  could reveal TEAM as an anonymous speaker (acting through its

23  agent).  We have noted that courts must balance the First Amendment

24  rights of anonymous speakers with plaintiffs' needs for discovery

25  that would destroy anonymity.  Quixtar, 566 F. Supp. 2d at 1211.  It

26  does not appear that Paragraphs (A)-(C) and (E) of the Magistrate

27  Judge's Order (#330) effectively achieve that balance.

28                                  30

1     We note that no objection has been raised to Paragraph 2(F) of
2 the Magistrate Judge's Order (#330). This provision requires that
3 Mr. Dickie identify "[w]ebsites, blogs, forums and videos, known to
4 Mr. Dickie, containing statements that reference or relate to
5 Quixtar or Alticor." The Magistrate Judge then elaborates that "at
6 this stage, Mr. Dickie's answers shall include the content of such
7 statements but not the identity of the speaker." It would seem that
8 any website, blog, forum or video that would fall under Paragraphs
9 2(A)-(C) and (E) of the Magistrate Judge's Order (#330) — at least
10 those that would be relevant to Quixtar's claims for tortious
11 interference — would also fall under Paragraph 2(F). The procedure
12 for discovery under Paragraph 2(F), however, appears to provide for
13 application of the Cahill analysis before destroying the anonymity
14 of any anonymous speakers.

15     Of course, our concern about the First Amendment rights of
16 anonymous speakers does not relate to any websites, blogs, forums,
17 or videos that Mr. Dickie or TEAM employees or management created,
18 administered or sponsored non-anonymously. To the extent that any
19 websites, blogs, forums, or videos may fall under Paragraphs 2(A)-
20 (C) and (E), but do not involve anonymous speech by Mr. Dickie or
21 TEAM, no First Amendment concerns are raised by the requirement that
22 Mr. Dickie answer questions regarding them.

23     We conclude, therefore, that Mr. Dickie shall answer, pursuant
24 to Paragraphs 2(A)-(C) and (E) of the Magistrate Judge's Order
25 (#330), questions regarding the non-anonymous creation,
26 administration, or sponsorship of websites, blogs, forums and videos
27 by Mr. Dickie or other TEAM employees, as well as the creation,

28                                          31

1  administration, sponsorship, or authorization of such things by
2  TEAM's management and leaders.  With regard to websites, blogs,
3  forums and videos that were created, administered, sponsored, or
4  authorized anonymously, and which would otherwise fall under
5  Paragraphs 2(A)-(C) or (E), Mr. Dickie shall identify them as being
6  known to him, pursuant to Paragraph 2(F), so that the Cahill
7  analysis may be performed.

8

9                              **VI. Conclusion**

10      Under Nevada law, after a business entity merges into another,
11  the constituent entity cannot later sue or be sued because the
12  separate existence of every entity except the surviving entity
13  ceases.  All liabilities of the constituent entity, however, survive
14  the merger and are the responsibility of the surviving entity.

15      Further, the Magistrate Judge's rulings regarding the Hooded
16  Angry Man video, the "Save Us Dick DeVos" blog, the "Integrity is
17  TEAM" blog, and the "IBO Rebellion" blog were neither clearly
18  erroneous nor contrary to law.  We disagree with the Magistrate
19  Judge's determination regarding the statement at issue from the
20  "Q'Reilly" blog: that statement can, in the totality of the
21  circumstances, reasonably be considered an implied assertion of fact
22  and is thus potentially defamatory.  Under the Cahill standard,
23  Quixtar is therefore entitled to discover the identity of the
24  anonymous online speaker who posted it.

25      Also, the Magistrate Judge was within his discretion to limit
26  the required production of financial records to companies that are
27

28                                  32

1  parties to this case.  His Minute Order (#295) to that effect was
2  neither clearly erroneous nor contrary to law.

3      Finally, we find the objections of Mr. Dickie and Defendants
4  with regard to the Magistrate Judge's Order (#330) to be well taken.
5  The Order, as written, raises concerns regarding the First Amendment
6  rights of anonymous speakers.  These concerns may be ameliorated
7  through application of the Cahill standard, pursuant to the
8  procedure contemplated by Paragraph 2(F) of the Magistrate Judge's
9  Order (#330).

10

11      **IT IS, THEREFORE, HEREBY ORDERED** that the "Five Constituent
12 Defendants' Motion to Dismiss and for Summary Judgment" (#231) is
13 **GRANTED** on the following basis: the five constituent defendants are
14 entitled to dismissal pursuant to Fed. R. Civ. P. 12(b)(6) because
15 those parties lack the capacity to be sued under Nevada law.  All
16 causes of action asserted against those five parties in the first
17 amended complaint, however, remain a part of this case.  These
18 claims will be treated as asserted against Defendant Sky Scope Team,
19 Inc., which as the surviving entity acquired all liabilities of the
20 constituent defendants upon merger.

21

22      **IT IS FURTHER ORDERED** that the "Anonymous Online Speakers'
23 Objection to Magistrate Judge's Ruling" (#267), regarding the "Save
24 Us Dick DeVos" blog and the Hooded Angry Man video, is **OVERRULED**.
25 Thus, the Magistrate Judge's ruling that Mr. Dickie shall testify
26 with regard to the identity of these two anonymous online speakers
27 is affirmed.

28                                33

1    **IT IS FURTHER ORDERED** that "Plaintiff Quixtar Inc.'s Objections
2    to Magistrate Judge's November 12, 2008 Minute Order" (#269) are
3    **SUSTAINED IN PART and OVERRULED IN PART** as follows: the Magistrate
4    Judge's rulings regarding the "Integrity is TEAM" blog and the "IBO
5    Rebellion" blog are hereby affirmed; we reverse the Magistrate
6    Judge's ruling with regard to the "Q'Reilly" blog.  Mr. Dickie
7    therefore shall testify as to the identity of the author of the
8    statement from "Q'Reilly" blog, but need not testify regarding the
9    identity of the anonymous online speakers from the "Integrity is
10   TEAM" blog or the "IBO Rebellion" blog.

11

12   **IT IS FURTHER ORDERED** that our rulings here on the objections
13   (## 267, 269) to the Magistrate Judge's Minute Order (#261) shall
14   apply equally to Paragraph 2(D), 3 and 4 of the Magistrate Judge's
15   later Order (#330).  Thus, Mr. Dickie shall be required to testify
16   with regard to the identity of the anonymous speaker from the "Save
17   Us Dick DeVos" blog, the Hooded Angry Man video, and the "Q'Reilly
18   blog," but not the "Integrity is TEAM" blog or the "IBO Rebellion"
19   blog.

20

21   **IT IS FURTHER ORDERED** that Defendants' Objection (#306) to the
22   Magistrate Judge's December 12, 2008 Minute Order (#295) is
23   **OVERRULED**.  The Magistrate Judge's ruling regarding what documents
24   must be produced is thus affirmed.

25

26

27

28
                                    34

1    **IT IS FURTHER ORDERED** that the objections (## 342, 343) to the
2  Magistrate Judge's Order (#330) are **SUSTAINED IN PART and OVERRULED**
3  **IN PART** on the following basis:

4    Mr. Dickie shall answer, pursuant to Paragraphs 2(A)-(C) and
5  (E) of the Magistrate Judge's Order (#330), questions regarding the
6  non-anonymous creation, administration, or sponsorship of websites,
7  blogs, forums, and videos by Mr. Dickie or other TEAM employees, as
8  well as the creation, administration, sponsorship, or authorization
9  of websites, blogs, forums, and videos by TEAM's management and
10 leaders.

11    With regard to websites, blogs, forums, and videos that were
12 created, administered, sponsored, or authorized anonymously, and
13 which would otherwise fall under Paragraphs 2(A)-(C) or (E), Mr.
14 Dickie shall identify them as being known to him, pursuant to
15 Paragraph 2(F), so that the Cahill standard may be applied as
16 appropriate.

17

18

19 DATED: April 7, 2009.

20

21                                             UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28                                35

Exhibit 6

1   JOHN J. FRANKOVICH (NSBN 667)
    MIRANDU DU (NSBN 5288)
2   MCDONALD CARANO WILSON LLP
    100 West Liberty Street 10TH Floor
3   Reno, Nevada 89501
    Telephone: (775) 788-2000
4   Facsimile: (775) 788-2020
    E-Mail: jfrankovich@mcdonaldcarano.com
5
    CEDRIC C. CHAO (CA SBN 76045)
6   (*Pro Hac Vice Pending* )
    WILLIAM L. STERN (CA SBN 96105)
7   (*Pro Hac Vice Pending*)
    JAMES M. SCHURZ (CA SBN 145874)
8   (*Pro Hac Vice Pending*)
    MORRISON & FOERSTER LLP
9   425 Market Street
    San Francisco, California 94105-2482
10  Telephone: (415) 268-7000
    Facsimile: (415) 268-7522
11  E-Mail: cchao@mofo.com and western@mofo.com

12  Attorneys for Plaintiff QUIXTAR INC.

13
                    UNITED STATES DISTRICT COURT
14
                         DISTRICT OF NEVADA
15

16  QUIXTAR INC.,

17                 Plaintiff,              **CASE NO.**

18       v.                               **COMPLAINT**

19  SIGNATURE MANAGEMENT TEAM, LLC
    d/b/a TEAM,
20
                   Defendant.
21

22

23       For its Complaint against defendant Signature Management Team, LLC doing business

24  as "TEAM," Plaintiff Quixtar Inc. ("Quixtar") states as follows:

25                            **INTRODUCTION**

26       1.    In August 2007, TEAM and its principals set in motion a carefully orchestrated,

27  multi-pronged plan to form a new multi-level marketing company to compete against Quixtar.

28  The central element of TEAM's strategy was a massive and unprecedented raid on one of

1  Quixtar's most valuable assets – its confidential, proprietary, trade secret Line of Sponsorship

2  ("LOS") information – to solicit Quixtar distributors to resign from Quixtar and join TEAM's

3  new competing multilevel marketing business.

4      2.      TEAM has instructed or encouraged thousands of individuals to terminate their

5  Quixtar contracts and resign from Quixtar, resulting in many millions of dollars in lost sales of

6  Quixtar products and lost distribution channels. TEAM's principals and leaders have blatantly

7  violated critical non-compete and non-solicitation agreements, tortiously interfered with

8  Quixtar's relationships with its distributors, and unfairly used Quixtar's registered trademarks.

9  TEAM has initiated and driven frivolous litigation against Quixtar in at least 17 different court

10  cases around the country, and has disparaged Quixtar in a vicious smear campaign.

11                          **PARTIES AND JURISDICTION**

12      3.      Plaintiff Quixtar is a Virginia corporation whose address and principal place of

13  business is 5101 Spaulding Plaza, Ada, MI 49355. Quixtar, which began operations September

14  1, 1999, is a successor in interest to Amway Corporation ("Amway") with regard to certain

15  assets of Amway in North America, including distributorship agreements previously made with

16  Amway.

17      4.      Defendant Signature Management Team, LLC ("TEAM") is a Nevada limited

18  liability company, with its principal place of business in the State of Michigan. According to

19  sworn testimony by TEAM's CEO and sole member, TEAM is owned by six corporations

20  registered in Nevada.

21      5.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121, 28 U.S.C.

22  § 1331, and 28 U.S.C. § 1367.

23      6.      Venue is properly laid in this court pursuant to 28 U.S.C. § 1391.

24                          **GENERAL ALLEGATIONS**

25              **RELATIONSHIP BETWEEN TEAM AND WOODWARD/BRADY**

26      7.      TEAM was established, and has at all relevant times been run and operated, by

27  Orrin Woodward ("Woodward") and Chris Brady ("Brady"), two former Independent Business

28  Operators ("IBOs") of Quixtar. TEAM produces, markets, and sells Business Support Materials

1

1   ("BSM"), such as books, CDs, rallies, meetings, educational seminars, and other services, to
2   train and motivate Quixtar IBOs.

3       8.     TEAM markets BSM and otherwise conducts business under the direction of
4   Woodward, Brady, and individuals acting on their behalf. For example, TEAM communicates
5   with individuals affiliated with TEAM largely through its website, www.the-team.biz. That
6   website is registered to Woodward personally.

7                                    **PROCEDURAL BACKGROUND**

8       9.     On September 4, 2007, TEAM commenced an action against Quixtar in the
9   District Court of Collin County, Texas, 380th Judicial District. The named plaintiff in the Collin
10   County litigation was Signature Management Team, LLC. TEAM alleged that Quixtar had
11   tortiously interfered with TEAM's prospective business relations, had disparaged the business of
12   TEAM, and had engaged in acts of unfair competition.

13       10.     Quixtar moved to dismiss the Collin County case on grounds of forum non
14   conveniens. On October 2, 2007, after nearly a full day of hearing argument and receiving
15   testimony and documentary evidence, the Collin County court granted Quixtar's motion for
16   dismissal based on forum non conveniens. Quixtar now brings this action for damages,
17   declaratory judgment, and injunctive relief.

18                                **QUIXTAR BUSINESS MODEL**

19       11.     Quixtar offers throughout North America a unique business opportunity
20   combining the efficiency of the Worldwide Web with personal contact. Quixtar has operated a
21   multilevel marketing Sales and Marketing Plan in North America since September 1, 1999.
22   Previously, Amway operated a multilevel marketing Sales and Marketing Plan in North America
23   beginning in 1959.

24       12.     Amway continues to operate direct selling plans in more than eighty foreign
25   countries outside North America. Quixtar is currently the largest online seller of health and
26   beauty products and the largest online retailer among all e-commerce sites. Amway and Quixtar
27   together generate worldwide sales of about $6 billion each year.

28

2

1       13.    Quixtar attributes its success not only to its outstanding lines of consumer

2  products but also to its unique network of Independent Business Owners, or IBOs. (As used in

3  this Complaint, "distributor" and "IBO" are synonymous. "Distributorship" means the

4  Independent Business operated by a distributor or IBO under contract with Amway or Quixtar.)

5  IBOs are independent contractors who earn "bonus" commissions under Quixtar's multilevel

6  Sales and Marketing Plan for generating sales of Quixtar products. In addition to selling

7  products and services to customers and purchasing products and services for their own use, an

8  IBO may sponsor other IBOs by introducing them to the Sales and Marketing Plan and providing

9  them with information about the Quixtar business.

10                        **QUIXTAR'S PROPRIETARY "LOS" INFORMATION**

11       14.    This lineage or linkage between IBOs is referred to as the "line or sponsorship,"

12  or "LOS." The LOS is one of Quixtar's most valuable assets. It includes not only a list of

13  Quixtar customers, but also the architecture and structure of the organization of Quixtar's

14  independent sales force, its sales commission structure and its key customers. The LOS is the

15  exclusive channel through which Quixtar products are marketed. The LOS encompasses the

16  organization of Quixtar's sales force, its sales commission structure and its key customers. The

17  goodwill and relationships Quixtar has with customers and/or IBOs, all based on and organized

18  around the LOS, are extremely valuable to Quixtar. The architecture and structure of the Quixtar

19  LOS is unique and proprietary, and constitutes Quixtar's confidential trade secret information.

20       15.    This information is not publicly available. Quixtar takes substantial measures to

21  protect the confidentiality of this proprietary and competitively valuable distribution network

22  architecture. The Quixtar LOS information is protected by, among other things, Rule 4.27 of the

23  Quixtar Rules of Conduct, which are more fully discussed below.

24       16.    The confidential distributor network information is extremely valuable and

25  constitutes a substantial portion of the value of Quixtar's business. The network and its specific

26  architecture of relationships set Quixtar apart from less successful multilevel marketing

27  organizations and provide a substantial competitive advantage.

28

                                                                        3

1    17.    It would be practically impossible for a competitor to reconstruct or duplicate the

2    confidential information about Quixtar's distributor network without access to that confidential

3    information.

4    18.    Quixtar, and it predecessor, Amway, have spent nearly 50 years developing their

5    unique and confidential distribution network. Disclosure of the architecture and structure of this

6    confidential distribution network (i.e., the LOS) to a competitor would cause serious and

7    irreparable harm to Quixtar's business and give any such competitor an unfair competitive

8    advantage.

9    **QUIXTAR'S RULES OF CONDUCT**

10    19.    To become an IBO, an individual must submit a written Application to Quixtar.

11    By executing the Application, each IBO agrees to comply with the Sales and Marketing Plan and

12    Rules of Conduct as they may be amended and published from time to time in official literature.

13    20.    Each IBO is required to renew his or her contract with Quixtar each and every

14    year, pay a renewal fee, and renew the commitment to abide by the Quixtar Sales and Marketing

15    Plan and Rules of Conduct as they may be amended and published from time to time in official

16    Quixtar literature.

17    21.    Rule 4.14 prohibits IBOs from "tak[ing] advantage of their knowledge of or

18    association with other IBOs whom they did not personally register, including their knowledge

19    resulting from or relating to their individual lines of sponsorship," in order to promote and

20    expand other business ventures, including other selling activities involving products, services, or

21    business opportunities not offered or marketed by Quixtar.

22    22.    Rule 4.14.1 prohibits IBOs from soliciting, directly or indirectly, other IBOs

23    whom they (i.e., the first-referenced IBOs) did not personally register in order to sell, offer to

24    sell, or promote other product, services, or business opportunities not offered or marketed by

25    Quixtar.

26    23.    Rule 4.27 provides that all LOS information is considered and maintained as

27    Proprietary Information of Quixtar, and that all IBOs, among other things, shall not disclose

28    such Proprietary Information to any third party or use such Proprietary Information to compete

4

1   either directly or indirectly with Quixtar. Rule 4.27 provides that any such use or disclosure of
2   Proprietary Information will cause significant and irreparable harm to Quixtar, warranting an
3   award of injunctive relief, including temporary and preliminary injunctive relief.

4       24.    Rule 4.8 requires IBOs to comply with all applicable laws, regulations and codes,
5   and to refrain from activities that could injure the reputation of the distributor or Quixtar.

6       25.    Rule 6.5 prohibits IBOs from using the LOS to sell, distribute, or promote
7   competing products, services or other business ventures, or otherwise interfere in the business of
8   Quixtar or other IBOs.

9       26.    Rule 6.5.3 prohibits IBOs from competing, either directly or indirectly, with
10  Quixtar while registered as a Quixtar IBO.

11      27.    Rules 6.5.4 prohibits IBOs from competing, either directly or indirectly, with the
12  business of Quixtar in the United States, Canada, and all offshore markets operating under the
13  North American Independent Business Ownership Plan during the six-month period following
14  the voluntary or involuntary resignation, non-renewal, or termination of their distributorship.

15      28.    Rule 6.5.5 prohibits IBOs from encouraging, soliciting or otherwise attempting to
16  recruit or persuade any other IBO to compete with the business of Quixtar for a period of two
17  calendar years following the termination of their registration as a Quixtar IBO.

18      29.    Under Rule 6.5.10, IBOs acknowledge that a violation of any subsection of Rule
19  6.5 will cause significant and irreparable harm to active IBOs and Quixtar, warranting an award
20  of injunctive relief, including a temporary restraining order and/or a preliminary injunction,
21  specific performance, and damages including costs, attorneys' fees, and disgorgement of all
22  profits made as a result of such unauthorized activity.

23      30.    The non-competition provisions contained in Rule 6.5 are reasonably limited in
24  duration and scope, and serve to protect Quixtar's reasonable competitive business interests in
25  protecting its goodwill and relationships with its IBOs and other customers, and protecting its
26  interests in its confidential, proprietary and trade secret information.

27

28

5

| | |
|---|---|
| 1 | **TEAM AND ITS MISCONDUCT** |
| 2 | 31.    TEAM was established, and has at all relevant times been run and operated, by |
| 3 | Orrin Woodward and Chris Brady, or persons operating under their direction. Woodward and |
| 4 | Brady were terminated as Quixtar Independent Business Owners ("IBOs") on August 9, 2007. |
| 5 | 32.    TEAM produces, markets, and sells Business Support Materials ("BSM"), such as |
| 6 | books, CDs, rallies, meetings, educational seminars, and other services to train and motivate |
| 7 | Quixtar IBOs. Until recently, TEAM sold BSM exclusively to Quixtar IBOs; but in recent |
| 8 | weeks thousands of IBOs have resigned in response to TEAM's wrongful solicitation and |
| 9 | therefore, on information and belief, TEAM today sells BSM both to current Quixtar IBOs and |
| 10 | to former Quixtar IBOs. |
| 11 | 33.    TEAM derives most, if not all, of its revenue from selling BSM to Quixtar IBOs. |
| 12 | TEAM recently stated in another court filing that: |

13    QUIXTAR owns its own training system and sells training
       materials to QUIXTAR IBOs which compete with the training,
14    leadership and motivational materials sold to QUIXTAR IBOs by
       TEAM. QUIXTAR is, in that regard, a competitor of TEAM,
15    QUIXTAR permits other successful IBOs to develop and sell
       training materials to its IBOs – including IBOs which are affiliated
16    with TEAM. The training systems developed by other IBOs which
       are not affiliated with TEAM are competitors of TEAM.
17

| 18 | 34.    TEAM markets BSM and otherwise conducts business under the direction of |
| 19 | Woodward, Brady, and individuals acting at their direction. TEAM's operations are inextricably |
| 20 | intertwined with those of Woodward, Brady, and other individuals authorized by TEAM. |
| 21 | 35.    Prior to their termination, Woodward and Brady qualified as Diamond IBOs, a |
| 22 | high level of achievement within the Quixtar business. As Diamond IBOs, Quixtar granted |
| 23 | Woodward and Brady a limited, revocable license to use Quixtar's confidential, trade secret, and |
| 24 | proprietary information, including LOS information, in accordance with Quixtar's Rules of |
| 25 | Conduct. |
| 26 | 36.    Woodward and Brady have conveyed to TEAM substantial portions of Quixtar's |
| 27 | confidential, proprietary and competitively valuable LOS information. TEAM has used this |
| 28 | |

6

1  confidential information without Quixtar's authorization to recruit and solicit Quixtar IBOs to

2  align with TEAM and/or to resign from Quixtar, and for other purposes detrimental to Quixtar.

3      37.    TEAM's unauthorized use of Quixtar's confidential, proprietary and

4  competitively valuable information has caused and will continue to cause serious and irreparable

5  harm to Quixtar's business.  TEAM's unauthorized use of Quixtar's confidential information

6  gives TEAM an unfair competitive advantage in the multilevel marketing industry.

7      **TEAM's Early Efforts to Break Off from Quixtar and Start a Competing Company**

8      38.    On information and belief, TEAM started planning to launch a new competing

9  multi-level marketing company at least as early as the first half of 2007, and, at the same time, to

10 stop promoting and supporting the Quixtar business.

11     39.    TEAM has used the Quixtar LOS to recruit a large organization of Quixtar IBOs

12 as customers for TEAM products and services.  TEAM induced each of these recruits to execute

13 a Quixtar IBO contract while concealing or minimizing the fact that the recruit would actually

14 become a Quixtar IBO.  TEAM falsely represented to each of these newly recruited Quixtar

15 IBOs that they were in fact joining a business operated by TEAM, and referred to Quixtar, if at

16 all, as a mere supplier to TEAM.

17     40.    TEAM required its customers to use their unique Quixtar IBO registration number

18 as a password for entering TEAM controlled web sites and meetings, or as a prerequisite for

19 obtaining a TEAM number for access to those websites and meetings.  Recently, TEAM

20 assigned new TEAM numbers to all TEAM-affiliated Quixtar IBOs in anticipation of a mass

21 exodus from Quixtar, solicited and orchestrated by TEAM.

22     41.    TEAM's business has been derivative of and dependent upon the Quixtar

23 business, as virtually all, if not all, of its revenue has been derived from selling BSM to Quixtar

24 IBOs through the Quixtar LOS.  TEAM used the Quixtar LOS to sell TEAM products and

25 services to Quixtar IBOs, but discouraged those same IBOs from acting as effective distributors

26 for Quixtar products.  TEAM has continued to free ride on Quixtar's products and LOS

27 distribution channel, while systematically alienating Quixtar IBOs from Quixtar by persuading

28 many of them to believe that they were TEAM customers rather than Quixtar IBOs.  This

7

1  deceptive practice laid the groundwork for TEAM eventually to try to hijack a substantial

2  segment of Quixtar's LOS as a multilevel distribution channel for products supplied by TEAM

3  instead of Quixtar.

4      42.    On information and belief, TEAM has negotiated with at least one new supplier as

5  a source of products for TEAM's new multi-level marketing company.

6          **TEAM's Threats Against Quixtar—The August 9, 2007 Meeting**

7      43.    Earlier this year, Quixtar requested a meeting to address violations of Quixtar's

8  Rules of Conduct by Woodward, Brady and their TEAM organization.

9      44.    On August 9, 2007, representatives of Quixtar, including Michael A. Mohr, Vice

10  President and General Counsel of Alticor Inc. (Quixtar's parent), attended a meeting in Ada,

11  with Woodward, Brady, TEAM's CEO (Robert Dickie III), TEAM's lawyer (Kevin Thompson)

12  and other IBOs acting in concert with TEAM. Although Quixtar intended to provide Woodward,

13  Brady and their TEAM organization with (i) notice of their numerous defaults under their

14  Quixtar contract, (ii) the bases for Quixtar's conclusion that they were in default, and (iii) a

15  remediation plan to cure their defaults, Woodward, Brady and the other TEAM representatives

16  demanded their release from their Quixtar contracts so they could leave and compete with

17  Quixtar.

18      45.    TEAM immediately proposed that Quixtar waive a number of important contract

19  provisions that protect Quixtar's LOS and prevent raiding of its IBOs by competitive multi-level

20  marketing companies. The TEAM representatives asked Quixtar to agree, contrary to their

21  contracts with Quixtar, that Woodward, Brady and other TEAM leaders be permitted to take the

22  thousands of Quixtar IBOs under them in the LOS to a competing business opportunity.

23  Knowing that their plan would violate the non-compete rule in their Quixtar contracts, they

24  asked that Quixtar repeal that rule for them. The obvious reason for requesting a repeal of the

25  non-compete rule was to allow TEAM to compete with Quixtar, and to transform a network of

26  distributors recruited using Quixtar's LOS into a competing multi-level marketing business.

27      46.    Quixtar tried to direct the meeting back to its original purpose – to discuss a cure

28  of the numerous, serious breaches of the Quixtar Rules of Conduct in the TEAM organization.

8

1    The TEAM founders, Woodward and Brady, however, refused to discuss that matter.  Quixtar
2    then terminated them as IBOs.

3        47.    The TEAM leaders then had one of their lawyers, D.J. Poyfair, deliver a copy of a
4    draft class action complaint that would be filed in California by close of business that same day
5    if Quixtar did not accede to his clients' demands.  TEAM also threatened Quixtar with regulatory
6    action and negative publicity if Quixtar did not give them a roll back of Quixtar's non-compete
7    Rule.  Quixtar would not accede to TEAM's request, so TEAM had a number of its leaders and
8    followers file the class action complaint in California that same day, August 9, 2007, as
9    threatened.

10        48.    The California complaint includes scandalous, meritless allegations to the effect
11    that Quixtar products are too expensive and that Quixtar therefore operates as an illegal pyramid.
12    It is clear from the complaint that the TEAM conspirators did not come to the August 9 meeting
13    to discuss in good faith remediation of their breaches of the Quixtar contracts.  They came in bad
14    faith to attempt to blackmail Quixtar into waiving its contractual rights.  It also is clear from the
15    California complaint that the TEAM conspirators also breached additional confidentiality
16    agreements with Quixtar and the IBOAI.

17        49.    On its face, the California complaint also wrongfully discloses certain
18    confidential, commercially sensitive information that had been disclosed to some of the named
19    plaintiffs in their capacity as IBO leaders, subject to written confidentiality agreements with
20    Quixtar and the IBOAI.

21        50.    On October 5, 2007, less than two months after it was filed, a federal district
22    judge in California dismissed the class action complaint with prejudice.

23                        **Unlawful TEAM Activity**

24        51.    TEAM and its agents have engaged in a concerted, systematic, nation-wide effort
25    to unfairly compete with Quixtar, misappropriate Quixtar's trade secrets, disparage Quixtar and
26    interfere with Quixtar's contracts with thousands of Quixtar IBOs and disrupt Quixtar's business.
27
28

                                                                                    9

1          52.    TEAM and its agents have continued to use Quixtar's proprietary LOS to compete
2    unlawfully with and interfere with the business of Quixtar and its IBOs and to solicit IBOs to
3    compete with Quixtar's business in breach of their Quixtar contracts.

4          53.    For example, TEAM and its agents continue to hold TEAM meetings around the
5    country on Tuesday and Saturday nights. TEAM publicizes and generates attendance at these
6    meetings through the use of Quixtar's LOS information. At a number of these TEAM meetings,
7    attendees were required to provide a Quixtar IBO number to gain admittance. The times and
8    locations of these meetings have been posted on TEAM's website, which until recently has only
9    been accessible with a Quixtar IBO number or with a TEAM password obtained with a Quixtar
10   IBO number.

11         54.    TEAM used Quixtar LOS information to heavily promote a "major function" in
12   Louisville, Kentucky scheduled for the weekend of October 19, 2007. TEAM has announced
13   that this "Fall Leadership Conference" would be the public launch of the restructured TEAM
14   multilevel marketing business. TEAM promised that Louisville is where Woodward and Brady
15   will "roll out" their "flurry of new activity and materials" and that the Louisville meeting would
16   be "the most important major convention the TEAM has ever had and one that you will not want
17   to miss."

18         55.    TEAM's continuing efforts to hold meetings for existing and prospective Quixtar
19   IBOs is not to promote and support the Quixtar business, but to further TEAM's own self-
20   interests which are detrimental to Quixtar.

21         56.    Not only is TEAM using its meetings to lay the groundwork for future
22   competition against Quixtar, but TEAM engages in such competition with Quixtar and its IBOs
23   every time it holds a meeting. TEAM has admitted that it is a direct competitor of both Quixtar
24   and its authorized IBOs in the market for BSMs. Every TEAM meeting takes away potential
25   customers for Quixtar and its legitimate IBOs who sell approved BSMs. TEAM continues to
26   gather together large groups of current and potential Quixtar IBOs for the primary purpose of
27   selling them TEAM BSMs and maintaining their primary allegiance to TEAM to the detriment
28   of Quixtar.

1      57.    As another example, TEAM and its agents have sent emails to Quixtar IBOs

2 informing them that TEAM soon will be "free" from Quixtar, but that TEAM loyalists should

3 continue to recruit and sign up new Quixtar IBOs in the meantime so that they can transfer these

4 new recruits over to the new, competing TEAM business.

5      58.    As yet another example, TEAM, its agents and representatives continue to

6 broadcast mass voice messages to IBOs disparaging Quixtar, discouraging them from building

7 their Quixtar businesses, and encouraging them to resign from Quixtar.  In particular, high level

8 TEAM representatives sent voicemails between August 30, 2007 and September 6, 2007 to the

9 IBOs under them in the LOS:

10      &bull;    encouraging Quixtar IBOs to build the competing TEAM business, but
11         discouraging those same Quixtar IBOs from participating in or building their
        Quixtar business;

12      &bull;    disparaging and diminishing the reputation of Quixtar by stating that (1) Quixtar
13         is "in freefall," (2) "partner stores are dropping" Quixtar and (3) "the credit card
        company that's financing their credit card is also dropping them;"

14      &bull;    calling Quixtar's pricing "horrible" and stating that "people cannot sell" Quixtar
15         products; and

16      &bull;    comparing Quixtar to the communist East German regime and its IBOs to "rats
        leaping off a ship."

17      59.    TEAM's and its agents' continued use of Quixtar's LOS information to identify

18 and target Quixtar's IBOs in order to induce them to do business with TEAM's competing MLM

19 has caused and is continuing to cause substantial and material harm to Quixtar and its

20 distribution network of IBOs.

21      60.    TEAM has indicated that it will solicit other IBOs as well as their non-IBO

22 customers to switch from Quixtar to their competing businesses.  Even more damaging, TEAM

23 promises to solicit other IBOs to spend their time and effort selling competing products instead

24 of Quixtar products.  The damage to Quixtar's business due to lost product sales, while difficult

25 to measure in dollar terms with certainty, has been and will continue to be substantial.

26      61.    TEAM and its agents are also undermining the integrity of the Quixtar LOS itself.

27 By soliciting IBOs to switch their sponsoring efforts from Quixtar to a competitor, TEAM is

28 depriving Quixtar not only of future sales but of the current and future Quixtar sales force.

11

1   Quixtar competes with other multi-level marketing companies not only with respect to the sale of
2   its products, but also in attracting and retaining its IBO distributors. Losses of IBOs to a
3   competitor adversely affect Quixtar as well as all the IBOs who are working hard to build and
4   maintain a Quixtar business. Each IBO may be entitled to receive bonuses based on sales
5   generated by his or her downline IBOs. Thus, anything that disrupts or interferes with the
6   productivity of an IBO's downline distributors, including disparagement of Quixtar and wrongful
7   solicitation of its IBO sales force, adversely impacts and depreciates the earning ability of the
8   upline IBO.

9          62.     As part of their calculated plan to interfere with and compete unfairly with
10   Quixtar's business, TEAM and its agents have encouraged thousands of Quixtar IBOs to resign
11   from Quixtar or to remove themselves from Quixtar's auto renewal plan. These actions are
12   calculated to reduce the number of IBOs in the Quixtar organization, and ultimately place former
13   Quixtar IBOs into TEAM's competing venture. In the past few weeks, thousands of Quixtar
14   IBOs have resigned in a manner that has been coordinated and directed by TEAM and its agents.

15          63.     At its TEAM meetings, TEAM hides the Quixtar business opportunity so that it
16   can instead exploit TEAM BSM. In particular, TEAM misrepresents to those attending its
17   meetings that those who join Quixtar as IBOs are instead joining TEAM, and that Quixtar is
18   merely a vendor, supplier or subcontractor of TEAM. TEAM thus intentionally creates
19   confusion amongst actual and prospective Quixtar IBOs.

20          64.     It is difficult to know how many new Quixtar IBOs will not be sponsored because
21   of TEAM's interference, but Quixtar as well as its IBOs are harmed and will continue to be
22   harmed by the loss of the selling and sponsoring efforts of IBOs who have resigned or ceased to
23   distribute Quixtar's products due to TEAM's improper actions. The damage to Quixtar's
24   business due to lost IBO recruitment will be substantial.

25          65.     TEAM has promoted Quixtar's XS line of products, including energy drinks and
26   meal supplement bars, through TEAM websites and meetings, in a manner that is likely to cause
27   confusion as to the source of the products, for example, by suggesting that the origin of Quixtar's
28   XS line of products is TEAM, not Quixtar. Quixtar's XS Energy drink has been featured

1    prominently on TEAM's U.S. website and TEAM's Spanish website.  Likewise, TEAM

2    advocates that each TEAM member eat one XS bar and drink two cans of XS Energy drink per

3    day. Because TEAM conceals Quixtar as the exclusive source of these products, TEAM has

4    created the false impression that the origin of Quixtar's XS line of products is TEAM, not

5    Quixtar.

## COUNT 1

## VIOLATION OF THE LANHAM ACT

8        66.    Quixtar realleges and incorporates paragraphs 1-65 as if fully set forth herein.

9        67.    TEAM and its agents have made false and/or misleading statements about the

10    pricing of Quixtar products  These actions constitute false or misleading representations of fact

11    in violation of §1125 of the Lanham Act.

12        68.    TEAM and its agents have also, by its representations and omissions at its

13    meetings, created the false impression among those attending its meetings that those who join

14    Quixtar as IBOs are instead joining TEAM, and that Quixtar is merely a vendor, supplier or

15    subcontractor of TEAM.

16        69.    Additionally, TEAM and its agents have promoted Quixtar's XS line of products,

17    including energy drinks and meal supplement bars, through TEAM websites and meetings, in a

18    manner that is likely to cause confusion as to the source of the products, for example, by

19    suggesting that the origin of the XS line of products is TEAM, not Quixtar.

20        70.    By reason of such representations and omissions, TEAM and its agents have, in

21    connection with its goods, services and commercial activities, used in commerce false or

22    misleading descriptions of fact, or false or misleading representations of fact, which in

23    commercial advertising or promotion, misrepresent  the nature, characteristics, or qualities of

24    TEAM's and/or Quixtar' goods, services, and/or commercial activities.

25        71.    Quixtar has been damaged by such actions of Defendants, and is likely to suffer

26    further injury if Defendants are not enjoined from their illegal acts.

27

28

13

## COUNT 2

## TRADE SECRET MISAPPROPRIATION

72.    Quixtar realleges and incorporates paragraphs 1-71 as if fully set forth herein.

73.    Quixtar's confidential LOS distributor network information is extremely valuable, and constitutes a substantial portion of the value of Quixtar's business. The network and its specific architecture provide a substantial competitive advantage.

74.    A number of TEAM-affiliated Quixtar IBOs, including Woodward and Brady, achieved levels within the Quixtar organization that allowed them confidential access to Quixtar's confidential LOS information to build and support their business in accordance with the Quixtar Rules of Conduct. With the use of Quixtar's LOS information, TEAM exerts substantial influence over and creates valuable relationships with Quixtar IBOs.

75.    Woodward, Brady and other TEAM-affiliated Quixtar IBOs with access to Quixtar's confidential LOS information knew that they had an express obligation to maintain its secrecy and to use LOS information only for the promotion of the Quixtar business in accordance with the Quixtar Rules of Conduct.

76.    Quixtar has since revoked authorization for TEAM and its agents, including Woodward and Brady, to use Quixtar confidential LOS information. TEAM and its agents, however, continue to use it without Quixtar's consent. In particular, TEAM continues to carry out at least the following unauthorized acts:

(a)    using Quixtar's confidential LOS to organize and hold TEAM meetings and functions, including TEAM's Fall Leadership Conference in Louisville, Kentucky;

(b)    using Quixtar's confidential LOS through Quixtar's website to transmit emails to TEAM-affiliated Quixtar IBOs for the benefit of TEAM and to disparage Quixtar; and

(c)    using Quixtar's confidential LOS to send mass voice mail messages to TEAM-affiliated Quixtar IBOs for the benefit of TEAM and to disparage Quixtar.

77.    Furthermore, TEAM's use of Quixtar's confidential LOS information is not only unauthorized and unlawful in and of itself, but TEAM is using Quixtar's confidential LOS

14

1    information for unlawful purposes, including unfairly competing with Quixtar and its IBOs,

2    soliciting IBOs, disparaging Quixtar, and violating Quixtar's Rules of Conduct.

3      78.    Quixtar has been damaged by such actions of Defendants, and is likely to suffer

4    further injury if Defendants are not enjoined from their illegal acts.

5                        **COUNT 3**

6      **TORTIOUS INTERFERENCE WITH EXISTING CONTRACTS**

7      79.    Quixtar realleges and incorporate paragraphs 1-78 as if fully set forth herein.

8      80.    Quixtar has valid contracts with its IBOs governing their participation in the

9    Quixtar business.

10      81.    Defendants have knowledge of the contracts between Quixtar and its IBOs.

11      82.    TEAM and its agents intentionally and improperly interfered with Quixtar's

12    contracts with its IBOs through the actions described above, including but not limited to:

13           (a)      encouraging Quixtar IBOs to resign from the Quixtar business;

14           (b)      encouraging Quixtar IBOs to remove themselves from Quixtar's auto-

15    renewal list, thus ultimately reducing the number of IBOs that renew with Quixtar;

16           (c)      telling Quixtar IBOs to stop building their Quixtar business;

17           (d)      telling Quixtar IBOs not to purchase certain Quixtar products;

18           (e)      causing one or more Quixtar IBOs to improperly compete with the

19    business of Quixtar or its IBOs in breach of their contracts with Quixtar;

20           (f)      causing one or more Quixtar IBOs to improperly solicit other IBOs in

21    breach of their contracts with Quixtar;

22           (g)      causing one or more Quixtar IBOs to improperly use Quixtar's

23    confidential and proprietary LOS information in breach of their contracts with Quixtar;

24           (h)      disparaging Quixtar, its products and prices;

25           (i)      causing IBOs to create the false impression among those attending TEAM

26    meetings that those who join Quixtar as IBOs are instead joining TEAM, and that

27    Quixtar is merely a vendor or supplier of TEAM; and

28

1          (j)     causing one or more Quixtar IBOs to employ improper practices in

2              building or maintaining their Quixtar business.

3      83.    Quixtar has been damaged by such actions of Defendants, and is likely to suffer

4   further injury if Defendants are not enjoined from their illegal acts.

5      84.    Defendants' actions are per se wrongful, or if lawful, were undertaken with

6   malice and without legal justification for the purpose invading Quixtar's contractual rights and/or

7   business relationships. There are no legitimate business reasons to justify or motivate

8   Defendants' actions.

9                                    COUNT 4

10   **TORTIOUS INTERFERENCE WITH ADVANTAGEOUS BUSINESS RELATIONS**

11     85.    Quixtar realleges and incorporates paragraphs 1-84 as if fully set forth herein.

12     86.    Quixtar has the expectancy of future business relationships with prospective IBOs

13   who may participate in the Quixtar business.

14     87.    TEAM has knowledge of those relationships and/or expectancies between Quixtar

15   and its prospective IBOs.

16     88.    TEAM and its agents intentionally and improperly interfered with Quixtar's

17   relationships and/or expectancies with prospective IBOs through the actions described above,

18   including but not limited to:

19          (a)     soliciting prospective Quixtar IBOs into TEAM's competing multi-level

20              marketing company;

21          (b)     encouraging prospective Quixtar IBOs not to join Quixtar;

22          (c)     hiding the Quixtar business opportunity from prospective Quixtar IBOs

23              during TEAM meetings and functions;

24          (d)     misrepresenting to prospective Quixtar IBOs that those who join Quixtar

25              as IBOs are instead joining TEAM, and that Quixtar is merely a vendor or supplier of

26              TEAM; and

27          (e)     disparaging Quixtar.

28

                                                                              16

1    89.    Quixtar has been damaged by such actions of Defendants, and is likely to suffer

2    further injury if Defendants are not enjoined from their illegal acts.

3    90.    Defendants' actions are per se wrongful, or if lawful, were undertaken with

4    malice and without legal justification for the purpose invading Quixtar's current and/or

5    prospective business relationships. There are no legitimate business reasons to justify or

6    motivate Defendants' actions.

7    ## COUNT 5

8    ## DECLARATORY JUDGMENT RE TEAM'S CLAIMS

9    91.    Quixtar realleges and incorporates paragraphs 1-90 as if fully set forth herein.

10    92.    TEAM asserted claims challenging certain of Quixtar's business practices in the

11    Collin County litigation, captioned Signature Management Team, LLC, d/b/a TEAM v. Quixtar,

12    Inc., Cause No. 3800298407, 380th Judicial District, Collin County, Texas.

13    93.    In that lawsuit, TEAM alleged that:

14    • Quixtar tortiously interfered with TEAM's prospective business relations
         (Count 1);
15

16    • Quixtar disparaged the business of TEAM (Count 2);

17    • Quixtar engaged in acts of unfair competition (Count 3);

18    • Quixtar made binding promises to TEAM through its conduct in reviewing and
         approving TEAM BSM (Count 4); and

19    • Quixtar has engaged in anticompetitive conduct (Counts 5 and 6).

20    94.    Even though the Collin County, Texas lawsuit has been dismissed, Quixtar has a

21    reasonable apprehension that TEAM will file a new suit, raising the same allegations. Indeed,

22    TEAM has orchestrated 17 different lawsuits in 9 states against Quixtar since the August 9,

23    2007, meeting.

24    95.    Quixtar denies the allegations in the dismissed Collin County, Texas complaint.

25    The threat that allegations may be reasserted by TEAM places a cloud over Quixtar and its IBOs.

26    96.    Quixtar seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not liable for

27    any of the unlawful acts that TEAM alleged in the Collin County litigation. Specifically, Quixtar

28    seeks a judgment declaring that:

17

1          (a)    Quixtar has not tortiously interfered with TEAM's prospective business

2   relations (Count 1);

3          (b)    Quixtar has not disparaged the business of TEAM (Count 2);

4          (c)    Quixtar has not engaged in acts of unfair competition (Count 3);

5          (d)    Quixtar has not made binding promises to TEAM through its conduct

6   (Count 4); and

7          (e)    Quixtar has not engaged in an unlawful restraint of trade or

8   anticompetitive conduct (Counts 5 and 6).

9                    **PRAYER FOR RELIEF**

10      THEREFORE, Quixtar respectfully requests that the Court enter judgment in its favor

11  and against TEAM:

12    A.    Awarding Quixtar compensatory damages;

13    B.    Awarding Quixtar exemplary damages;

14    C.    Declaring Quixtar has not tortiously interfered with TEAM's prospective business

15        relations;

16    D.    Declaring Quixtar has not disparaged the business of TEAM;

17    E.    Declaring Quixtar has not engaged in acts of unfair competition against TEAM;

18    F.    Declaring Quixtar has not made binding promises to TEAM through its conduct;

19    G.    Declaring Quixtar has not engaged in an unlawful restraint of trade or

20        anticompetitive conduct;

21    H.    Enjoining TEAM, and anyone acting in concert with TEAM or acting on its

22        behalf, from:

23        1.    holding any meetings in which the Quixtar LOS has been used to invite

24            attendees;

25        2.    making false or misleading statements concerning i) the salability or

26            pricing of Quixtar products, ii) TEAM's relationship with Quixtar, or iii)

27            the origin Quixtar products;

28

1     3. using the Quixtar LOS to sell, distribute, or promote products and services

2      of TEAM or other non-Quixtar products, services, and business ventures,

3      or otherwise interfering with the Quixtar business of other IBOs;

4     4. encouraging, soliciting or otherwise attempting to recruit or persuade any

5      other IBO to join TEAM or otherwise to compete with Quixtar's business;

6     5. disparaging Quixtar, or otherwise engaging in activities injurious to the

7      reputation of Quixtar; and

8     6. keeping, using or disclosing Quixtar's confidential information, or

9      otherwise making it available directly or indirectly to any person,

10      including but not limited to Quixtar's competitors.

11   I. Affirmatively requiring TEAM, and anyone acting in concert with TEAM or on

12   its behalf, to:

13     1. return to Quixtar all Quixtar's LOS and other confidential information,

14      and all data or information that was derived from it; and

15     2. disgorge all profits made as a result of its wrongful acts.

16   J. Directing TEAM to pay all costs incurred by Quixtar related to this proceeding,

17   including attorney's fees; and

18   K. Awarding such other relief as the Court deems equitable and just.

19 Dated: October 23, 2007

20        MCDONALD CARANO WILSON LLP

21

22       By:   /s/ Miranda Du
           JOHN FRANKOVICH (NSBN 667)

23         MIRANDA DU (NSBN 5288)
          100 W. Liberty Street, 10th Floor

24         P.O. Box 2670
         Reno, Nevada 89505-2670

25         Attorneys for Plaintiff

26

27

28

                       19

exhiBit  7



**Alticor Media Blog** is the official news weblog from the <u>Alticor</u> family of companies.

# August 10th, 2007 @ 3:59 pm ET...

### Just go, Team

You can <u>post a comment</u> or <u>trackback</u> from your own site.

We terminated Orrin Woodward yesterday, along with several other leaders of his field organization, named Team. We'll post our formal statement when it's ready. Informally, here's the story:

We terminated Orrin Woodward for philosophical reasons. We did it for legal reasons.

But the main reason we did it is because the way Orrin Woodward ran his organization was a disgrace to every person who's ever tried to build a Quixtar or Amway business the right way.

We have fought to clean up the reputation of our company for years. We know that one of the biggest challenges our reputation faces is misrepresentation of the Quixtar and Amway businesses to others.

And over the last several months, it became clear to us that Orrin Woodward was a poster child for a long list of bad business practices that our critics hate about our company. The other leaders we terminated — including Chris Brady, Billy Florence, Don Wilson, Randy Haugen, Tim Marks and Chuck Goetschel — also showed they were unwilling to reform.

Not telling people they were signing up with Quixtar? Woodward would hide that fact from new Independent Business Owners as long as he could.

Making people think it was easy money? Same deal.

Telling people that Quixtar was merely a "supplier," and not the company they were signing a contract with? Yup.

We'd told Woodward we had problems with the way he ran his business for years, and we worked methodically to bring those problems to resolution. We got ignored, we got lied to, and, boy, we got the runaround.

So in the end, yesterday, we tried to give him one last chance to reform.

He didn't even want to hear his options. So we terminated him. And in return, he handed us a trumped-up, trash-talking lawsuit on his way out the door. In response, we have a temporary restraining order issued by a court that prevents him from looting the business as he seeks to take his act to a new company.

So he's gone, and so are others. We are doing our best to repair the relationships Orrin Woodward damaged and protect the businesses of the people in his organization that Orrin Woodward betrayed. And we will continue building our business with thousands of people who know how to build it the right way.

We would say we were sorry to see Orrin Woodward go. But only if that were true.

# State of Michigan

## In the Circuit Court for the County of Kent

·QUIXTAR, INC.
a Michigan corporation,

      Plaintiff,

                                    Case No.: 07-08413-CZ

v

                                      Honorable Paul J. Sullivan

Orrin Woodward, Laurie Woodward,
Chris Brady and Terri Brady, individuals,

      Defendants.

## ORDER DENYING PLANTIFF'S MOTION FOR CLARIFICATION OF ORDER AND EXPEDITED DISCOVERY

Edward J. Bardelli (P53849)
·WARNER NORCROSS & JUDD LLP
Attorneys for Plaintiff
900 Fifth Third Center
111 Lyon, NW
Grand Rapids, MI 49503
(616) 752-2000

James R. Sobeiraj
BRINKS HOFER GILSON & LIONE
Attorneys for Plaintiff
NBC Tower, Suite 3600
455 North Cityfront Plaza Drive
Chicago, IL 60611
(312) 321-4226

J. Terrance Dillon (P23404)
James R. Bruinsma (P48531)
MYERS NELSON DILLON & SHIERK,
PLLC
Attorneys for Defendants
125 Ottawa Avenue, NW; Suite 270
Grand Rapids, MI 49506
(616) 233-9640/(616) 233-9642 fax

D.J. Poyfair ·
SHUGHART THOMSON & KILROY, PC
Attorneys for Defendants
1050 - 17th Street, Suite 2300
Denver, CO 80265
(303) 572-9300·

William A. Sankbeil (P19882)
KERR, RUSSELL & WEBER, PLC
Attorneys for Defendants
500 Woodward Avenue, Suite 2500
Detroit, MI 48226
(313) 961-0200/(313) 961-0388 Fax

Sharon M. Woods (P22542)
Morley Witus (P30895)
.BARRIS, SOTT, DENN & DRIKER, P.L.L.C.
Attorneys for Signature Management Team, LLC
211 W. Fort St., 15th Floor
Detroit, MI 48226-3281
(313) 965-9725

## ORDER DENYING PLANTIFF'S MOTION FOR
## CLARIFICATION OF ORDER AND EXPEDITED DISCOVERY

At a session of this Court held in the City of Grand Rapids,
County of Kent, State of Michigan, on the 26th day of September,
· 2007.                                                    5+b    Oct

PRESENT:    HON. PAUL J. SULLIVAN
            Circuit Court Judge

For the reasons set forth on the record, Plaintiffs' Motion for Clarification of Order and

for Expedited Discovery is DENIED.

/0 -5-07

**PAUL J. SULLIVAN**

Paul J. Sullivan
Circuit Court Judge

**Approved as to Form:**

James R. Bruinsma (P48531)
*Attorney for Defendants*

Edward J. Bardelli (P53849)
*Attorney for Plaintiff*

ATTEST: A TRUE COPY

LINDA WIERENGA
Court Clerk

2

exhibit 10

**Exhibit A**

| No. | Statement | Source |
|-----|-----------|--------|
| 1. | Quixtar's business is an "illegal pyramid scheme." | www.freetheibo.com |
| | "It is now impossible for [IBOs] to earn money by legitimately selling Quixtar products." | The identity of the author of these statements is not in question, as TEAM has already admitted that it owns this website. (Docket No. 54, Ex. H.) There is therefore no First Amendment issue with respect to anything Mr. Dickie or TEAM posted on this website. Quixtar intends to ask questions relating to Mr. Dickie's and TEAM's postings on this site. |
| | "The only way for [IBOs] to make money is by illegally recruiting new distributors and earning bonuses on the internal consumption of this downline – a classic illegal pyramid." | |
| | "Quixtar has regularly, but secretly, acknowledged that its products are overpriced and not sellable." | These statements were attached as Ex. D to Docket No. 54. The Court found at the February 21 hearing that they are tortious and that Quixtar "has made a sufficient showing in this case that they are entitled to some discovery" concerning this website. |
| | "Quixtar is aware of, approves, promotes, and facilitates the systematic noncompliance with the FTC's *Amway* rules . . . Quixtar's cavalier approach to these rules, while advertising the company's legitimacy by flashing the 1979 *Amway* decision, flies in the face of lawful business practices." | |
| | "Quixtar knows that it violates the *Amway* rules and has disregarded this fact for years." | |
| | "IBOs have no choice but to continue | |

| No. | Statement | Source |
|---|---|---|
| | purchasing and consuming overpriced Quixtar products and recruiting new victims into the pyramid scheme, since that is the only way to make money with the Quixtar business opportunity." | |
| 2. | Quixtar's "high prices crippled IBOs' ability to sell at retail prices,"<br><br>Quixtar "terminated IBOs without due process."<br><br>Quixtar "refused to pay year end bonuses to IBOs in good standing." | Excerpt from the "Hooded Angry Man" video, posted at www.youtube.com/watch?v=pfjVHCtNMQQ<br><br>The first and third of these statements were attached as Ex. E to Docket No. 54. The Court found at the February 21 hearing that they are tortious and that Quixtar "has made a sufficient showing in this case that they are entitled to some discovery" concerning this website. |
| 3. | "That is the point in time when we would all need to renew our business with Quixtar. Please just hold on until your upline tells you to resign or not renew or whatever. It is way to [sic] early in the battle to give up. I am pretty sure one huge major drop of IBOs will have a much bigger [effect]." | http://forums.freetheibo.info/search/php?fid[  ]=11<br><br>This statement was attached as Ex. F to Docket No. 54. The Court found at the February 21 hearing that it is tortious and that Quixtar "has made a sufficient showing in this case that they are entitled to some discovery" concerning this website. |
| 4. | "It sounds as though the roof is caving in on Quixtar. I am sure these resignations will pave the way for a mass exodus. All of the above [TEAM] leaders are very well respected and their departure is sure to influence others to follow suit."<br><br>"[Alticor, Quixtar's parent company] will milk you for all your worth, methodically destroy your businesses, and then without | http://theiborebellion.blogspot.com/2007_09_01<br><br>archive.html<br><br>The first of these statements was attached as Ex. G to Docket No. 54. The Court found at the February 21 hearing that it is tortious and that Quixtar "has made a sufficient showing in this case that they are |

| No. | Statement | Source |
|-----|-----------|--------|
|  | warning pull the plug." | entitled to some discovery" concerning this website. |
| 5. | "Quixtar has regularly, but secretly, acknowledged that its products are overpriced and not sellable . . . . Quixtar is aware of, approves, promotes, and facilitates the systematic noncompliance with the FTC's Amway rules . . . . Quixtar knows that it violates the Amway rules and has disregarded this fact for years." | http://saveusdickdevos.blogspot.com/2007_10_31_archive.html |
| 6. | [Quixtar has] "Refuse[d] to pay bonuses to IBOs in good standing and claim[ed] the bonuses are 'discretionary[.]'" | http://qreilly.blogspot.com/2007/12/25-years-of-business-building-flushed.html |
| 7. | "Quixtar currently suffers from systemic dishonesty.  There is a pattern of deceit that emanates from its core." | http://integrityisteam.blogspot.com/ |
| 8. | "IBO's [sic] in good standing denied bonuses they earned." | http://ibominuteman.blogspot.com/2007/12/below-is-fascinating-little-article.html |
| 9. | "I'm actually beginning to be afraid.  Not afraid that I'll be sued, or that Q/A will win in court, or anything like that.  The veritable psychosis exhibited in Ada has me afraid for Orrin's life, literally.  These folks have strayed so far from rational thought that it would not take very much for them to consider arranging for a hit or a kidnapping as part of their 'strategy.'  And we all know about their connections to Blackwater.  Just so you know, A/Q, I have guns in my house.  Shotguns and pistols.  I know how to use them.  And I also have a CCW (CPL).  So be warned.  (Go ahead, make my day). | http://qssr.blogspot.com/ |
| 10. | "Quixtar/Amway over time has evolved into a pompous corrupt organization that | http://quixtarisacultintervention.blogspot.com/ |

sf-2549888

| No. | Statement | Source |
|-----|-----------|--------|
|  | has done unimaginable harm to this country as well as harm to individuals caught up in its deception. Under no circumstances do they operate a 'legal' business because they operate an inventory loading (self consumption) dream inspired 'bait and switch' con of unimaginable magnitued [sic]." |  |
|  | "The age of on line computer communication and media scrutiny have instead revealed the corrupt nature of Quixtar and its kingpin distributor motivational organizations. . . . Add to this mix the number of former high level distributors which were the subject of last years IBO Rebellion and who voiced what the former critics had been reporting: that AmQuix operates a overpriced product (monopolistic) scam on its own distributors." |  |

exhibit 11

SEARCH BLOG | FLAG BLOG | Next Blog»                    Create Blog | Sign In

# Dick DeVos - Save Yourself!

A PLEA TO THE DEVOS AND VANANDEL FAMILIES TO PREVENT THE DESTRUCTION OF DICK'S
GUBERNATORIAL AND PERHAPS PRESIDENTIAL CHANCES BECAUSE OF THE PR HAVOC BEING WREAKED
BY THEIR QUIXTAR / AMWAY ATTORNEYS.

**wednesday, october 31, 2007**

## Mike Mohr's Clown Act

Dick, one of my out of town friends arrived today, sat down at my computer, and directed my attention to FreetheIBO.com website where I glumly read the following:

**Q&A**

Q. What is the goal of the plaintiffs in this case?

A. They seek a judicial declaration that the non-competition and non-solicitation provisions of the uniform Quixtar distributor agreement are unenforceable as a matter of law, so that the plaintiffs who choose will be able to extricate themselves from continued participation in Quixtar's illegal pyramid scheme and pursue legitimate business opportunities instead.

Q. Have the plaintiffs voiced their concerns about the business structure prior to filing this lawsuit?

A. Absolutely. The plaintiffs have had close relationships and engaged in private conversations with Quixtar/Amway founders and executive management for more than 30 years. They voiced their concerns on the business structure that are outlined in the complaint long before the lawsuit was filed.

Q. Have the Quixtar products recently been deemed "unsellable in the open retain market" by the plaintiffs?

A. IBOs have been complaining to Quixtar that their products are not sellable since at least 1997.

Q. Didn't the plaintiffs realize the time and energy it takes to sell products and become successful as an IBO?

A. The inability to sell Quixtar products is not the fault of the plaintiffs. Quixtar has priced its products well above similar retail products for the purpose of increasing its own profitability. No amount of work or complaining on behalf of the plaintiffs was successful in reducing the price of the Quixtar products or making the products more saleable. In addition, the plaintiffs were some of the most successful Quixtar distributors.

### favorites

Amway or the Highway
Orrin Woodward on Leadership
Chris Brady Insights
Q'Reilly - The No Spin Zone
Quixtar Amway Award Site
Quixtar - The QSSR!
Quixtar Lawsuits - Attny Perspective
Quixtar IBO Legal News
IBO Legal Defense Fund
Free the IBO!
Impartial Axiom
Launching a Leadership Revolution
Ron Simmons Speaks
Free The Quixtar IBO Blog
Making the Decision on Facts
Quixtar IBO Rebellion Blog
Quixtar - The Battle Against
Free the Quixtar IBO Forum
Quixtar Pricing

### blog archive

▼ 2008 (5)
  ▼ January (5)
    ▼ Jan 28 (2)
      The Statesman?
      Dick DeVos is No Favorite Son in Michigan
    ► Jan 16 (1)
    ► Jan 09 (1)
    ► Jan 04 (1)
► 2007 (67)

### about me



**S. Adams**
As a Quixtar Emerald who recently was fortunate enough to plug into the Team leadership training system, and having seen significant growth in my team for the first time in years, I am dismayed by what I see happening to the good name of the Devos and VanAndel families. I

Q. How can a distributor have a successful business if the products are over-priced and difficult to sell in the open retail market?

A. It is now impossible for the plaintiffs to earn money by legitimately selling Quixtar products. The only way for Plaintiffs to make money is by illegally recruiting new distributors and earning bonuses on the internal consumption of this downline—a classic illegal pyramid.

Q. Didn't Quixtar realize its products are overpriced?

A. Quixtar has regularly, but secretly, acknowledged that its products are overpriced and not sellable.

Q. Doesn't Quixtar need to comply with the FTC's rules that exist to end illegal pyramid schemes?

A. Quixtar is aware of, approves, promotes and facilitates the systematic noncompliance with the FTC's Amway rules. These rules were designed to give a company a concrete way to avoid being deemed an illegal pyramid scheme. Quixtar's cavalier approach to these rules, while advertising the company's legitimacy by flashing the 1979 Amway decision, flies in the face of lawful business practices. Quixtar knows that it violates the Amway rules and has disregarded this fact for years.

Q. How are distributors most largely affected by the current non-competition and non-solicitation rules?

A. Distributors are prevented from leaving Quixtar in favor of pursuing a legitimate multi-level marketing business opportunity due to Quixtar's non-competition and non-solicitation rules.

Q. So ultimately, these provisions prevent distributors from escaping an illegal pyramid schemes?

A. Yes. So long as Quixtar is able to enforce the noncompete, these IBOs have no choice but to continue purchasing and consuming overpriced Quixtar products and recruiting new victims into the pyramid scheme, since that is the only way to make money with the Quixtar business opportunity.

Q. What monetary amount or recourse do the plaintiffs seek with this lawsuit?

A. Plaintiffs do not seek damages against Quixtar, or to shut Quixtar down. Rather, plaintiffs merely seek a judicial declaration that the non-competition and non-solicitation provisions of the uniform Quixtar distributor agreement are unenforceable as a matter of law.

Dick, these statements sound truthful to me. Remember, I was a Emerald Quixtar IBO and I must say, I agree with everything said here.

Why won't you just let these people go? Every day this legal circus continues, more voters tune in to the abysmal performance of your ring-master Mike Mohr and his clown act

have had nothing but the utmost respect and admiration for Rich and Jay and their contribution to the well-being of thousands of families across our great nations. The business they began is one of the best examples of Free Enterprise on the planet. The eldest scion, Dick DeVos, was unfortunately defeated last year in his bid for Governor of the State of Michigan. This blog is an appeal to both the DeVos and VanAndel families, and to the public, to weigh in on the recent tragic events promulgated by Quixtar/Amway attorneys, which, although they may be guided by a good faith effort to "protect" the good name of Quixtar and thus the DeVos and VanAndel families, are nevertheless destroying that good name. Weigh the evidence presented here and choose for yourself. Which course of action will produce the best result for these captains of industry?

View my complete profile

he calls attorneys. Certainly some of them are decent people who don't appreciate what they are being forced to do to keep their jobs. What if one of them decides to act on his conscience rather than his paycheck? What if one of them starts a mass exodus of attorneys from the Mohr / Amway / Alticor fold?

Oh sure, Mohr will be able to find some other bottom feeders like himself to keep the action going. But Dick, at the end of the day, why would you want to fight such an uphill battle to clear your name? Every day, these hired guns are putting your future in deeper and deeper jeopardy.

Why do you let it go on?!

posted by s. adams at 9:31 pm

labels: alticor, amway, ftc, mohr, quixtar

---

**2 comments:**

**john said...**

So right on! Why do they want to keep so many from achieving their dreams? Thousands have left, yet they still think their non-compete is valuable? They haven't given us any sort of severance package to provide for our families during the non-compete timeframe. They don't care about us do they?

October 31, 2007 11:38 PM

**s. adams said...**

I think you're on to them John! As fo a severence package, don't hold your breath. These are the sort of people who are responsible for worker unionization. Sam

November 8, 2007 7:58 PM

Post a Comment

**links to this post**
Create a Link

Newer Post                    Home                    Older Post

Subscribe to: Post Comments (Atom)

exhiBit 12

1  JOHN J. FRANKOVICH (NSBN 667)
   MIRANDA DU (NSBN 5288)
2  MCDONALD CARANO WILSON LLP
   100 West Liberty Street, 10th Floor
3  Reno, Nevada 89505-2670
   Telephone: (775) 788-2000
4  Facsimile: (775) 788-2020
   E-Mail: jfrankovich@mcdonaldcarano.com
5  and mdu@mcdonaldcarano.com

6  CEDRIC C. CHAO (CA SBN 76045)
   WILLIAM L. STERN (CA SBN 96105)
7  JAMES M. SCHURZ (CA SBN 145874)
   MORRISON & FOERSTER LLP
8  425 Market Street
   San Francisco, California 94105-2482
9  Telephone: (415) 268-7000
   Facsimile: (415) 268-7522
10 E-Mail: cchao@mofo.com
   and wstern@mofo.com
11 and jschurz@mofo.com

12 [Additional Counsel on Signature Page]

13 Attorneys for Plaintiff QUIXTAR INC.

14

15             UNITED STATES DISTRICT COURT

16                 DISTRICT OF NEVADA

17

18 QUIXTAR INC.,                          Case No.    3:07-cv-00505

19             Plaintiff,                 DECLARATION OF GARY D.
                                          VANDERVEN IN SUPPORT OF
20      v.                                QUIXTAR'S RESPONSE TO
                                          ANONYMOUS ONLINE SPEAKERS'
21 SIGNATURE MANAGEMENT TEAM, LLC         OBJECTION AND OPPOSITION TO
   d/b/a TEAM,                            MOTION TO COMPEL RESPONSES
22                                        FROM BENJAMIN DICKIE
             Defendant.
23

24

25

26

27

28

sf-2566403

1      I, Gary D. VanderVen, declare under penalty of perjury that the following is true and
2  correct.

3      1.    My name is Gary VanderVen. I have personal knowledge of the following and am
4  competent to testify thereto.

5      2.    I am currently employed as Director, Global Business Conduct and Rules/Business
6  Support Materials Administration doing work for Quixtar Inc. I began my employment with
7  Amway Corporation in December 1986. From December 1986 to May 1996, I was employed
8  in various positions of increasing responsibility within the Amway Distributor Relations
9  Department. In that capacity, I served as a liaison between Amway and the independent
10  distributors of its products for virtually all aspects pertaining to Amway distributorships,
11  including routine issues involving Amway Rules of Conduct. From May 1996 until the
12  present, I have served in positions of increasing responsibility where I am responsible for
13  managing the adoption, education and enforcement of the Rules of Conduct.

14      3.    By virtue of my position, I have personal knowledge of the statements made in this
15  declaration, except where I state that the information is based on my information and belief.

16      4.    I incorporate into this declaration my Declaration in Support of Quixtar's Motion
17  to Compel Responses from Deponent Benjamin Dickie, dated February 8, 2008, which is
18  attached to Quixtar's Response to Anonymous Online Speakers' Objection and Opposition to
19  Motion to Compel Responses From Benjamin Dickie ("Response") as Exhibit B.

20      5.    I have reviewed certain online statements that are the subject of Quixtar's
21  Response. These statements are false, and their publication injures Quixtar's business and its
22  relationships with its Independent Business Owners (IBOs).

23      6.    I have reviewed the "Hooded Angry Man" video, posted at
24  www.youtube.com/watch?v=pfjVHCfNMQQ. This video makes the following statements:

25      •   Quixtar's "high prices crippled IBOs' ability to sell at retail prices;"

26      •   Quixtar "terminated IBOs without due process;" and

27      •   Quixtar "refused to pay year end bonuses to IBOs in good standing."

28

I have also reviewed the following statement from http://qreilly.blogspot.com/2007/12/25-years-of-business-building-flushed.html:

> [Quixtar has]Refuse[d] to pay bonuses to IBOs in good standing and claim[ed] the bonuses are 'discretionary[.]'

and the following statement from http://ibominuteman.blogspot.com:

> "IBO's in good standing denied bonuses they earned."

These statements are false. As I stated in my previous declaration, Quixtar's products are successful and generate billions of dollars in annual sales. (Ex. B ¶ 16.) For example, the Artistry® cosmetics line and the Nutrilite® vitamin, mineral and dietary supplement line are industry-leading and are price competitive with comparable products from other industry leaders. I am unaware of the termination of any IBO, or any improper refusal to pay bonuses to any IBO, that did not comport with the Quixtar Rules of Conduct. From time to time, IBOs may be terminated or their bonuses withheld when they violate the Quixtar Rules of Conduct, which are designed to ensure compliance with the FTC's *Amway* ruling. (*Id.* ¶¶ 17-32.) Statements such as these injure Quixtar, because they disparage the Quixtar business, discourage new IBOs from signing up with Quixtar and encourage current IBOs to abandon their Quixtar businesses. As I have previously stated, tens of thousands of IBOs have either resigned or indicated that they would not renew their contracts with Quixtar since August 9, 2007. (*Id.* ¶ 33.) Upon information and belief, statements like these have encouraged IBOs to leave Quixtar.

7. I have reviewed the following statements from http://theiborebellion.blogspot.com/2007_09_01archive.html:

> It sounds as though the roof is caving in on Quixtar. I am sure these resignations will pave the way for a mass exodus. All of the above [TEAM] leaders are very well respected and their departure is sure to influence others to follow suit.

> [Alticor, Quixtar's parent company] will milk you for all your worth, methodically destroy your businesses, and then without warning pull the plug.

1   These statements are false. Quixtar provides substantial support to its IBOs and expends

2   significant resources to do so. For example, Quixtar works with the IBO trade organization, the

3   Independent Business Owners Association International (IBOAI) to address issues of concern

4   for IBOs. Quixtar also publishes educational materials designed to help IBOs succeed and

5   makes them available free of charge. Quixtar has not and has no intention to destroy the

6   businesses of its IBOs. Statements such as these injure Quixtar, because they disparage the

7   Quixtar business, discourage new IBOs from signing up with Quixtar, and encourage current

8   IBOs to abandon their Quixtar businesses. As I have previously stated, tens of thousands of

9   IBOs have either resigned or indicated that they would not renew their contracts with Quixtar

10  since August 9, 2007. (*Id.* ¶ 33.) Upon information and belief, statements like these have

11  encouraged IBOs to leave Quixtar.

12       8.    I have reviewed the following statements from

13  http://saveusdickdevos.blogspot.com/2007_10_31_archive.html

14           Quixtar has regularly, but secretly, acknowledged that its
             products are overpriced and not sellable . . . . Quixtar is aware
15           of, approves, promotes, and facilitates the systematic
             noncompliance with the FTC's Amway rules . . . . Quixtar
16           knows that it violates the Amway rules and has disregarded this
             fact for years.

17

18  These statements are false. As I stated in my previous declaration, Quixtar's products are

19  successful and generate billions of dollars in annual sales. (Ex. B ¶ 16.) For example, the

20  Artistry® cosmetics line and the Nutrilite® vitamin, mineral and dietary supplement line are

21  industry-leading and are price competitive with comparable products from other industry

22  leaders. The Quixtar Rules of Conduct are designed—and enforced—in order to ensure that

23  Quixtar complies with the FTC's *Amway* decision. (*Id.* ¶¶17-29.) Statements such as these

24  injure Quixtar, because they disparage the Quixtar business, discourage new IBOs from signing

25  up with Quixtar, and encourage current IBOs to abandon their Quixtar businesses. As I have

26  previously stated, tens of thousands of IBOs have either resigned or indicated that they would

27  not renew their contracts with Quixtar since August 9, 2007. (*Id.* ¶ 33.) Upon information and

28  belief, statements like these have encouraged IBOs to leave Quixtar.

sf- 2566347                                    4

9.    I have reviewed the following statement from http://integrityisteam.blogspot.com:

> Quixtar currently suffers from systemic dishonesty.  There is a
> pattern of deceit that emanates from its core.

This statement is false.  Statements such as these injure Quixtar, because they disparage the Quixtar business, discourage new IBOs from signing up with Quixtar, and encourage current IBOs to abandon their Quixtar businesses.  As I have previously stated, tens of thousands of IBOs have either resigned or indicated that they would not renew their contracts with Quixtar since August 9, 2007.  (Ex. B ¶ 33.)  Upon information and belief, statements like these have encouraged IBOs to leave Quixtar.

10.    I have reviewed the following statement from http://qssr.blogspot.com:

> I'm actually beginning to be afraid.  Not afraid that I'll be sued,
> or that Q/A will win in court, or anything like that.  The veritable
> psychosis exhibited in Ada has me afraid for Orrin's life,
> literally.  These folks have strayed so far from rational thought
> that it would not take very much for them to consider arranging
> for a hit or a kidnapping as part of their 'strategy.'  And we all
> know about their connections to Blackwater.

> Just so you know, A/Q, I have guns in my house.  Shotguns and
> pistols.  I know how to use them.  And I also have a CCW
> (CPL).  So be warned.  (Go ahead, make my day).

These statements are false.  Quixtar does not and has not used or threatened violence against anyone.  Statements such as these injure Quixtar, because they disparage the Quixtar business, discourage new IBOs from signing up with Quixtar, and encourage current IBOs to abandon their Quixtar businesses.  As I have previously stated, tens of thousands of IBOs have either resigned or indicated that they would not renew their contracts with Quixtar since August 9, 2007.  (Ex. B ¶ 33.)  Upon information and belief, statements like these have encouraged IBOs to leave Quixtar.

11.    I have reviewed the following seven statements from http://www.freetheibo.com:

- Quixtar's business is an "illegal pyramid scheme;"

- "It is now impossible for [IBOs] to earn money by legitimately selling Quixtar products;"

- "The only way for [IBOs] to make money is by illegally recruiting new distributors and earning bonuses on the internal consumption of this downline—a classic illegal pyramid;"

- "Quixtar has regularly, but secretly, acknowledged that its products are overpriced and not sellable;"

- "Quixtar is aware of, approves, promotes, and facilitates the systematic noncompliance with the FTC's Amway rules. . . . Quixtar's cavalier approach to these rules, while advertising the company's legitimacy by flashing the 1979 *Amway* decision, flies in the face of lawful business practices;"

- "Quixtar knows that it violates the Amway rules and has disregarded this fact for years;" and

- "IBOs have no choice but to continue purchasing and consuming overpriced Quixtar products and recurring new victims into the pyramid scheme, since that is the only way to make money with the Quixtar business opportunity."

These statements are false. As I stated in my previous declaration, Quixtar's products are successful and generate billions of dollars in annual sales. (Ex. B ¶ 16.) For example, the Artistry® cosmetics line and the Nutrilite® vitamin, mineral and dietary supplement line are industry-leading and are price competitive with comparable products from other industry leaders. The Quixtar Rules of Conduct are designed—and enforced—to ensure compliance with the FTC's *Amway* ruling. (*Id.* ¶¶ 17-32.) Statements such as these injure Quixtar, because they disparage the Quixtar business, discourage new IBOs from signing up with Quixtar and encourage current IBOs to abandon their Quixtar businesses. As I have previously stated, tens of thousands of IBOs have either resigned or indicated that they would not renew their contracts with Quixtar since August 9, 2007. (*Id.* ¶ 33.) Upon information and belief, statements like these have encouraged IBOs to leave Quixtar.

    12.    I have reviewed the following statement from http://quixtarisacultintervention.blogspot.com:

> "Quixtar/Amway over time has evolved into a pompous corrupt organization that has done unimaginable harm to this country as well as harm to individuals caught up in its deception. Under no circumstances do they operate a 'legal' business because they operate an inventory loading (self consumption) dream inspired 'bait and switch' con of unimaginable magnitude [sic];" and

> The age of on line computer communication and media scrutiny have instead revealed the corrupt nature of Quixtar and its kingpin distributor motivational organizations. . . . Add to this

mix the number of former high level distributors which were the
subject of last years IBO Rebellion and who voiced what the
former critics had been reporting: that AmQuix operates a
overpriced product (monopolistic) scam on its own
distributors.""

These statements are false. As I stated in my previous declaration, Quixtar's products are
successful and generate billions of dollars in annual sales. (Ex. B ¶ 16.) For example, the
Artistry® cosmetics line and the Nutrilite® vitamin, mineral and dietary supplement line are
industry-leading and are price competitive with comparable products from other industry
leaders. The Quixtar Rules of Conduct are designed—and enforced—to ensure compliance
with the FTC's *Amway* ruling. (*Id.* ¶¶ 17-32.) Statements such as these injure Quixtar, because
they disparage the Quixtar business, discourage new IBOs from signing up with Quixtar and
encourage current IBOs to abandon their Quixtar businesses. As I have previously stated, tens
of thousands of IBOs have either resigned or indicated that they would not renew their
contracts with Quixtar since August 9, 2007. (*Id.* ¶ 33.) Upon information and belief,
statements like these have encouraged IBOs to leave Quixtar.

I declare under penalty of perjury under the laws of the United States of America that
the foregoing is true and correct and that I am competent to testify to the facts contained in this
Declaration if called as a witness.

Dated: August 25, 2008                    Signed: _____
                                                   Gary D. VanderVen

exhiBit  13



exhiBit 14

Case: 09-71265    04/24/2009    ID: 6901651    DktEntry: 1-3    Page: 120 of 150
Case 3:07-cv-00505-ECR-RAM    Document 194-2    Filed 08/13/2008    Page 35 of 44

Doug, it will take courage to make the right choices to correct the things that need fixing in this business. I am confident that if those choices are made this business will become the greatest success story in our lifetime. I know that the suggestions that I am making will work. If we do not make the decision to fix the problems that are hindering us from going from good to great, then it is my feeling that some other corporation will eventually see what needs to be done and will do it. This is our opportunity to make this business the greatest business opportunity in the country. I want to forge ahead with you to a fantastic future. I want to give genuine help to those who are struggling financially. And finally, I want to see this business be used of God to help bring back to our country the Godly principles that it was founded upon. This is a goal worth striving for and a life worth living. Sir Edmund Burke one said, "The only way for evil to prosper is for good men to do nothing."

Thank you for your time in reading this letter. I would love to take you to lunch sometime and give you copies of the books from which I have quoted. If I can serve the Quixtar team in any way, please feel free to call or email me.

God Bless,

Orrin Woodward

Posted by QReilly at 10:11 PM                    5 comments

SUNDAY, DECEMBER 9, 2007

## 25 Years of Business Building Flushed at Amquix "Discretion"

If you haven't had a chance to read about the Amway UK Diamonds that are living the nightmare called "Amquix Discretion", click on the link below and read the unbelievable tale of these Diamonds that were in good standing with the company (for 25 YEARS!) until Amway

Case: 09-71265    04/24/2009    ID: 6901651    DktEntry: 1-3    Page: 121 of 150

Case 3:07-cv-00505-ECR-RAM    Document 194-2    Filed 08/13/2008    Page 36 of 44

needed a scapegoat. This is just scary stuff for anyone trying to build an Amway/Quixtar business right now (*Is anyone actually trying to do that?!!*). Knowing how this corporation has treated some of its top business builders of all-time here in the U.S. (Woodward, Brady, Haugen, Florence, Goetschel, Wilson et al.), and now seeing what they are doing to their top leaders in the UK, should cause you to scratch your head and wonder what these Amquix folks are up to. My guess?...Getting rid of all those pesky IBO's!

I have mentioned this in previous posts, but ask yourself this...What are the top 3 things you would do (in the U.S. market) if you were Amquix and wanted to get rid of your IBO sales force and start selling directly to the public from the store shelves? I'll get you started with some ideas:

1)**Name the company AMWAY** (this will clear out the majority of the U.S. IBO's!)

2)Terminate and malign well known and beloved leaders

3)Deem the IBOAI Board powerless (that represents the voices in the field!)

4)Publicly refer to IBO's as "property"

5)Refuse to pay bonuses to IBO's in good standing (and claim the bonuses are "discretionary")

6)Post the following on the Alticor official blog "Just Go, Team!"

7)Ok...you finish the list...my fingers are getting tired, and I know I could easily take this list of moronic moves (*or maybe well thought out plans to rid the company of IBO's*)up to about 100!!

If you are following the court case that the UK Government has brought against Amquix, you have seen that Amquix is pointing directly to the IBO's as the source of ALL their problems. (*Hmmmm...then why did Amquix massively slash prices the minute the Government began investigating??*) Unfortunately, for the Scrivens...Amquix took aim and bagged their scapegoat....

Case: 09-71265    04/24/2009    ID: 6901651    DktEntry: 1-3    Page: 122 of 150
Case 3:07-cv-00505-ECR-RAM    Document 194-2    Filed 08/13/2008    Page 37 of 44

Page 11 of 112

QReilly - The No Spin Zone

Take the time to read the following link:
http://www.jerryandmandy.co.uk/

If you are still clinging to the hope that this company will be there for its IBO's, watch the following video. It is one of Amquixes top executives describing what a fantastic organization Jerry and Mandy Scriven had built in the UK. Shortly afterwards, Amquix terminated the Scrivens....

http://www.youtube.com/watch?v=64WUmBlPq1o

Posted by QReilly at 6:38 PM          6 comments

**TUESDAY, DECEMBER 4, 2007**

**"Hey...I EARNED that Bonus!!"**

Please read the letter to Quixtar from a current IBO who just happens to use the TEAM training system to build his business. This is EXACTLY why anybody who is still associated with this company should be VERY concerned. You do the work...you may or may not get paid. If you want to argue about it, start digging into your bank account cause Amquix will force you to take a financial blood bath paying attorneys and mediators to get your bonuses. By the way...this is just one example of what is happening to many current IBO's that use TEAM training materials....

---------------------------------------

November, 29, 2007

Quixtar/Alticore
7575 Fulton St. E
Ada, MI 49355

Re: QBI Bonus and Founders Platinum Bonus

Exhibit    15

Edwards & Cooper Co. ☺ Recycled Paper
213-747-7141 · 800-421-8703 · Fax 213-747-3035

1   JOHN J. FRANKOVICH (NSBN 667)
    MIRANDA DU (NSBN 5288)
2   MCDONALD CARANO WILSON LLP
    100 West Liberty Street, 10th Floor
3   Reno, Nevada 89505-2670
    Telephone:    (775) 788-2000
4   Facsimile:    (775) 788-2020
    E-Mail: jfrankovich@mcdonaldcarano.com
5   and mdu@mcdonaldcarano.com

6   CEDRIC C. CHAO (CA SBN 76045)
    WILLIAM L. STERN (CA SBN 96105)
7   JAMES M. SCHURZ (CA SBN 145874)
    MORRISON & FOERSTER LLP
8   425 Market Street
    San Francisco, California 94105-2482
9   Telephone:    (415) 268-7000
    Facsimile:    (415) 268-7522
10  E-Mail: cchao@mofo.com
    and wstern@mofo.com
11  and jschurz@mofo.com

12  [Additional Counsel on Signature Page]

13  Attorneys for Plaintiff QUIXTAR INC.

14

15              UNITED STATES DISTRICT COURT

16                   DISTRICT OF NEVADA

17

18  QUIXTAR INC.,                          | Case No.   3:07-cv-00505-ECR-RAM

19                  Plaintiff,             | **PLAINTIFF QUIXTAR INC.'S MOTION TO COMPEL**

20          v.                             | **DEPONENT BENJAMIN DICKIE TO TESTIFY ABOUT**

21  SIGNATURE MANAGEMENT TEAM, LLC         | **ADDITIONAL ANONYMOUS ONLINE SPEAKERS**
    d/b/a TEAM, APOLLO WORKS HOLDINGS,
22  INC., GREEN GEMINI ENTERPRISES, INC.,
    NORTH STAR SOLUTIONS, INC., NORTHERN
23  LIGHTS SERVICES, INC., SUNSET
    RESOURCES, INC., and SKY SCOPE TEAM,
24  INC.,

25                  Defendants.

26

27

28

MCDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
PO. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ........................................................................................................ 1

II.   OVERVIEW OF TEAM INTERNET CAMPAIGN .......................................... 4

      A.    Ashton Partners' Creation of the Free The IBO Website ...................... 4

      B.    The Creation of a Network of Blogs, Forums, and Videos....................... 4

      C.    Directing Traffic on the TEAM Blogosphere: Benjamin Dickie............................ 5

      D.    A Deluge of IBO Resignations Followed TEAM's Anti-Quixtar Blog
            Campaign ................................................................................................. 6

III.  PROCEDURAL HISTORY......................................................................................... 7

IV.   ARGUMENT ................................................................................................................ 9

      A.    Legal Standard ........................................................................................ 9

      B.    Quixtar Is Entitled to Discover the Identity of Anonymous Speakers Who
            Made False and Disparaging Statements .............................................. 10

            1.    Quixtar Has Provided Evidence of False and Damaging Purported
                  Statements of Fact About Quixtar from Eight Anonymous
                  Speakers. .................................................................................. 10

                  a.    The Court Has Already Ruled that Quixtar Is Entitled to
                        Discovery on the Speaker of the False Statement that
                        Quixtar "Refused to Pay Year End Bonuses to IBOs in
                        Good Standing."........................................................... 11

                  b.    Quixtar Is Entitled to Discover the Identities of Anonymous
                        Speakers Who Posted Additional False and Disparaging
                        Statements about Quixtar............................................... 13

            2.    Quixtar Is Entitled to Discover the Identity of the Anonymous
                  Speaker "Q'Reilly," Who Posted False and Misleading Statements
                  Designed to Enhance TEAM's Reputation at the Expense of
                  Quixtar.......................................................................................... 15

      C.    Quixtar Is Entitled to Discover the Identities of Speakers Who Posted
            Solicitations to IBOs that Were Hyperlinked to TEAM's Blog. ........................... 17

V.    CONCLUSION ............................................................................................................ 21

McDONALD·CARANO·WILSON⸓
100 WEST LIBERTY STREET, 10ᵀᴴ FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
[PHONE 775-788-2000 • FAX 775-788-2020]

i

## I.    INTRODUCTION    TABLE OF CONTENTS

Page

Several months ago, TEAM founders Orrin Woodward and Chris Brady acknowledged the challenge they faced communicating with their former IBOs downline from them in the Quixtar LOS after Woodward and Brady were terminated in August 2007. And Woodward and Brady trumpeted the ingenuity of their solution: the Internet.

> Nearly a year ago (at the time of this writing) we found a strange need to communicate "from the grave" you could say. It was almost as if we were in enemy territory (figuratively, of course) and all lines of communication had been severed. We knew we had to communicate with the rest of the troops or victory would be jeopardized (slightly melodramatic but we LOVE military examples!) If only we had a way to transmit and receive information without the use of phones, radios, letter carriers . . . etc. Just then, it dawned on us. There was a way, created years ago for just such a scenario . . . the internet!

(Ex. G, Brady and Woodward, *Leadership: Tidbits and Treasures,* Acknowledgements (Obstacles Press, July 2008)). The "grave" Woodward and Brady found themselves in was a court-ordered injunction enjoining them from (1) competing against Quixtar and (2) soliciting Quixtar IBOs to join them in them new venture. Their solution was a carefully crafted, professionally orchestrated internet campaign to disparage Quixtar and solicit Quixtar IBOs to defect from Quixtar and align with TEAM in its competing business.

In the fourteen months since Benjamin Dickie refused to answer questions about TEAM's Internet campaign against Quixtar, the structure and breadth of TEAM's campaign has come into sharper focus. Ashton Partners, a public relations firm, launched the website "freetheibo.com" (the "Free The IBO website") in August 2007 to further Woodward and Brady's strategy. Additionally, TEAM created a virtual, online community to assist its leaders in the process of convincing IBOs to leave Quixtar. TEAM hired Margaret Ross, a web communications specialist, in September 2007, to develop interactive blogs and forums. She connected the sites, and other TEAM-initiated sites, through a series of hyperlinks. In this way, the Free The IBO website, forum, and blog became the "hub" or portal for TEAM to advance Woodward and Brady's business objectives. The strategy was successful. The portal spawned literally dozens of

PLAINTIFF'S MOTION TO COMPEL TESTIMONY
RE ANONYMOUS ONLINE SPEAKERS

sf-2652081

1    TEAM blogs, forums, and videos dedicated to rallying the self-proclaimed "freedom fighters" in

2    their battle against Quixtar.

3         In order to ensure that TEAM members were led to the "right" sites, Benjamin Dickie

4    created and managed a blog called www.freetheiboblog.typepad.com (the "Free The IBO Blog").

5    On a daily basis, Mr. Dickie directed traffic—identifying and promoting websites, advancing and

6    publishing claims, and encouraging TEAM members to visit. To make it easier, Mr. Dickie

7    embedded a link within his daily postings so visitors could move easily to the recommended sites.

8    To cover TEAM's tracks, Dickie registered the blog under a pseudonym using his home address.[1]

9    Despite his stealth tactics, Dickie's intent was clear: the coordination of a professional campaign

10   to disparage Quixtar, promote TEAM leaders, and solicit TEAM members to leave Quixtar and

11   follow Woodward and Brady to their new venture. Mr. Dickie's execution was successful. On

12   the day Orrin Woodward announced his decision to join Mona Vie on his blog—a site managed

13   by Mr. Dickie—it received nearly 100,000 hits, fifty times the average daily traffic.

14        Throughout the last year, TEAM has made every effort to frame Mr. Dickie's testimony

15   as a question of protecting "anonymous" bloggers exercising their rights under the First

16   Amendment. By focusing on "who," TEAM has obscured and delayed discovery of "what"—

17   namely, what Mr. Dickie has done at the behest of TEAM to develop web content and direct

18   TEAM members to websites developed by others.

19        This Court ruled in its Amended Order Granting In Part and Denying In Part Quixtar

20   Inc.'s Motion to Compel Responses from Deponent Benjamin Dickie (the "January 15 Order")

21   that Mr. Dickie is to answer questions regarding websites, blogs, and forums that he created,

22   administered, or sponsored. This Court further ordered Mr. Dickie to identify the authors of

23   certain damaging statements.

24        This motion identifies 24 additional statements from websites, blogs, and videos about

25   which Quixtar seeks discovery. These statements fall into three distinct categories.

26        _____

     [1] Mr. Dickie attempted to hide his and TEAM's involvement in the Free The IBO Blog by
27   registering the blog under the name "Peter Petrelli," the name of a fictional character from the
     television show *Heroes*.

28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
P.O. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

1    First, Quixtar seeks testimony relating to fifteen false and misleading statements of

2    purported fact about Quixtar from eight different sources.  These purported statements of fact

3    span a range of subjects, including Quixtar's alleged failure to pay bonuses to IBOs in good

4    standing, Quixtar's purported knowledge that it is an illegal pyramid, and Quixtar's purported

5    attrition rate for IBOs.  As this Court has previously recognized, these types of statements meet

6    the *Doe v. Cahill* standard.  Mr. Dickie must identify the speaker and respond to questioning

7    about the circumstances under which the statements were created and posted.

8    Second, Quixtar seeks testimony relating to false statements of fact designed to enhance

9    TEAM's reputation.  These statements are discoverable under *Doe v. Cahill* because they

10    constitute tortious interference with Quixtar's IBO contracts and prospective business relations:

11    they are misrepresentations that Quixtar is dishonest and that Quixtar has falsely characterized

12    what occurred at the August 9, 2007 meeting.  Because they are false statements that interfered

13    with Quixtar's contracts and prospective relations, they are tortious and thus discoverable under

14    *Doe v. Cahill*.

15    Third, Quixtar seeks testimony regarding content encouraging Quixtar IBOs to leave

16    Quixtar, not renew, join a competitor, or otherwise disregard the Quixtar Rules of Conduct.  Such

17    statements are directly relevant to injuries caused by TEAM in that they constitute evidence of

18    interference.  Quixtar has shown that TEAM posted statements on the Free The IBO Website and

19    its related blogs claiming that Quixtar is an illegal pyramid scheme; that Quixtar knowingly

20    violates the law; and that Quixtar's products are not sellable.  Quixtar has also shown that other

21    blogs to which TEAM directed IBO readers via hyperlink contained additional statements urging

22    IBOs to leave Quixtar.  Finally, Quixtar has shown that after these statements began appearing in

23    the online community TEAM created, tens of thousands of IBOs did leave Quixtar.  Both types of

24    statements – the false and misleading purported factual representations, and the exhortations to

25    IBOs to quit – are evidence of TEAM's tortious interference, and both are discoverable.

26    Collectively, the statements reflect a carefully orchestrated campaign designed by TEAM

27    to damage Quixtar through false and misleading statements, and solicit Quixtar IBOs to leave

28    Quixtar and join Woodward and Brady in a competing venture.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

## II.    OVERVIEW OF TEAM INTERNET CAMPAIGN

### A.    Ashton Partners' Creation of the Free The IBO Website

TEAM retained Ashton Partners in August 2007 to perform standard public relations services to TEAM and its principals. In an article published in August 2007, TEAM's counsel explained that Ashton Partners was:

> brought on board to provide strategic communications counsel, drive media relations and outreach, and manage the plaintiff's Web site, www.freetheibo.com.

(*See* Ex. A, ("Quixtar, IBOs Use Web to Spar," PR Week US article dated August 31, 2007) at p. 1.) TEAM specifically retained Ashton Partners to "help manage the Internet traffic" relating to this litigation. (*See* Ex. B attached hereto ("Bitter Amway Fight Has Local Tie," Colorado Law Week article dated week of September 3, 2007) at p. 2.)

The principal means of executing TEAM's communications and media strategy was launching the Free The IBO Website. The website served as a vehicle for TEAM and its leaders to communicate anonymously with current and former Quixtar IBOs, to convey TEAM's targeted messages efficiently to large groups of IBOs that TEAM and its leaders directed to the blogs, and ultimately to wage TEAM's wrongful campaign against Quixtar. TEAM and its leaders wanted not only the ability to communicate through websites to solicit current and former Quixtar IBOs, but also the interactivity offered by blogs and forums. Accordingly, they hired Margaret Ross.

### B.    The Creation of a Network of Blogs, Forums, and Videos

Margaret Ross was engaged by TEAM in August 2007 to consult on a "Strategic Communication Initiative" and to serve as a "Project Director" for TEAM's web communications strategies. Ms. Ross provided both procedural and substantive input into the contents of TEAM-related websites. Ms. Ross identified interactivity—the opportunity for TEAM leaders and members to interact and participate—as another way to bolster TEAM's web strategy. TEAM's leaders were all subject to non-solicitation agreements in their IBO contracts. TEAM therefore devised a strategy to use the anonymity of the Internet to assist its leaders in asking other IBOs to leave Quixtar and/or join another multi-level marketing company. So TEAM, with the assistance of Ms. Ross, established a companion blog, Free The IBO Blog, and a forum hyperlinked to the

1    Free The IBO website. Next, TEAM used the Free The IBO Blog to direct readers to a multitude

2    of other sites, most of which were run by purportedly "anonymous" parties. These other sites

3    contained false and damaging statements about Quixtar and/or direct solicitations to IBOs to

4    leave Quixtar and follow TEAM.

5        **C.    Directing Traffic on the TEAM Blogosphere: Benjamin Dickie**

6        To direct readers of the Free The IBO Blog to the other sites containing solicitations and

7    additional tortious statements, TEAM posted a column of "favorite" sites, including Save Us Dick

8    Devos, QSSR, Q'Reilly, and many others, on the right-hand side of the Free The IBO Blog's

9    front page. This column contained hyperlinks that readers could click to reach the other sites.

10    TEAM wanted to be sure that all of its IBO readers would click on the hyperlinks that would take

11    them to these additional sites. So in addition to posting hyperlinks on its front page, TEAM also

12    posted articles on its blog in which it explicitly instructed IBO readers to "check out" these other

13    blogs and "share with a friend." Mr. Dickie was tasked with directing traffic on the TEAM

14    blogosphere. Mr. Dickie routinely directed IBOs to read the other sites and provided hyperlinks

15    to them. Mr. Dickie even suggested that IBOs "check in daily" with the other sites. A set of the

16    twenty-nine posts on the Free The IBO Blog instructing readers to view other blogs is attached as

17    Exhibit C. Examples of Mr. Dickie's efforts to flag the sites he wanted IBOs to see include:

18    • "I visited a site today called 'Quixtar Lost My Cents' **[provides link to Quixtar Lost
         My Cents Blog]** . . . . The 'Quixtar Lost My Cents' blog is authored by a mother of
19        four children . . . . This poor mom is just trying to make ends meet and provide for her
         family. . . . **Be sure to check in daily to the 'Quixtar Lost My Cents' blog[.]"** Free
20        The IBO Blog, September 22, 2007 (Ex. C at pp. 1-2 (emphasis added)).

21    • "Amway/Quixtar/Alticor has recently went [sic] on a warpath against internet
         bloggers **[provides link to Quixtar Lost My Cents Blog]**. Good thing we live in
22        America, the land of the free!! For more details check out *The IBO Rebellion*
         **[provides link to The IBO Rebellion Blog]**." Free The IBO Blog, October 18, 2007
23        (Ex. C at p. 10).

24    • "I recently reviewed this article from the 'Quixtar Soviet Socialist Republic' blog. It
         is an interesting read, **and you can click here [provides link to QSSR Blog] for
25        other great articles on Quixtar policy at play. . . "** Free The IBO Blog, October 22,
         2007 (Ex. C at p. 13) (emphasis added).
26
      • "Be sure to stay tuned to 'Quixtar Lost My Cents' daily as great posts continue to
27        highlight the crazy ridiculous pricing structure that Amway supports. **[provides link
         to Quixtar Lost My Cents Blog]**." Free The IBO Blog, October 23, 2007 (Ex. C at p.
28        15 ).

1    • "Barrister has recently re-located to Google's *Blogger*. **You may want to update your favorite links** for those of you who wish to stay up to date with Barrister's [**provides link to Barrister Quixtar Lawsuit Blog**] legal perspective regarding the lawsuits that have taken place in recent months[.]" Free The IBO Blog, October 31, 2007 (Ex. C at p. 20) (emphasis added).

4    • "I cam[e] across another blog has online [sic] titled, *Amway Or The Highway* [**provides link to Amway Or The Highway Blog**]. How many more blogs will we see here in the future? They keep popping up left and right. This particular blog has a few great posts featured on their blog in the short time that it was launched, and **I am excited to check back in as they post more articles in the future.**" Free The IBO Blog, November 2, 2007 (Ex. C at p. 22) (emphasis added).

7    • "A new blog has sprouted up in recent weeks called Quixtar-Less, I Need Your Help [**provides link to Q-Less, I Need Your Help Blog**]. . . . Q-Less raises a number of questions in their two posts that they have featured on their blog since they made it live and **it seems that these are questions that most IBOs would like to have answered by the company.**" Free The IBO Blog, November 17, 2007 (Ex. C at p. 27) (emphasis added).

11    • "Another blog has surfaced in the midst of the Quixtar v. Team disputes, which have been taking place over the past few months. The blog is titled *The Quixtar Whistle Blower* [**provides link to The Quixtar Whistle Blower Blog**]. . . . **This may be of interest to you to view and share with a friend.**" Free The IBO Blog, November 23, 2007 (Ex. C at p. 28) (emphasis added).

14    • "Q'Reilly [**provides a link to Q'Reilly Blog**] featured a letter on his blog that was written by an IBO in good standing with Quixtar seeking to obtain their QBI bonus. . . . It looks as though this couple is getting the run around and Quixtar is playing games with their money. Can Quixtar do this to other IBOs in the field? I sure hope this does not become an epidemic." Free The IBO Blog, December 6, 2007 (Ex. C at p. 29).

17    • "The below post appeared on the QSSR blog [**provides link to QSSR Blog**] and is pretty powerful." Free The IBO Blog, December 26, 2007 (Ex. C at p. 33).

19    • "The author of the blog *Dick DeVos – Save Yourself!* [provides link to Save Us Dick DeVos Blog] featured an article titled, 'Quixtar Spys on Team in Ladies Room. . . . Be sure to check in to *Dick DeVos – Save Yourself!* to read the article and other information regarding some interesting Quixtar/Amway/Alticor business policies and procedures." Free The IBO Blog, December 27, 2007 (Ex. C at p. 35).

22    **D.    A Deluge of IBO Resignations Followed TEAM's Anti-Quixtar Blog Campaign**

24    Not long after the launch of TEAM's blog strategy, Quixtar received approximately 9,166

25    resignation letters. During the months of September and October 2007, Quixtar received 20,430

26    resignation letters, and more than 92% of them originated from TEAM-affiliated IBOs. For the

27    five-month period between August 9, 2007 and December 31, 2007, Quixtar received 26,242

28    resignation letters. For the previous three-and-one-half-year period preceding this time frame,

1    Quixtar received only 118 resignation letters. (Ex. D (March 9, 2009 Declaration of Gary

2    VanderVen) at ¶ 10.)

3    **III.    PROCEDURAL HISTORY**

4         Quixtar incorporates the extensive factual history set forth in its previous Opposition to

5    Benjamin Dickie's Objections to Magistrate Judge's April 7, 2008 Order (Dkt. No. 141 at pp. 3-

6    10). Without repeating that full history here, we briefly summarize it as follows:

7         On January 18, 2007, Quixtar began the deposition of Mr. Dickie. Quixtar asked a

8    number of questions about TEAM's online activities and Mr. Dickie's knowledge of websites,

9    blogs, and videos that contained tortious statements of disparaging misrepresentations and

10   solicitations. On the advice of counsel, Mr. Dickie refused to answer questions about those sites.

11   Mr. Dickie claimed that the First Amendment right to anonymity allowed him to refuse to answer

12   questions in both categories.

13        On February 8, 2008, Quixtar moved for an order compelling Mr. Dickie to answer

14   questions about his knowledge regarding the websites, blogs, and videos that contain false and

15   harmful statements about Quixtar. (Dkt. No. 54.) Both Mr. Dickie and TEAM opposed. (Dkt.

16   Nos. 62, 65.) After a lengthy hearing, the Court issued an Order on February 21, 2008 granting

17   Quixtar's motion. (Dkt. No. 72.) Mr. Dickie moved to clarify and objected to the February 21

18   Order (Dkt. No. 84), and Quixtar opposed. (Dkt. No. 95.) On April 7, 2008, the Court issued

19   another order requiring Mr. Dickie to answer questions regarding sites that Mr. Dickie, other

20   TEAM employees, or TEAM leaders created or on which they posted content. Mr. Dickie filed

21   Objections to the April 7 Order with the District Court on April 24, 2008 (Dkt. No. 124), and

22   Quixtar opposed. (Dkt. No. 141.)

23        On July 7, 2008, Judge Reed issued an Order on Mr. Dickie's Objections. The District

24   Court ruled that Mr. Dickie had failed to establish that he had standing to object to the April 7

25   Order. (Dkt. No. 167 at 18.) The District Court therefore vacated the April 7 Order and

26   remanded the matter for further proceedings. (*Id.* at 22.) The Court instructed that Mr. Dickie

27   and TEAM should inform the anonymous parties that Mr. Dickie might be obligated to reveal

28   their identities so that any anonymous party who did have standing to object to the April 7 Order

MCDONALD·CARANO·WILSON⸍
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    could do so. (*Id.* at 20.) The District Court also ruled that if an anonymous speaker with standing

2    filed an objection, then this Court should apply the analysis set forth in *Doe v. Cahill*, 884 A.2d

3    451 (Del. 2005) (discussed in detail below), to determine whether Quixtar was entitled to

4    discover that anonymous speaker's identity. (*Id.* at 21.)

5        After the District Court remanded the matter, the parties submitted a scheduling order that

6    included a list of statements from ten different websites, blogs, and videos that Quixtar contended

7    were tortious. (Dkt. No. 181.) Mr. Dickie stated that he knew six of these authors and did not

8    know the remaining four.[2] He notified the six anonymous parties of the action, and they filed

9    objections under pseudonyms on August 13, 2008. (Dkt. No. 194.) Quixtar filed a response on

10   August 25. (Dkt. No. 212.) On November 12, 2008, the Court granted Quixtar's request for

11   discovery as to two of the six statements and denied it as to the other four.[3] (Dkt. No. 261.) The

12   Court issued a final Amended Order on January 15, 2009. (Dkt. No. 330.)[4]

13       On February 23, 2009, the Court ruled that the parties must file any motions to compel

14   further discovery within fourteen days, by March 9, 2009. (Dkt. No. 370 at 2.) Quixtar

15   performed another analysis of the sites that are hyperlinked to the Free The IBO website and the

16   Free The IBO Blog and discovered additional tortious statements on those sites, including

17   damaging misrepresentations about Quixtar, misrepresentations about TEAM that are harmful to

18   Quixtar, and express solicitations of IBOs. Pursuant to the procedure outlined in Judge Reed's

19   July 7 Order, Quixtar notified counsel for Mr. Dickie by letter on March 6 that when Mr. Dickie's

20   deposition resumes, Quixtar intends to seek testimony regarding these additional anonymous

21

22

23       [2] Because Mr. Dickie claimed not to know the identities of the speakers of four of the
     tortious statements Quixtar identified, those statements were not at issue when the anonymous
24   speakers filed objections.

25       [3] Both Quixtar and Mr. Dickie filed objections to this portion of the November 12 Order.
     (Dkt. Nos. 267, 269.) Those objections are pending.
26

27       [4] Mr. Dickie and TEAM both filed objections to the January 15 Order (Dkt. Nos. 342 and
     343), and Quixtar opposed. (Dkt. No. 368.) Those objections are pending.
28

1  speakers. (*See* Ex. E.)[5] Counsel for Mr. Dickie has represented that Mr. Dickie will not testify

2  about purportedly anonymous speakers without a court order.

3  **IV.    ARGUMENT**

4      **A.    Legal Standard**

5        The District Court ruled in its July 7 Order that if Anonymous Speakers opposed an order

6  requiring Mr. Dickie to identify them, this Court should apply the test set forth in *Doe v. Cahill*,

7  884 A.2d 451 (Del. 2005). In that case, a plaintiff sought to identify an anonymous speaker who

8  had posted unpleasant comments about him on a website. *Id.* at 454. The Delaware Supreme

9  Court ruled that the speaker had a right under the First Amendment to post his statements

10  anonymously, and that the plaintiff could overcome that right and obtain discovery relating to the

11  speaker's identity only if he first made a showing, sufficient to overcome a motion for summary

12  judgment, that the anonymous party's speech was tortious and thus not protected under the First

13  Amendment. *Id.* at 460.

14        In the present case, Quixtar has uncovered eighteen purported statements of fact, posted

15  across eight different blogs and videos, that are both false and highly damaging to Quixtar.

16  Although the speakers who posted these statements are purportedly anonymous, each of these

17  statements is hyperlinked to TEAM's Free The IBO Blog. As outlined above, these statements

18  were integral to TEAM's strategy of hiding behind the anonymity of the Internet to spread lies

19  about Quixtar and to solicit IBOs to leave Quixtar and join a competing MLM. And, as shown in

20  the VanderVen Declaration (Ex. D), these statements were highly effective in encouraging tens of

21  thousands of IBOs to abruptly resign from Quixtar, which caused Quixtar to lose millions of

22  dollars in sales. Accordingly, Quixtar has established that the statements set forth below are

23  tortious under *Doe v. Cahill*, and Mr. Dickie should be ordered to testify about each of the eight

24  "Anonymous Speakers" behind these tortious statements.

25

26      [5] In its January 15 Order, the Court denied discovery relating to several of the Anonymous Speakers at issue here (The IBO Rebellion, QSSR, and Q'Reilly), based on its finding that the

27  statements at issue in Quixtar's previous motion did not satisfy the *Doe v. Cahill* standard. The present motion seeks discovery based on different statements by these Speakers.

28

McDONALD·CARANO·WILSON LLP
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
PO BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

1    In addition to using the Internet to post false and disparaging statements, TEAM and its

2    agents also posted direct, explicit solicitations to IBOs to leave Quixtar and join TEAM in a

3    competing MLM. Quixtar has uncovered six such express solicitations posted on four different

4    "anonymous" blogs that are directly hyperlinked to TEAM's Free The IBO Blog. To the extent

5    that these statements were posted by TEAM or persons acting at TEAM's direction, they go

6    directly to the tortious interference by TEAM and are discoverable under *Doe v. Cahill*. Mr.

7    Dickie should therefore be required to testify about these four Anonymous Speakers as well.[6] A

8    full set of the 24 statements at issue, as well as the blog pages on which they are found, is set

9    forth in a chart attached as Exhibit F.

10    **B.    Quixtar Is Entitled to Discover the Identity of Anonymous Speakers Who
11             Made False and Disparaging Statements**

12    Under *Doe v. Cahill*, Quixtar is entitled to discover the identity of an Anonymous Speaker

13    once Quixtar (1) identifies the exact statement at issue, and (2) provides evidence that would be

14    sufficient to defeat a hypothetical motion for summary judgment showing that the statement is

15    tortious. 884 A.2d at 460. The statements set forth below satisfy this standard.

16    **1.    Quixtar Has Provided Evidence of False and Damaging Purported
17             Statements of Fact About Quixtar from Eight Anonymous Speakers.**

18    As shown in the chart attached as Exhibit F, Quixtar has provided evidence that eight

19    different Anonymous Speakers posted a total of fifteen false and damaging purported statements

20    of fact about Quixtar on the Internet. Each of the blogs on which these statements appeared was

21    hyperlinked from TEAM's Free The IBO Blog. The statements, discussed individually below,

22    assert that Quixtar has committed various harmful misdeeds, or asserts purported facts

23    disparaging and discrediting Quixtar as a business. Each of these statements is false, and Quixtar

24    provided evidence of their falsity in the VanderVen Declaration (Ex. D). Accordingly, Quixtar is

25    entitled to discovery on each of these statements.

26    ────────────────────

    [6] Two of these four final Anonymous Speakers also posted false and disparaging
27    statements, and Quixtar also seeks discovery relating to their identities in Section IV.B. Thus,
    there are ten Anonymous Speakers at issue.

28

McDONALD·CARANO·WILSON<br>
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501<br>
P.O. BOX 2670 · RENO, NEVADA 89505-2670<br>
PHONE 775-788-2000 · FAX 775-788-2020

1

       **a.**    **The Court Has Already Ruled that Quixtar Is Entitled to**
               **Discovery on the Speaker of the False Statement that Quixtar**

2
               **"Refused to Pay Year End Bonuses to IBOs in Good Standing."**

3         At the November 12 hearing, Quixtar and the Anonymous Speakers argued at length over

4  the statement on the "Hooded Angry Man" video that Quixtar "refused to pay year end bonuses to

5  IBOs in good standing." Quixtar argued that the statement purported to state a fact, and Quixtar

6  provided evidence that the statement was false. (Dkt No. 212 at 12-13; Ex. A at ¶ 6; Ex. B at ¶¶

7  16-32.) The "Hooded Angry Man" argued that the statement was not actionable because it was

8  true, opinion, parody, and satire. (*See* Dkt. No. 194 at 8.) The Court rejected each of the Hooded

9  Angry Man's arguments and found:

> [I]t seems to me that these are not statements of opinion, that these
> are made as statements of fact, these three statements, and, as far as
> the prima facie case, are raising a material issue of fact. They could
> be considered defamatory I believe. . . . Nobody could say that this
> is satire; nobody could say that this is hyperbole. These are made
> as statements of fact, and given that, I think that Quixtar has met the
> *Cahill* standard, and that it's going to be the order that Mr. Dickie
> has to testify about his knowledge of who's made those statements
> for Hooded Angry Man.

(R. Tr. 11/12/2008 at 23-24.) Accordingly, the Court ordered Mr. Dickie to testify about the

identity of the Hooded Angry Man. (Dkt. No. 330 at 2.)

         In the present motion, Quixtar seeks to compel Mr. Dickie to testify about five different

Anonymous Speakers (Q-Less, I Need Your Help; Q'Reilly; QSSR; The IBO Rebellion; and

Barrister Quixtar Lawsuit) who made the *same false and actionable statement* – that Quixtar

refused to pay bonuses to IBOs who had earned them – on their blogs. Again, Quixtar has

provided evidence that these purported factual statements are false. (Ex. D ¶ 6.) Because the

Court has already found that (1) the statement that Quixtar refused to pay bonuses to IBOs in

good standing purports to present a fact, (2) that statement cannot be considered opinion, parody,

or satire, and (3) Quixtar provided sufficient evidence of its falsity to satisfy *Doe v. Cahill*,

Quixtar is entitled to discover the identities of these five additional Anonymous Speakers. These

statements, and the blogs where the Anonymous Speakers posted them, are:

| No. | Statement | Source |
|-----|-----------|--------|
| 1. | "IBO's [sic] in good standing denied bonuses they earned." | http://q-less-q-less.blogspot.com/2008/04/would-you-trust-these-guys.html, April 9, 2008 (Ex. F at p. 3). |
| 2. | "Apparently [sic] [Quixtar is] also refusing to pay the Q12 or QBI bonuses for hundreds of other IBOs or former IBOs that earned these rewards but happen to be affiliated with the TEAM leadership training system." | http://qreilly.blogspot.com/2007/11/win-for-team-in-texas.html, November 7, 2007 (Ex. F at p. 5). |
| 3. | "Quixtar refused to pay bonuses that many IBOs earned and worked hard to qualify for." | http://qssr.blogspot.com/2008/04/politics-and-war.html, April 10, 2008 (Ex. F at p. 12.) |
| 4. | "I am talking about existing IBOs, those who have NOT resigned, let alone 'taken' others with them. Many of these people have not received bonuses that they qualified for and earned." | http://qssr.blogspot.com/2007/12/success-less-from-home.html, December 12, 2007 (Ex. F at p. 19). |
| 5. | "[Quixtar has] knowingly withheld bonuses earned by their distributors to the amount of millions of dollars this year alone." | http://theiborebellion.blogspot.com/2008/03/cal-to-action-part-2.html, March 20, 2008 (Ex. F. at p. 28). |
| 6. | "Fake customers, refusing to accept resignations, not paying earned bonuses, being big fat liars, and now giving people free renewals in order to trap them in their piece of crap business." | http://theiborebellion.blogspot.com/2008/03/deceit-and-treachery.html, March 7, 2008 (from the comments section, posted by "Anonymous") (Ex. F at p. 45). |
| 7. | "The fact that Quixtar lords over IBO's and can withhold significant bonus money on the mere suspicion of a rules violation is a testament to their totalitarian tactics." <br><br> From the comments to this post by three anonymous posters: <br><br> "From what I've heard, anyone remotely associated with Team will not be getting their bonuses. My upline was due over $20K and he hasn't received his bonus. He didn't sue anybody, didn't disparage anybody, and his family has to suffer." <br><br> "my upline platinum, as well, was due 20K. how dare Q withhold those monies from people who went out, worked their hearts out and earned it!" <br><br> "It's disgusting that they can withhold our money. . . ." | http://barristerquixtarlawsuit.blogspot.com/2007/11/quixtar-can-possibly-be-held-in.html, November 14, 2007 (Ex. F at pp. 57- 58). |

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE: 775-788-2000 · FAX 775-788-2020

| No. | Statement | Source |
|-----|-----------|--------|
| 8. | "Apparantly [sic] they are also refusing to pay the Q12 or QBI bonuses for hundreds of other IBOs or former IBOs that earned those rewards but happen to be affiliated with the Team leadership training system." | http://barristerquixtarlawsuit.blogspot.com /2007/11/simmons-v-quixtar-update.html, November 8, 2007 (Ex. F at p. 60). |

        **b.**     **Quixtar Is Entitled to Discover the Identities of Anonymous Speakers Who Posted Additional False and Disparaging Statements about Quixtar.**

Quixtar has also discovered false and disparaging statements by three additional Anonymous Speakers (Amway Or The Highway Blog, Quixtar Lost My Cents Blog, and the video "Amway Global/Quixtar – Tell Me Sweet Little Lies," which is posted on You Tube), as well as additional false and damaging statements by the Anonymous Speaker QSSR. Each of these statements purports to assert damaging facts about Quixtar, and each is false. Further, Quixtar has provided evidence of causation and damages. (Ex. D ¶ 10.) Under *Doe v. Cahill*, Quixtar is therefore entitled to discovery regarding the following Anonymous Speakers and statements.

(1) The Anonymous Speaker "QSSR" made the following false statements:

- "In the past 15 years, only two couples in the entire U.K. [in Amway U.K.] have succeeded in making an income large enough to leave their outside employment." http://qssr.blogspot.com/2007/12/hubris.html, December 1, 2007.

- "[F]ewer than ½ of 1% (.0025) of all IBOs ever make a profit from their business due to the outrageously high product prices and the untenable compensation plan." http://qssr.blogspot.com/2008/04/politics-and-war.html, April 10, 2008.

- "[Quixtar] refused to allow IBOs to attend trips that were earned and qualified for." http://qssr.blogspot.com/2008/04/politics-and-war.html, April 10, 2008.

http://qssr.blogspot.com/2007/12/hubris.html, December 1, 2007; http://qssr.blogspot.com/2008 /04/politics-and-war.html, April 10, 2008 (Ex. F at pp. 8, 11-12.) These statements are damaging because they purport to state facts that would cause IBOs to wrongly believe that they have almost no chance of being successful if they work for Quixtar, and that Quixtar may take away incentive trips that they earn. As shown in the VanderVen Declaration, each of these statements is false. (Ex. D ¶¶ 6-7.) Under *Doe v. Cahill*, Quixtar is entitled to discover the identity of the Anonymous Speaker behind the QSSR Blog.

1    (2) The Anonymous Speaker "Amway Or The Highway" posted the following statements:

2    • "Amway realizes that it **IS** an internal consumption pyramid. It **KNOWS** that people
3    aren't retailing, and it knows that the government and the courts are going to come
     knocking soon (as in RIGHT NOW in the UK) because such an internal consumption
4    model with overpriced products IS illegal."

5    • "[N]obody can retail the Amway/Quixtar products."

6    http://amwayorthehighway.blogspot.com/2007/10/reading-tea-leaves.html, October 28, 2007

7    (emphasis in the original) (Ex. F. at p. 62.)

8         In its January 15 Order, the Court ruled that statements in the Hooded Angry Man video

9    claiming that Quixtar knowingly violated the law were sufficiently tortious to warrant discovery

10   under *Doe v. Cahill*. (Dkt. No. 330 at 2.)[7]  The statement here, i.e., that Amway realizes that it is

11   an illegal pyramid, is damaging and therefore tortious for the same reason: it accuses

12   Quixtar/Amway of knowingly violating the law. Quixtar has provided evidence that this is false.

13   (Ex. F ¶ 8.) As with the Hooded Angry Man's statements, these statements are also subject to

14   discovery.

15        Similarly, the statement that "nobody can retail" Quixtar's products is tortious and

16   damaging. It does not state that one particular IBO or group of IBOs was unable to retail product;

17   rather, it claims as fact that *nobody* can retail the products because there is something inherently

18   wrong with them. As shown in Exhibit D, this statement is demonstrably false. (Ex. D ¶ 8.) Mr.

19   Dickie should be ordered to testify about Amway Or The Highway.

20        (3) The Anonymous Speaker "Quixtar Lost My Cents" maintained on her blog a comment

21   by "Jason" stating:

22            The problem is you cannot run a legitimate business selling amway
          [sic] products with the prices so high and the profit margin so little.
23        . . . it forces one to build a network and 'sell' to their own network
          of IBOs. . . . Amway is way overboard which is why they only do
24        3.4% retail which puts IBOs at legal risk with the FTC.

25   _____

26       [7] In the January 15 Order, the Court granted discovery on the author of the statements in
     the Hooded Angry Man video that "Quixtar is aware of, approves, promotes, and facilitates the
27   systematic noncompliance with the FTC's Amway rules," and that "Quixtar knows that it violates
     the Amway rules and has disregarded this fact for years." (Dkt. No. 330 at 2.)

28

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  http://quixtarlostmycents.blogspot.com/2007/11/daily-multivitamin-comparison.html,

2  November 14, 2007 (Ex. F. at pp. 83-84). This statement is damaging because it asserts as fact

3  that IBOs cannot run a legitimate, lawful Quixtar business, and that if they attempt to sell Quixtar

4  products, they will be at legal risk. This statement is false (Ex. D ¶ 8), and Quixtar is entitled to

5  discovery on this speaker.

6        (4) The Anonymous Speaker "Amway Global/Quixtar –Tell Me Sweet Little Lies"

7  posted a video on You Tube that contained the following statements:

8        • 67.8% of IBOs that registered last year, did not renew this year.

9        • Only 18.4% of IBOs registered even one person.

10       • 65.6% of IBOs never once attained 100 personal PV in the previous eleven months.

11       • The average IBO had 38.5 PV/month (100 PV is shown in the plan).

12  Amway Global/Quixtar – Tell Me Sweet Little Lies video, posted at www.youtube.com

13  /watch?v=NAwJrP1_ZeE, on September 9, 2007 (Ex. F at p. 88). Each of these statements is

14  damaging because each purports to assert facts showing that Quixtar IBOs are unsuccessful in

15  their businesses. Each of these statements is false. (Ex. D ¶ 9.) Quixtar is therefore entitled to

16  discovery on the speaker of these statements.

17       In short, Quixtar has provided evidence that eight Anonymous Speakers made false and

18  damaging statements about Quixtar in fifteen separate blogs, posts, and videos. Quixtar also

19  provided evidence of causation and damages. Under *Doe v. Cahill* and the Court's prior Orders,

20  Quixtar is entitled to discovery on each and every one of those Anonymous Speakers. The

21  motion to compel should be granted.

22                2.    **Quixtar Is Entitled to Discover the Identity of the Anonymous Speaker**
23                      **"Q'Reilly," Who Posted False and Misleading Statements Designed to**
                       **Enhance TEAM's Reputation at the Expense of Quixtar.**

24       As discussed above, TEAM's Free The IBO Blog hyperlinked to numerous blogs that

25  contained false and disparaging statements about Quixtar that were designed to convince IBOs to

26  quit their Quixtar contracts. In addition, one of the blogs to which TEAM hyperlinked contained

27  false and misleading statements designed to show that TEAM's leaders truthfully reported the

28  events of their August 2007 meeting with Quixtar, and that Quixtar's explanation of what

1    happened at that meeting was untruthful. As Quixtar has briefed elsewhere, on August 9, 2007,

2    Quixtar representatives met with leaders of TEAM to attempt to remediate the TEAM members'

3    repeated violations of Quixtar's Rules of Conduct. (*See* Dkt. No. 141 at 4-5, Ex. C at ¶ 31.)

4    TEAM, however, did not agree to comply with the Rules. On the contrary, TEAM indicated that

5    it intended to form a competing MLM and insisted that Quixtar waive provisions in the Rules

6    prohibiting TEAM's members from competing against Quixtar for six months and from soliciting

7    other IBOs for two years. (*See id.*) When Quixtar refused to allow TEAM to solicit its IBOs in

8    violation of the Rules, TEAM subscribers launched a massive wave of lawsuits and disparaging

9    websites and blogs against Quixtar. (Dkt. No. 141, Ex. C, ¶ 32.)

10        In an effort to persuade IBOs to leave Quixtar and join TEAM, TEAM drew IBO readers

11    of its Free The IBO Blog to the Q'Reilly blog, which contained the following false statements:

12        • "Now. . .we have 2 independent parties that were in the room at the August 9 meeting,
         and both confirm that Orrin and Chris DID NOT 'promise to solicit' IBO's [sic] as
13        Quixtar/Amway has stated. Quixtar/Amway totally jumped the gun and got
         EMERGENCY Temporary Restraining Orders against Orrin and Chris based upon an
14        ASSUMPTION."

15        • "To comply with the rules, Orrin was willing to wait six months before attempting to
         start any other business venture. This is all Orrin wanted, nothing more. It was not
16        his desire to be involved in a lawsuit with the Corporation."

17        • "Randy Haugen (present at the meeting) states: '. . .the next thing I know, they are
         telling untruths about what went on in the meeting. What totally shocked me was they
18        accused us of having an MLM put together, and that Orrin was trash talking them, all
         things that weren't true in any way."

19

20    http://qreilly.blogspot.com/2007/09/lie-the-cover-up-part-1.html, September 26, 2007. (Ex. F at

21    pp. 91-92.) These statements are false. (*See* February 8, 2008 Declaration of Gary VanderVen

22    ISO Motion to Compel, Dkt. No. 54-2, ¶¶ 31-32.) They are designed to convince IBOs that

23    TEAM is an innocent party, and Quixtar a dishonest party, so that IBOs will leave Quixtar for

24    TEAM. And, as shown in the VanderVen Declaration, this strategy was highly successful,

25    contributing to the exodus of tens of thousands of IBOs who left behind years of business with

26    Quixtar to align with a competing MLM in TEAM and ultimately Mona Vie. (Ex. D ¶ 10.)

27        In short, these statements on Q'Reilly are false, and they damaged Quixtar. TEAM's

28    linking to that blog to direct IBOs to read the statements was an integral part of its efforts to bring

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
P.O. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1    IBOs to a competing MLM.  Accordingly, these false statements are actionable and subject to

2    discovery.

3    **C.    Quixtar Is Entitled to Discover the Identities of Speakers Who Posted**
     **Solicitations to IBOs that Were Hyperlinked to TEAM's Blog.**

4

5    Finally, Quixtar has discovered that four Anonymous Speakers whose blogs were

6    hyperlinked to TEAM's Free The IBO Blog (QSSR, Quixtar Lost My Cents, The Q-

7    Whistleblower, and Lives Turned Upside Down) posted direct, explicit solicitations to IBOs to

8    leave Quixtar and join TEAM (we refer to these as the "Solicitation Statements").  These

9    statements are:

10    (1) The Anonymous Speaker QSSR posted the following solicitations on his blog:

11        Here are my predictions for the coming year:

12        — TEAM will launch an MLM-type business opportunity with
        various consumable products –some exclusive to TEAM and some
13        not.  Prices will be competitive and the compensation plan will be
        outstanding.
14
        — Thousands and thousands of remaining Quixtar IBOs will resign
15        from Quixtar when they see the TEAM is going forward.  Many
        people have been just biding their time, waiting for a new business
16        opportunity to launch.

17                                    . . . .

18        — In spite of the resources diverted for legal defense, the TEAM
        will flourish.  Growth will sky-rocket [sic] across the continent.
19        Hundreds will qualify for Round Table.  The year 2008 will herald
        the onset of the first truly mainstream MLM-type business,
20        primarily because of the leadership development side.

21        — Thousands of businesses will flock to affiliate with TEAM.  The
        TEAM headquarters will be swamped with possible partners as
22        companies realize the power of the TEAM community.

23        — Thousands of ordinary men and women will achieve
        extraordinary results in their lives because of their affiliation with
24        the TEAM. . . . people will realize financial success they could only
        imagine.
25

26    http://qssr.blogspot.c om/2008/01/happy-2008.html, January 7, 2008 (Ex. F at pp. 95-96).

27    (2) The Anonymous Speaker Quixtar Lost My Cents posted the following solicitations on

28    her blog:

1
2
3
4
5

> I have only one thing to say to all those wondering about the character of a man like Orrin Woodward. Should I follow this man? Should I believe all the disparaging remarks that are said of him? Read for yourself [hyperlink to orrinwoodward.blog harbor.com]. Read and see if you find the man Alticor would like you to believe he is: A Greedy LOS Stealer! Or do you find a godly man who wishes to offer each and every person the right to succeed under a free enterprise system and in dosing [sic] so preserve this great nation we are all blessed to live in.

6    http://quixtarlostmycents.blogspot.com, November 1, 2007 (Ex. F at p. 105).

7    (3) The Anonymous Speaker The-Q-Whistleblower posted the following solicitations on

8    his blog:

9
10
11
12
13
14
15

> If you haven't been reading Orrin's blog on a regular basis (I'd suggest now is a good time to start checking it daily), you're missing out on some incredible leadership information! But in the near future it sounds like you will also be missing out on some important information about the future from Orrin & Chris. Check out Orrin's post from this morning on his blog.
>
> [Posted from Orrin Woodward's blog]: Traffic on this blog has nearly doubled again. Must be some excitement bubbling up for the mid-February announcements on Chris and my future plans and the MLM Benchmarking Study. . . . Are there any other hungry students desiring to think, discuss, learn, and change out there? IF there are, let's add them to our community.

16    http://the-q-whistleblower.blogspot.com/2008/02/orrinsleadership-blog-is-on-fire.html,

17    February 7, 2008 (Ex. F at p. 106).

18    (4) The Anonymous Speaker Lives Turned Upside Down posted the following

19    solicitations on his blog:

20
21

> • According to Orrin Woodward's Blog, Orrin has been benchmarking MLMs and will be sharing his findings soon.

22
23

> [Excerpt from Orrin Woodward's blog] I benchmarked many companies in the MLM/Networking filed recently. In another month, I will share the results from my benchmarking study. . . . Would a benchmarking study of the MLM/Networking industry be of value to you?

24
25

> One month ladies and gentlemen, then we can have a professional and informed view on what some good choices to make may be for us!

26
27
28

> • "Looks to me like Mona Vie has more than doubled its site traffic in the same amount of time Amway lost over half. Also note that Mona Vie did not gain the same rough numbers that Amway lost, so it was NOT just a shift of distributors from an illegal pyramid to a valid business opportunity. It was more like over 40k IBOs jumping ship from a dangerous endeavor, and several thousand new distributors choosing to join the

world of network marketing while the majority of the 40k that left Amway sit out an illegal non-compete clause."

- [From a comment posted by "amthrax"]: "[W]hy do you have to start your MV [MonaVie] business from scratch?  Were you not able to migrate your entire downline into MV as Orrin did?  HE went from a new MV distributor to Black Diamond in the span of just a few months, so I have to believe that the structure of his downline were transferred over from his A/Q LOS."

http://livesturnedupsidedown.blogspot.com/2008/01/benchmarking-mlms.html, January 16, 2008; and http://livesturnedupsidedown.blogspot.com/2008/04/way-to-decide.html, April 9, 2008 (Ex. F at p. 108).  Mr. Dickie should be ordered to testify about the parties who posted these Solicitation Statements.

As discussed above, TEAM's strategy to solicit Quixtar's IBOs involved two types of statements:  (1) false and highly disparaging statements and (2) Solicitation Statements that encouraged, invited, and urged IBOs to leave Quixtar and follow TEAM.  Essentially, the false statements of fact informed IBOs of purported reasons why they should leave Quixtar, and the Solicitation Statements told them where they should go after they left.  Accordingly, the Solicitation Statements go to the interference.[8]  Quixtar is entitled to discovery regarding the authors of these statements for each of the following reasons.

*First*, the Anonymous Speakers will likely argue that Quixtar is not entitled to any discovery unless it shows that each Solicitation Statement is independently actionable under *Doe v. Cahill*.  This is wrong.  *Doe v. Cahill* provides a threshold test in cases where the plaintiff is aware of potentially tortious speech but does not know the identity of the speaker.  If the plaintiff makes a sufficient showing, he or she is then entitled to compel the identity of the speaker and name him or her a defendant.  That is as far as *Doe v. Cahill* goes; its test is simply used to determine whether the anonymous speaker must come forward and stand as a defendant.  Once the plaintiff satisfies *Doe v. Cahill* and obtains the identity, then nothing in that case stands in the

---

[8] Moreover, Quixtar's IBOs were contractually obligated not to solicit other IBOs.  To the extent that the persons making the Solicitation Statements on the linked blogs were themselves IBOs, TEAM's facilitation of their solicitations constitutes inducement of them to breach their own IBO contracts for the improper purpose of hurting Quixtar and helping TEAM.

McDONALD·CARANO·WILSON℠
100 WEST LIBERTY STREET, 10TH FLOOR · RENO, NEVADA 89501
PO. BOX 2670 · RENO, NEVADA 89505-2670
PHONE 775-788-2000 · FAX 775-788-2020

1   way of the normal rules of discovery. In other words, once the court allows the case to proceed

2   against the defendant, then just as in any other lawsuit, the plaintiff is entitled to full discovery on

3   all of the defendant's activities that are relevant to the claims. In a tortious interference case,

4   once the plaintiff shows that the defendant made tortious statements, he or she is entitled to ask

5   about everything else the defendant did in his or her efforts to interfere. Thus, the plaintiff can

6   ask "What did you say to my distributors to encourage them to leave?" or "What did you post

7   online to encourage my distributors to leave?" Here, TEAM is not an anonymous party; it is the

8   named defendant, and Quixtar has provided evidence that TEAM tortiously interfered. Quixtar is

9   therefore entitled to question Mr. Dickie about any involvement TEAM had (through those acting

10   on its behalf, such as its employees, agents, or leaders) in posting the Solicitation Statements on

11   these four blogs.

12       *Second*, with respect to two of these four Anonymous Speakers (QSSR and Quixtar Lost

13   My Cents), Quixtar has provided evidence above that they posted false and disparaging tortious

14   statements on their blogs. (*See* pp. 12-15, *supra*, and Exhibit F at pp. 8-19 and 83-84.) Quixtar

15   has therefore satisfied *Doe v. Cahill* with respect to those speakers, and they have no First

16   Amendment right to anonymity. Accordingly, Mr. Dickie must testify about the posting of

17   Solicitation Statements by QSSR and Quixtar Lost My Cents.

18       *Finally*, even if it turns out that the other two Anonymous Speakers who posted

19   Solicitation Statements urging IBOs to join TEAM (The-Q-Whistleblower and Lives Turned

20   Upside Down) were not actually acting on behalf of TEAM, but were simply parties who were

21   sympathetic to TEAM, Quixtar is still entitled to discovery regarding any involvement TEAM

22   may have had in those statements,[9] such as creating, editing, contributing to, approving, or

23   posting the Solicitation Statements.[10] Quixtar can also question Mr. Dickie about TEAM's

24

25       [9] It strains credulity to imagine that persons who have *no* involvement with TEAM would
26   nevertheless be so interested in the dispute between Quixtar and TEAM that they would take the
     time to create a blog and post statements encouraging others to join TEAM.

27       [10] To the extent these individuals were not acting at the behest of TEAM and were not
28   otherwise affiliated with TEAM, Quixtar does not seek the identity of these Speakers.

McDONALD·CARANO·WILSON
100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501
PO. BOX 2670 • RENO, NEVADA 89505-2670
PHONE 775-788-2000 • FAX 775-788-2020

1  actions in creating hyperlinks from its Free The IBO Blog that led directly to the sites containing

2  these Solicitation Statements.

3  **V.    CONCLUSION**

4      Mr. Dickie directed traffic on TEAM's blogosphere identifying, promoting, and

5  publishing disparaging statements about Quixtar and explicit solicitations of Quixtar IBOs. Mr.

6  Dickie cannot hide behind the purported anonymity of certain online speakers to cover up

7  TEAM's coordinated campaign to raid Quixtar's distributors. Mr. Dickie should be ordered to

8  testify about each of the purportedly Anonymous Speakers who posted tortious statements and/or

9  Solicitation Statements, as set forth at Exhibit F.

10

11  Dated: March 9, 2009

                                  */s/ Miranda Du*
                                    JOHN FRANKOVICH

12                                      MIRANDA DU
                                    MCDONALD CARANO WILSON LLP

13                                      100 W. Liberty Street, 10th Floor
                                    P.O. Box 2670

14                                      Reno, NV 89505-2670

15                                      CEDRIC C. CHAO
                                    WILLIAM L. STERN

16                                      JAMES M. SCHURZ
                                    SOMNATH RAJ CHATTERJEE

17                                      MORRISON & FOERSTER LLP
                                    425 Market Street

18                                      San Francisco, California 94105-2482

19                                      JAMES SOBIERAJ (IL SBN 6183779)
                                    DOMINIC P. ZANFARDINO (IL SBN 6204603)

20                                      BRINKS HOFER GILSON & LIONE
                                    NBC Tower, Suite 3600 North Cityfront Plaza Drive

21                                      Chicago, IL 60611-5599
                                    Telephone: (312) 321-4226

22                                      E-Mail: jsobieraj@usebrinks.com
                                    and dzanfardino@usebrinks.com

23                                      JAMES K. CLELAND (BN P68507)
                                    BRADLEY SMITH (BN 52,230)

24                                      BRINKS HOFER GILSON & LIONE
                                    524 South Main Street, Suite 200

25                                      Ann Arbor, MI 48104-2921
                                    Telephone: (734) 302-6032

26                                      E-Mail: jcleland@usebrinks.com
                                    and bsmith@usebrinks.com

27

28

*[Left margin vertical text: MCDONALD·CARANO·WILSON, 100 WEST LIBERTY STREET, 10TH FLOOR • RENO, NEVADA 89501, P.O. BOX 2670 • RENO, NEVADA 89505-2670, PHONE 775-788-2000 • FAX 775-788-2020]*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EDWARD J. BARDELLI  (MI SBN P53849)
BRIAN J. MASTERNAK (MI SBN P57372)
WARNER NORCROSS & JUDD LLP
900 Fifth Third Center, 111 Lyon Street, NW
Grand Rapids, MI 49503
E-Mail:  EBardelli@wnj.com
and BMasternak@wnj.com

Attorneys for Plaintiff Quixtar Inc.

1      CERTIFICATE OF SERVICE

2          I hereby certify, under penalty of perjury, that I am an employee of McDonald Carano

3   Wilson LLP and that, pursuant to LR 5-3, on this date I caused to be electronically filed a true and

4   correct copy of Plaintiff Quixtar Inc.'s Motion to Compel Deponent Benjamin Dickie to Testify

5   About Additional Anonymous Online Speakers with the Clerk of the Court using the CM/ECF

6   system, which will automatically e-serve the same on the attorneys of record set forth below:

7   Sharon M. Woods, *swoods@bsdd.com*          Kirk B. Lenhard, *kbl@jonesvargas.com*
    Morley Witus, *mwitus@bsdd.com*              Adam K. Bult, *abult@jonesvargas.com*
8   Daniel LaCombe, *dlacombe@bsdd.com*          JONES VARGAS
    Barris, Sott, Denn & Driker, P.L.L.C.        3773 Howard Hughes Parkway
9   211 West Fort Street, 15th Floor             Third Floor South
    Detroit, MI 48226-3281                       Las Vegas, NV 89169
10
    Wm. Charles Bundren, *cbundren@aol.com*      Daniel J.M. Schouman, *dschouman@gmail.com*
11  Wm. Charles Bundren & Associates            Ryan & Schouman, P.L.C.
    2591 Dallas Pkwy, Suite 300                 1060 E. West Maple
12  Frisco, TX 75034                            Walled Lake, MI 48390

13
    Michael Y. McCormick, *mmccormick@mhn-law.com*   William A. Sankbeil, *was@krwlaw.com*
14  Ronald T. Hancock, *rhancock@mhn-law.com*        Joanne Geha Swanson, *jgs@krwlaw.com*
    Anthony Spaeth, *aspaeth@mhn-law.com*            Kerr, Russell and Weber, PLC
15  McCormick, Hancock & Newton                      500 Woodward Avenue, Suite 2500
    1900 West Loop South, Ste. 700                   Detroit, MI 48226
16  Houston, TX 77027

17  Evan Beavers, *beaverslaw@charterinternet.com*   John Desmond, *jpd@jonesvargas.com*
    EVAN BEAVERS AND ASSOC., P.C.                    Molly Malone Rezac, *mrezac@jonesvargas.com*
18  1625 Highway 88, Suite 304                       JONES VARGAS
    Minden, NV 89423                                 100 W. Liberty St., 12th Floor,
19                                                   PO Box 281
                                                     Reno, NV 89504
20

21
    DATED:  March 9, 2009
22
                                            */s/ Kathleen E. Ryd*
23                                          Kathleen E. Ryd

24

25

26

27

28

## LIST OF EXHIBITS

| Exhibit No. | Description | No. of Pages |
|:---:|:---|:---:|
| A | Quixtar, IBO's use Web to Spar | 2 |
| B | Bitter Amway Fight Has Local Tie | 3 |
| C | List of Fee The IBO Statements (compiled) | 51 |
| D | Declaration of Gary D. Vanderven | 11 |
| E | March 6, 2009, letter from Chao to Schouman | 9 |
| F | List of Actionable Statements (complied blogs) | 121 |
| G | Leadership Tips and Treasures excerpts | 3 |